# PETITIONER'S
# MEMORANDUM EXHIBIT COVER SHEET

Exhibit No. __27__

**DESCRIPTION:**

This Exhibit is Self-Authenticating under the Federal Rules of Evidence, Rule 902, as it is part official court record of the Civil Service Appeal of *"Zepporiah Edmonds vs. Department of Public Works (City of New Orleans)*, Orleans Parish Civil Service Appeal Nos. 8444 and 8485 (combined), with this particular Exhibit entered into the Civil Service Appeal Record on the date of __4/21/16__, as Appellant's Exhibit No. __1__.

**ZEPPORIAH EDMONDS vs. CITY OF NEW ORLEANS, et al**
USDC, E.D., Louisiana, Case No. 16-cv-298

DATE: 06/01/2014

TO: MARK D. JERNIGAN, LT. COL. (RET.)
PUBLIC WORKS DIRECTOR

FROM: ZEPPORIAH A. EDMONDS, CAPP
PARKING ADMINISTRATOR

RE: RESPONSE TO VERBAL COUNSELING

---

This correspondence will serve as a response to the Verbal Counseling Session that was held in your office on May 20, 2014. At your request, Mr. Nguyen Phan, the department's senior classified employee attended this meeting. This correspondence will also serve as my official written response to the Counseling Form that I received from you via email on May 27, 2014.

The following issues were discussed and documented:

- My statement to you concerning my meeting with Deputy Mayor Grant and how that meeting caused me to be tardy to the Algiers Point RPP public forum on April 15, 2014
- What you cited as my failure to respond timely to requests for information
- HR Director, Linda Copeland

### 1) Late Arrival to Algiers RPP Public Forum

On Tuesday, April 15, 2014, I received a telephone call from Sabrina Hill, Special Assistant to Deputy Mayor Grant. Ms. Hill informed me that she had rescheduled my meeting with Mr. Grant from Wednesday, April 16, 2014 to this same day at 5:00p.m. When I arrived to Mr. Grant's office, Ms. Hill informed me that Mr. Grant was in another meeting, but that it should be ending shortly. I then informed her that I had a Public Meeting for 6:00p.m., but she was confident that Mr. Grant would start our meeting very shortly. Although my meeting with Mr. Grant started late, I anticipated that it would end in enough time for me to make the Public Meeting. As with all meetings with Mr. Grant, I did not bring in my cell phone. During our meeting, I said to Mr. Grant that I had another meeting. Our meeting did not end until approximately 6:00p.m.

On Wednesday, April 16, 2014, we met in your office to discuss my tardiness to the Public Meeting that was held on Tuesday, April 15, 2014. When you asked me to explain why I was late for the meeting, I responded as follows:

> "With a short notice, I was contacted by Sabrina Hill that I had a meeting with Mr. Grant in his office. A confidential matter was being discussed in this meeting. I did not have my cellphone with me because I never bring it in meetings with Mr. Grant. I informed

Copyright ©2016 eClinicalWorks. All rights reserved. version 6.2

> Mr. Grant that I had another meeting, but he motioned for me to continue speaking as we were in the midst of discussing a very serious personnel issue. Once our discussion concluded, the meeting ended and I headed for the Public Meeting in Algiers." I further stated, "I hope that you have enough confidence in me that you trust what I have stated. However, if you find it necessary, I request that you please confirm my statement with Mr. Grant." I then stressed, "In hindsight, I wish that I had taken my cell phone in this particular meeting so that I could have texted you regarding my status. I regret my unexpected tardiness and accept full responsibility for not contacting you."

I did not state nor implied that the Deputy Mayor did not "release" me from his office although I informed him that I had a Public Forum. Rather, I stated to you that Deputy Mayor Grant could confirm that I was indeed at 1340 Poydras until approximately 6:00p.m. on Tuesday, April 15, 2014.

## 2) Failure to Respond Timely to Requests for Information.

There was no mention of me being non-responsive to other DPW staff members who request/need information to complete actions/tasks that benefit the department as a whole. I cannot recall an instance when I have been non-responsive to any of my colleagues or other DPW employees who make reasonable requests for assistance and/or information. Many of my colleagues in DPW understand the demands of my job duties and usually call me for assistance. Furthermore, I am a long-term, proud employee of this department and would never intentionally operate in a manner that would compromise DPW's best interest.

You did state in the meeting that I had been non-responsive to requests/emails for information from Linda Copeland and Cheryn Robles. As I explained, Cheryn's emails are often duplicates from the City Council, Mayor's Office, and sometimes directly from citizens. I also explained that Sherida Emery often communicates with Cheryn by telephone.

A few months ago, I informed you that Cheryn had been calling and sending emails "instructing" us to void parking tickets for DPW employees who had violated the City Code relative to employee parking decals. I did not respond in writing to Cheryn, but asked if you would speak with her about sending emails in reference to our office taking this type of action. I shared with you that I would not respond to emails from Cheryn and another individual when requests are made to operate outside of the City Code. This also includes continued requests for parking decals for DPW staff who do not meet the eligibility requirements for field employees.

Still, I guaranteed that my responsiveness to Cheryn would improve and have already taken steps in getting these improvements underway. In addition, I will pause from whatever tasks I am working and acknowledge Cheryn's emails, which will include providing a status to her request for information. Moving forward, I will personally respond or appoint a designee from my office to respond to Cheryn in a timely manner.

### 3) Non-responsiveness to Linda Copeland and Other Related Concerns.

I do agree that during the "Verbal Counseling Session," you expressed your concern relative to my non-responsiveness to Linda Copeland. You mentioned a few specific instances in which I did not respond to her emails and/or requests for information. I provided feedback for each incident that you cited. In reading the "Verbal Counseling Form," I noted that much of my response in reference to Ms. Copeland was not included. Listed below are my complete response and the additional comments that I offered:

> Communication Issues. "Ms. Copeland has not communicated well with me since my supervisory staff and I would not agree to participate in her quest to disconnect Deputy City Attorney, Elizabeth Robins from DPW because of her personal dislike for Ms. Robins. What started out as a very cordial working relationship with Ms. Copeland became challenging immediately after I reported directly to you that Ms. Copeland blatantly stated that she, **'hated Elizabeth'** and because she, **'absolutely could not stand that woman'** she, **'refuse to work with her.'** Therefore, I did not agree with the proposed change in our working relationship with the Law Department because it was based on Linda's personal feelings and would be detrimental to the Parking Division's operations."
>
> *You responded that you had already addressed this with Linda and asked if she had mentioned any negative comments about Elizabeth Robins again. I replied, "No, but she continues to interact with me in a very negative manner and attempts to undermine my authority as Parking Administrator because I reported her unprofessional comments about Ms. Robins directly to you."*

I further stated, "Ms. Copeland continues to give contradictory and incorrect information to staff that is causing confusion in the workplace; all of which I have had to spend time to correct. I cited two instances: 1) She incorrectly stated to staff that you had 'signed off' on an increase to their uniform allowance, which actually falls under the authority of the CAO. 2) She gave incorrect information to managers and supervisors in reference to the City's Substance Abuse Policy. When the correct guidelines were given, Ms. Copeland responded in a very unprofessional manner, 'well we need to bring that policy to the jailhouse so that Nagin can change it.' "

*I reminded you of our previous conversations regarding Ms. Copeland's need to gain better knowledge of CAO Policy Memoranda, Civil Rules and Departmental Policies and Procedures prior to meeting with staff. I stated directly to you that it appears she is responding to questions and comments based on personal thoughts and opinions. As a tenured DPW employee, I also offered to work with Ms. Copeland in any area you directed. You said that you would think about it and let me know; however, you have never followed up with me on this matter.*

3

Operational Issues. I also expressed, "Ms. Copeland gets involved in matters that are not related to her duties as the Human Resource Director. She attempts to interact directly with my staff on operational matters, which has resulted in confusion." I cited the following instances: 1) During the Jazz and Heritage Festival, she called Towing Section Manager Robert Otis and instructed him to tow a vehicle, per a request from the Mayor's Office. Mr. Otis had the vehicle towed, but admitted afterwards that the tow was questionable. Upon investigation it was determined that the vehicle was not in violation. Mr. Otis stated, "When Ms. Linda called and said that the Mayor had requested it, I didn't know what to do." Col., I expressed to you that Ms. Copeland should have called me with this issue. 2) Ms. Copeland called me in reference to a citizen's complaint that had been previously addressed in our office. I informed her that the City Code, which governs our operations, did not allow us to release booted vehicles in the manner that she suggested. I asked her to have the citizen to contact me directly once his fines and fees were paid and that I would take the necessary action to expedite an assisted release of his vehicle. Instead, she called our Communications Office, attempting to direct staff to work outside of our normal process for releasing booted vehicles. Deputy Mayor Grant's office had also recommended that she work this issue directly with me. After being informed by Mr. Grant's office and my staff that her request had to be approved by the Parking Administrator, she finally called me and the situation was resolved properly. It was obvious to my staff that Ms. Copeland was attempting to undermine my authority on this issue.
*You stated that you heard a "different story" about the booted vehicle but gave no detail.*

Request for Emergency Contact Information. I stated, "These forms were emailed and hardcopies were brought to the Human Resource office."
*At the time that I made this statement I believed that the forms had been forwarded in this manner. I also believed that copies of the completed forms for the employees who Linda named were emailed to her after she made the 2nd request for this information. I did not learn until after our meeting that Earlette Johnson, who was tasked with this assignment, had actually hand delivered all originals to the HR office upon the first request. The documents were never emailed because the files were too large and she did not know how to separate them into individual files. I then instructed her to print each file and bring them to Human Resource. She agreed to do so, but when I followed up with her, she stated that she got sidetracked with issuing permits, interacting with citizens and working with Duncan on field operations that she got sidetracked. I then stopped what I was working on and personally sent the forms to Linda.*

Progressive Discipline Policy. I responded, "I was surprised to see that Ms. Copeland wrote this policy and disseminated it outside of DPW for review and comment after you stated to me in her presence that all Division Heads would be involved in a preliminary discussion prior to the development of such policy." When I asked why there was no

4

input from your Division Heads who would be charged with executing such policy you responded, "Well Linda asked for your comments." I then replied, "Yes, after it disseminated to the Law Department and Civil Service prior to any internal discussion, which is not what we discussed."
*You offered no further comment.*

Request for Sprint Account Information. On April 24, 2014, in following our normal process that was established per your direction for employees to reimburse the City for lost or damaged equipment, the Parking Division prepared and submitted for your review and approval, a document holding PCO Jamie Robiho responsible for the cost of her lost city issued cell phone. After a few weeks had passed, I asked you for a status and you responded that you had Linda looking into the cost to see if it was correct. I reminded you of the process we had in place and that how this matter had been vetted with the Law Department and the CAO's Office. You responded that you still wanted Linda to look into the correct cost of the phone and that you were going to have her to call me. I had not heard anything further until May 16, 2014. Auto Facility Supervisor Alton Jones called and informed me that Linda called him directly for information and with questions that he believed should have been directed to me. Alton stated that in order to avoid the miscommunication that he has encountered in the past, he asked Linda to call me directly. I did not receive a call from her, but at some point during this same day she sent me an email asking for PCO Jamie Robiho's cell phone number.

Email Responses on May 16, 2014. I explained, "I spent most of my workday on teleconferences with the Duncan Group, discussing the transition and implementation of our ticket processing services. In between, I had to address and respond to a constituent's complaint that I received from Deputy Mayor Grant's Office. Then later, I had to prepare a response directly to Deputy Mayor Grant about this same constituent's concern. By the time I had attended to all of the above, I checked my emails and responded to Ms. Copeland's requests beginning with a status of her request for a parking permit for a new DPW employee.

I continued to explain, "I discontinued interacting with Ms. Copeland on Friday, May 16, 2014 because of the conduct she displayed after I informed her via email that the employee did not qualify for a parking decal. Again, she attempted get involved in operational issues, which are outside of her job scope by stating how 'she thinks' the application process should be followed for employee parking decals and that she would meet with me later to discuss her change to the process. I also explained to Ms. Copeland that the process for employee decals was governed by the City Code and under the direction of a CAO Circular Memorandum for which she has no authority to change. Once I sent these responses to Ms. Copeland, I noticed that the tone of her emails and her continuous communications to me were becoming highly unprofessional. Therefore, I chose to not engage in this type of exchange as it would have resulted counter-

5

productively for me. I believed that my time would be better spent focusing on my responsibilities and duties as Parking Administrator.

*When I asked if you had taken note of Ms. Copeland's conduct and professional mannerism, you responded that you had "spoken" to her about it and offered no further comment on this issue.*

<u>Linda Copeland and Office Visits.</u> I responded, "I have never directly nor indirectly stated, implied or created the impression amongst any Parking staff that Ms. Copeland is not welcome on the 8th floor of the Amoco Building and that they were not allowed to visit the 6th floor of City Hall to meet with her. If Ms. Copeland needs to visit a roll call for a HR related matter, it should be coordinated through me. If staff needs to visit the HR office for any work related matter, it must be coordinated with the supervisory staff as these visits will impact our field operations. Unless urgent, all non-work related visits to HR must take place while employees are off duty." You agreed with this process. I then stated that I would take immediate action to clear up this possible misperception, which I did on the following day during roll call with all Parking Division staff. *As a reminder, a few days earlier, I referred PCO S. Covington to the HR Office to discuss an FMLA issue. My actions with this matter should help to serve as proof that this particular allegation is without merit. Apparently, the process that we agreed to was not communicated to Ms. Copeland. A few days after my "Verbal Counseling Session," she sent me an email contradicting what you and I discussed.*

Col., on numerous occasions I have expressed my concerns about Ms. Copeland's continued efforts to undermine my authority as Parking Administrator as well as her attempts usurp the Parking Division's operations in order to assert her personal thoughts and opinions, which are often outside of the City Code and CAO Policies. I have also pleaded with you for clear and specific directions relative to the function of the Human Resource Office and have asked if the direction of my duties and the Parking Division had changed or if changes were in progress. Each time I have asked, your response has always been the same, "my direction for you and the Parking Division has not changed."

During the "Verbal Counseling Session," I referenced some information that I reported directly to you about Ms. Copeland that was reported to me from some of my frontline staff. I received information that prior to Ms. Copeland's report date, an acquaintance of a staff member observed her outside of a city office announcing that she was the new HR Director in DPW now in charge of hiring and firing in Parking and that she was hired to "clean house in the Parking Division." As I stated on Tuesday, May 20, 2014, I now deeply regret reporting this incident to you. I am convinced that the sudden change in your evaluation of my work performance results from me reporting to you matters that I both witnessed and were reported directly to me. I have stated to you and directly to Ms. Copeland that her actions are causing confusion in the workplace and continuously present challenges for me as the Parking Administrator. I have also made you aware that the manner in which Ms. Copeland conducts business continues to be distracting and

time consuming. I added that I believe that many of her actions are outside of her responsibilities and duties as the HR Director. Instead of resolutions and/or clarifications, these issues are becoming progressively worse.

I then asked, "As DPW's Director, do you believe that Ms. Copeland is working within her job scope?" You responded that Linda Copeland was hired for the following purposes: 1) To supervise the administrative staff on the 6th floor. 2) To clean up and modify the filing system in DPW. 3) To get a better handle on the hiring process in DPW. You further stated that Linda was not hired for any other purpose. I again asked, "Have these duties been explained to Linda as she is working well beyond this scope?" *You offered no response.*

The "Verbal Counseling Session" concluded with me requesting to meet with Deputy Mayor Grant to clarify the events of April 15, 2014 and to discuss the communication issues that I have been experiencing with you for the past few months. I also reminded you that I have made you aware on numerous occasions of my increased responsibilities in the workplace, supporting special events, and other related duties; all of which have significantly impacted my availability to respond. You have acknowledged your awareness. Per our the discussions that we have held over the past few months relative to my increased duties, my extensive working hours are chronicled weekly on my time sheets. I have requested that you refer to them if needed and you have stated that you would use these records as a basis for me to be compensated for my increased workload and duties. I have also included a copy of the Parking Division's Organizational Chart. The highlighted areas are the duties that I have been performing daily, along with my duties as Parking Administrator. Again, I ask for consideration of my workload and once again request that a job study be conducted for the Parking Administrator's position. I stated, "Nevertheless, even under my current working conditions, I still commit to improving in the area of responding and following up more timely."

I am looking forward to the 90-day review where you will assess my progress. Hopefully, this assessment and evaluation will happen from <u>your personal perspective and observation</u> of my work performance as in the past. I pledge to communicate my work activities to you in writing, with hopes that I will get clear, direct and necessary feedback. In this, I can continue my proud, long time service as a DPW employee with an impeccable work history.

# PETITIONER'S

# MEMORANDUM EXHIBIT COVER SHEET

**Exhibit No.** _28_

## DESCRIPTION:

This Exhibit is authenticated as it is part of the personal employment-related papers of the petitioner ZEPPORIAH EDMONDS saved by the petitioner for her personal records, with these documents either generated and authored by her as part of employment with the defendant employer CITY OF NEW ORLEANS, or, are e-mails or communications either sent by her or received by her in the course and scope of her employment with the defendant employer, or, are documents sent by her in relation to her complaints or notices to several agencies regarding her concerns about the potential unlawful behavior of her employer regarding the bidding of a certain contract as explained in this memorandum. The defendant in this matter possesses each and every one of these documents in their records of the Petitioner's employment tenure and/or notices made to them by the Petitioner which is the subject of this litigation.

*ZEPPORIAH EDMONDS vs. CITY OF NEW ORLEANS, et al*
**USDC, E.D., Louisiana, Case No. 16-cv-298**

## Sherida M. Emery

**From:** Zepporiah Edmonds
**Sent:** Tuesday, April 15, 2014 3:43 PM
**To:** Sherida M. Emery
**Subject:** FW: Promotions for Sherida Emery and Earlette Johnson

---

**From:** Linda L. Copeland
**Sent:** Friday, April 04, 2014 8:58 AM
**To:** Zepporiah Edmonds
**Cc:** Mark D. Jernigan
**Subject:** RE: Promotions for Sherida Emery and Earlette Johnson

Good morning, Zepporiah, I apologize if I spoke to them out of turn and left you out of the loop. They both spoke with me directly about not getting their pay for a promotion that they were told was done in January. Deidre has been out most of this week so I could not check with her. I looked through the P1s that she had given me and could not find a P1 on them. Then I went to Civil Service to see if they had processed P1s for them and after their research, they told me they had not received any P1s. Both Sherida and Earlette are your most senior supervisors and I guess I mistakenly assumed I could speak with them directly about this. Now that we are communicating about this issue, and since Deidre is still out sick today, what is the status of their promotions? Were P1s processed for approval in January? If so, were they then held up for some reason? Both of these women were apparently told they were being promoted by someone, certainly not by me. If they were informed they were being promoted and then it didn't happen for whatever reason and no one told them, then there is indeed a problem with communication.
Are you in today? If so, Col. Jernigan would like the three of us to meet if it is possible with your schedule. Thanks, Zepporiah and sorry for the confusion.

---

**From:** Zepporiah Edmonds
**Sent:** Thursday, April 03, 2014 6:58 PM
**To:** Linda L. Copeland
**Cc:** Mark D. Jernigan
**Subject:** Promotions for Sherida Emery and Earlette Johnson

Hi Linda,

As our new HR Manager, I appreciate your goal to get employees who are on active promotional registers promoted. This is a great morale booster for employees who have performed well and incentive for those who have not done well to improve their performance. However, I must request that you modify the manner in which communication(s) regarding promotions is disseminated. Whether promotions are pending or our employees are on a promotional register, I am requesting that you just interact with me directly. I will determine when the employee is to be notified that they are being recommended for a promotion. This recommendation will be based on the employee's overall job performance and not just because he/she is on a promotional register. Once the recommendation for promotion is approved by Col. Jernigan, I should also be kept in the loop regarding the status and when the promotion is finalized.

Today, I had to address some serious morale issues with employees because of conflicting information that they received. Specifically, I spoke with you privately about Sherida and Earlette's promotion and asked that you follow-up with me; however, you did not provide me with the information I requested, but informed them that there was no record of their P1 promotional forms in Civil Service. This was a huge blow to their morale. It also contradicted what was told to them in January by the HR Office and by me. Had you shared this with me prior to speaking with them, I

1

could have enlightened you on what I knew about the steps that Deidre had already taken. It would have also afforded me the opportunity as their Administrator and immediate supervisor to have a specific conversation with them that could have made this situation much more bearable. The rapport and long standing working relationship that I have with these employees helps significantly in a situation such as this one. It is also my duty and responsibility as the Administrator of this division to communicate clearly and honestly with staff. If these 2 employees did not have confidence my integrity, this could have caused them to question my credibility.

Moving forward, I must insist that this protocol be followed. I also have other concerns that I will need to discuss with you and my direct report, Col. Jernigan. We were off to a fresh start and I am determined to keep the positive momentum going. A meeting invite will follow.

Thanks,

Zep


*Zepporiah A. Edmonds, CAPP*
Parking Administrator

City of New Orleans
Department of Public Works
Parking Division

1340 Poydras St.
8th Floor, Suite 801
New Orleans, LA 70131

504.658.8200 (Office)
504.658.8202 (Fax)

2

# PETITIONER'S MEMORANDUM EXHIBIT COVER SHEET

Exhibit No. __29__

**DESCRIPTION:**

This Exhibit is Self-Authenticating under the Federal Rules of Evidence, Rule 902, as it is part official court record of the Civil Service Appeal of *"Zepporiah Edmonds vs. Department of Public Works (City of New Orleans)*, Orleans Parish Civil Service Appeal Nos. 8444 and 8485 (combined), with this particular Exhibit entered into the Civil Service Appeal Record on the date of __6/30/16__, as Appellant's Exhibit No. __3__.

*ZEPPORIAH EDMONDS vs. CITY OF NEW ORLEANS, et al*
USDC, E.D., Louisiana, Case No. 16-cv-298

# OFFICE OF INSPECTOR GENERAL
# CITY OF NEW ORLEANS



ED QUATREVAUX
INSPECTOR GENERAL

Zepporiah Edmonds
Operations Chief Parking Division
Department of Public Works
1300 Perdido Street
New Orleans, Louisiana 70112

Re: <u>Request for Documents</u>

Dear Ms. Edmonds:

    We request your cooperation and assistance, pursuant to Article XIII of Chapter 2, Sections 18 and 20, of the Code of the City of New Orleans and Chapter 44 of Title 33 of the Louisiana Revised Statutes, Section 9613, in providing this office with the following documents and information in the possession, custody, or control of the City of New Orleans or any department, agency, board, commission, or public benefit corporation thereof:

1. Copies of all documents related to the Curbside Management and Enforcement Request for Proposals (RFP) to provide Parking Ticket Processing, Meter Operations and Delinquent Collections.

2. Copies of all documents related to any supplemental documents produced after the Curbside Management and Enforcement RFP was issued including documentation related to the evaluation of RFP responses, documentation of the City's selection process and all correspondence and communication with vendors.

3. Copies of all email communications sent by or received from Col. Mark Jernigan, Mary Kay Klienpeter-Zamora, Arcebia Matthews, Cedric Grant, Zepporiah Edmonds, Michael McKenna, Edward Kerkow, Allen Square, Andy Kopplin and Norman Foster *regarding* all the vendors that responded to the RFP including Duncan Solutions, Affiliated Computer Services, ACS and Standard Parking.

    I can be reached at (504) 681-3263 or via email at hschwartz@nolaoig.org. Please contact Investigator William Bonney at (504) 681-3207 or via email at wbonney@nolaoig.org to coordinate the transmittal of documents and information pursuant to this request. You may also contact him if you have any questions regarding this request.

525 ST. CHARLES AVENUE | NEW ORLEANS, LOUISIANA | 70130-3049
Phone (504) 681-3200 | Fax (504) 681-3230



I am requesting that these documents be provided on or before July 2, 2012. Thank you again for your continuing cooperation and assistance with this matter.

Sincerely,

Howard Schwartz
1st Assistant Inspector General for Investigations
City of New Orleans
Office of Inspector General

cc: Andrew Kopplin, First Deputy Mayor & Chief Administrative Officer
cc: Allen Square, Chief Technology Officer, Office of Information Technology & Innovation

This correspondence is part of an ongoing investigation, examination, audit, inspection, or performance review and is exempt from the Public Records Act until the investigation, examination, audit, inspection, or performance review is complete. See La. R.S. 33:9614 and La. R.S. 44:4.1(B)(18). Please notify this office immediately should you receive a Public Records Request which includes this correspondence.