# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF THE STATE OF LOUISIANA

**Zepporiah Edmonds**                **CIVIL ACTION  No.    16  cv  00298**

**VERSUS**                          **JUDGE:              LeMelle**

**City of New Orleans,**            **MAGISTRATE:**
**Mark D. Jernigan and**
**Linda Copeland**

FILED: _____          _____
                                                      DEPUTY CLERK

## SECOND SUPPLEMENTAL AND AMENDING  COMPLAINT AND PETITION   FOR   DAMAGES

The petition of ZEPPORIAH EDMONDS, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana, files here her Second Supplemental and Amending Complaint/Petition for Damages, which does with respect represent the following:

1

## RECENT PROCEDURAL HISTORY SONCE THE COURT ORDERS OF OCTOBER 18, 2017, Rec Doc. 112

This Second Supplemental and Amending Complaint/Petition is filed, with proper pleadings seeking leave of Court to file same,  pursuant to Court Orders of October 18, 2017, Rec. Doc. 112, which instructed Petitioner to file her accompanying Motion to Reopen (This) Case AFTER the conclusion of all state court proceedings. The Procedural History of the state court proceedings, now exhausted - less certain State Tort Claims and Whistleblower Claims remaining in State Court and previously, specifically severed from this matter by this Court's previous orders, are as follows:

1. In the period since directed by this Court on October 18, 2017, Rec. Doc. 112 to file these motions upon completion of state law proceedings, Petitioner's Appeal of her Termination was heard and ruled upon by the City of New Orleans Civil Service Commission. A Hearing Examiner for the Commission heard testimony over a period of nine (9) days between April 21, 2016, and March 13, 2017. On August 2, 2017, the Hearing Examiner rendered a written report concluding "that the DPW failed to prove by a preponderance of evidence that [Ms. Edmonds'] emergency suspension and termination were for cause."

2. On September 5, 2017, the Commission rendered its decision, summarily rejecting three of the four grounds sought by the defendant employer CITY OF NEW ORLEANS used to Terminate the Petitioner from her position as Parking Administrator in the Department of Public Works, and on the fourth charge holding

2

that her alleged misconduct DID NOT rise to a level justifying her Termination, but a lesser discipline, with the Commission holding that Petitioner "did engage in misconduct" regarding the OIG investigation, but that "such misconduct did not warrant termination." (see related pleadings filed here, Motion to Re-Open Case, attached Exhibit #1) The Commission therefore remanded the matter back to the hearing examiner to determine the appropriate level of discipline. The Hearing Examiner then concluded that an appropriate penalty could be recommended based on the record and his personal experience, with reference to the New Orleans Police Department Penalty Matrix, the Hearing Examiner accordingly recommended the Petitioner be assessed a one-day suspension.

3. It is worth noting that the City of New Orleans Civil Service Commissioners deciding the Petitioner's Appeal of her Termination from employment was decided and signed in mid-August, 2017 (see related pleadings filed here, Motion to Re-Open Case, attached Exhibit #1), but that the Civil Service Commission suspiciously did not release that decision until September 5, 2017, during the very hours that this Court had previously ordered – ka deadline known to all counsel in this matter for approximately TWO MONTHS prior to September 5, 2017 – where this Court charged the Petitioner and her Counsel to provide a very detailed and exhaustive memorandum and attachments to This Court in deciding the Petitioner's original submission and hearing of her 2017-filed Rules 59-60 Motion to Reconsider.  The Civil Service Commission – adjunct to the defendant CITY OF NEW ORLEANS and the with many members and staffers appointed by and aligned with the  then-

Landrieu Administration, as was the City Attorney working to oppose the Petitioner here and enrolled at all times as defense counsel here – held back the Commission's October, 2017 decision favoring the Petitioner for some THREE WEEKS after the last Commissioner signed that Order/Judgment, releasing the decision when it was too late to incorporate it into the Petitioner's pleadings filed September 5, 2017 despite the Commission's findings revealing to all that the "causes" alleged for the Petitioner's Termination were specious and baseless. Essentially, the Landrieu Administration – the main defendant here – held back the Commission's decision that was very helpful to the Petitioner and to this Court for THREE WEEKS until AFTER the Petitioner's Memorandum that was due on September 5, 2017 was already filed with this Court.

4. On November 16, 2017, the Commission revisited the discipline to be metted out to the Petitioner and then rendered a second 2-1 decision (See related Motion to Re-Open Case, attached Exhibit #2). The majority declined to follow the recommendation of the hearing examiner. However, the Commission agreed several mitigating factors existed, to wit: a lack of prior discipline during Ms. Edmond's thirty-two (32) year career at DPW; her prior cooperation with OIG investigations; her "serious personal illness;" and indications that she had been "overwhelmed" by her workload during the relevant period. Nonetheless, the Commission reaffirmed its position that Ms. Edmonds' engaged in "serious misconduct" and accordingly found "involuntary demotion to a lower classification" to be an appropriate penalty. The Commission ordered DPW to reinstate Ms.

Edmonds to the position of Assistant Parking Administrator "at a step that would result in no greater than a $3,000/yr. reduction in salary."

5.  Both Petitioner and DPW  then appealed the decisions of the Commission to the Louisiana Fourth Circuit Court of Appeal, the venue for such appeals. Specifically, Petitioner sought a review of the Commission's September 5, 2017 decision finding she engaged in misconduct warranting discipline with respect to the OIG investigation, arguing the Commission "manifestly erred" in making several findings. She further appealed her demotion, arguing such discipline is not commensurate with the conduct in question. DPW also appeals the Commission's decision regarding Ms. Edmonds' discipline, DPW suggesting that its decision to terminate was indeed warranted.  Petitioner also appealed the Commission's denials of her motions to reconsider its decisions.

6.  On December 5, 2018 the Fourth Circuit Court of Appeal three-judge panel ruled unanimously in your Petitioner's favor, holding that the Commission had committed "manifest error" in demoting and disciplining your Petitioner, and in a total victory for the Petitioner reversed the Involuntary Demotion of your Petitioner, specifically holding that:

> "we agree with the Commission's finding that termination was not appropriate under the circumstances. However, we find that the Commission manifestly erred in finding that DPW proved by a preponderance of the evidence that Ms. Edmonds engaged in any activity or conduct detrimental to the efficient operation of DPW. Accordingly, we additionally find the imposition of any discipline unjustified." ….

Accordingly, we find that the Commission correctly reversed the DPW's termination of Ms. Edmonds, but abused its discretion in assessing discipline in the form of a demotion. The Commission manifestly erred in finding that Ms.Edmonds' engaged in any conduct that was detrimental to the efficient operation of the DPW.

Fourth Circuit holding of December 5, 2018,
(Pages  11 and 16, attached Motion to Re-Open Case, Exhibit #3).

The Petitioner has prevailed in her Civil Service Appeal of her Termination, and in seeking be restored to her previous position of employment as Parking Administrator within the Department of Public Works, employed by the City of New Orleans. However, venue of a Civil Service Appeal limits by law the to a very narrow recovery of lost wages in the form of back pay, and restoration of her position, no matter how abusive and discriminatory her Termination and Harassment and Hostile Work Environment amounted to.   Any recovery of General Damages, tort recovery, special damages beyond back pay owed, attorney's fees and other damages must be recovered here, through Court litigation, and the Petitioner respectfully prays this Court find that pursuant to federal law, the Petitioner has properly stated viable, recoverable claims, and that this Court find there exist adequately stated claims justifying this matter going forward to trial or compromise herein.

## STATEMENT  OF  JURISDICTION

6

Petitioner is a resident and domicile of Orleans Parish and the State of Louisiana, within this district.  All violations, torts and disputes alleged herein involve FEDERAL statutes, laws and acts, with only one pendant state law claim remaining herein which involves an ongoing tort with the most recent occurrence less than one month ago. All torts and violations alleged herein that are in contention here occurred at her place of Employment as an employee of the defendant CITY OF NEW ORLEANS, and are made against the defendant employer as well as her co-workers named defendant herein. All federal administrative remedies have been followed and exhausted prior to the filing of the amended complaint/petition for damages. The defendants and the location of said torts and offenses occurred within Orleans Parish and the State of Louisiana, also within this district.  Plaintiff here timely seeks to amend her original Petition/Complaint to add the additional employment related claims and allegations made in her TWO additional EEOC Complaints filed by her and where the EEOC then issued to her Right to Sue letters  - since the filing and service and defendants Answer of her original Petition/Complaint. All claims here involve these same plaintiffs making claims against those same defendants named in the original Petition/Complaint herein, with additional allegations and torts alleged here made against these same defendants which occurred in the employment, workplace and wrongful termination of the plaintiff ZEPPORIAH EDMONDS who was employed at all times herein by the defendant CITY OF NEW ORLEANS until her termination. The claims made here via amending this Petition/Complaint involve claims made in addition to those made in the FIRST EEOC Complaint and then allowed via this Court in proper follow-up in filing the original

Petition/Complaint, claims and allegations properly alleged in plaintiff ZEPPORIAH EDMONDS SECOND and THIRD EEOC Complaints, which then had "Right to Sue" letters issued by the EEOC to plaintiff in letters dated September 26, 2016 (and received by on September 28, 2016), and with those additional allegations now sought made part of this pending litigation via amendment of this original Petition/Complaint in full timely comportment with the FRCP and the Administrative Process pursuant to EEOIC Claims and related subsequent federal court litigation.

Plaintiff filed her original Petition/Complaint on January 12, 2016 (Please see case Doc. 18) after filing her FIRST EEOC Complaint on November 4, 2014 (Please see case Doc. 35) and then receiving her Right to Sue letter from the EEOC on October 20, 2015 (Please see case Doc. 35).

After filing suit against the named defendants, and after motion practice to remove certain portions of her allegations and claims as untimely or premature, this Court ruled that the plaintiff had properly followed the administrative process and had properly exhausted all administrative remedies in alleging claims for federal jurisdiction employment discrimination claims regarding Race, Retaliation, and Hostile Work Environment, claims that this Court allowed to go forward after dismissing alleged pendant state law claims as well as claims of Wrongful Termination on the basis of the administrative remedies not yet being exhausted. The Court also dismissed (in error, as contended by the plaintiffs) the plaintiff's claims of Age Discrimination alleged in her original Petition/Complaint, despite the plaintiff alleging same in BOTH her FIRST EEOC Complaint and her original Petition/Complaint.  .

Plaintiff filed her SECOND EEOC Complaint with the EEOC on July 15, 2015 (Please see attached Exhibit 1), with given EEOC Docket Number 461-2015-00167, alleging additional items and incidents of Retaliation and harassment and hostile working environment against the same original defendants relative to her employment with the defendant CITY OF NEW ORLEANS, in her allegations the Retaliation caused by the filing of her original or FIRST EEOC Complaint against these same defendants. Plaintiff then received her "Right to Sue" Letter from the EEOC on September 28, 2016

Plaintiff filed her THIRD EEOC Complaint with the EEOC on April 13, 2016 (please see attached Exhibit 2), alleging additional items and incidents of Racial Discrimination, Retaliation, and Disability Discrimination, as well as for Wrongful Termination,  and other incidents of harassment and hostile working environment as explained in the lengthy attachment to that THIRD EEOC Complaint made part of that filing - again against the same original defendants relative to her employment with the defendant CITY OF NEW ORLEANS. Plaintiff then received her "Right to Sue" Letter from the EEOC on September 28, 2016 (Please see Attached Exhibit 3 – with both "Right to Sue" Letters for the plaintiff's SECOND and THIRD EEOC Complaints received in the same envelope from the EEOC on the same date, September 28, 2016,

Again, plaintiff seeks to clarify and better articulate her previously pled claims, and to add and amend her new claims here developed in the interim since this Court's October, 2017 orders to delay this amended petition being filed until the related state court/civil service proceedings had been completed. All claims alleged herein are made against these same defendants ONLY for related claims involving her same

employment with the defendant employer and abuse and discrimination on the part of the same direct supervisor and co-worker – in order to join all claims before this Court as allowable pursuant to FRCP Rule 15(a)(2) to reflect those claims made in her SECOND and THIRD EEOC Complaints.

At this point in time, plaintiff has filed her additional EEOC Complaints alleging the additional claims under federal law and will seeks leave to amend and supplement her original Petition/Complaint here to reflect all claims properly made herein after exhausting all administrative remedies as mandated by law.

Petitioner reasonably believes that the quantum value of her claims exceed the threshold necessary for jurisdiction in United States Court.

# I.

The following are made and remain defendants in this suit and are indebted unto your petitioner jointly, severally, and *in solido* for such damages as are reasonably equitable, together with legal interest thereon from the date of judicial demand until paid:

A. CITY OF NEW ORLEANS, a municipal/governmental corporation created and functioning under its Home Rule Charter pursuant to the Constitution of the State of Louisiana, and at all times pertinent hereto the governmental entity solely and directly responsible for the conduct and operation of the Department of Public Works' Parking Division, and at all times pertinent hereto the Employer of both

your Petitioner bringing these claims, as well as the Employer of the named defendant co-workers of the Petitioner, namely defendants Mark D. Jernigan and Linda Copeland, with the defendant City of New Orleans directly responsible for the hiring, screening, deployment, supervision of and conduct of their employees (either former or current employees, who at the time of alleged torts committed were actual City employees but some of whom have perhaps left employment with the City since the events described herein.

B. City of New Orleans employee Linda Copeland – both personally and in her capacity as the Human Resources Manager for the Department of Public Works, whose harassment of, undermining of, hostility toward, discrimination against, negligent and/or intentional acts against your petitioner in the particulars alleged below during the course and scope of their employment with the defendant CITY OF NEW ORLEANS, caused severe damage to your Petitioner, created the ongoing Hostile Work Environment endured through for years prior to her January, 2016 Termination from employment, again in the particulars alleged below;

C. City of New Orleans employee Mark D. Jernigan – both personally and in his capacity as the (former) Department of Public Works superior appointing authority and direct supervisor at all times pertinent hereto of your Petitioner, whose harassment of, undermining of, hostility toward, discrimination against, suborning co-workers to bear false witness against, creating and exercising his authority to create false grounds for her Termination and denial of salary and

benefits for at least eighteen months, and whose negligent and/or intentional acts against your petitioner in the particulars alleged below during the course and scope of their employment with the defendant CITY OF NEW ORLEANS, caused severe damage and injury to your Petitioner, created the ongoing Hostile Work Environment endured through for years prior to her January, 2016 Termination from employment, again in the particulars alleged below;

## II.

Petitioner Zepporiah A. Edmonds served for 30-plus years as an employee then Administrator in the Department of Public Works' Parking Division, having served in the Parking Division for the past 31-plus years. She was appointed as the Head of the Parking Division in 2006 on an interim basis and was subsequently placed in a permanent status in 2009.   Petitioner received notice from her Employer that she terminated from her employment effective January 11, 2016.  Petitioner believed at the time of the filing of her original Complaint/Petition that her Termination to be wrongful, discriminatory, and lawfully reversible on many grounds, and adjudicated her Termination through the City of New Orleans Civil Service Commission and the Louisiana Fourth Circuit Court of Appeal, where the Petitioner was ordered reinstated to her full benefits, salary emoluments and position of employment.  However, months after the adjudication and victory at the state administrative and court level regarding her return to her position of employment with the defendant CITY OF NEW ORLEANS, this defendant/employer continues to deny the Petitioner her full salary owed, her full authority and resources of her former and returned to/current position of Parking

Administrator, and refuses to pay those benefits owed to her.  While those issues are of the purview of the Civil Service Commission and State Court of Appeal, these details are evidence of the ongoing undermining, Hostile Work Environment and Discrimination against your Petitioner even after her prevailing in those state venues, and evidence of the animus of the defendant/employer for this Court to evaluate in the torts alleged here under federal law.

## III.

Beginning in mid-2012, Petitioner was targeted and singled-out for harassment, alienation, diminishment of her authority, hostile working environment, racial discrimination, racially disparate treatment and scrutiny and discipline by her white superior, age discrimination and workplace retaliation including having her longtime work and employment position of Parking Administrator being threatened, with this finally resulting in her notice of employment termination presented to her in January, 2016, effective January 11, 2016.  The four grounds presented by defendant MARK JERNIGAN, her immediate supervisor in his then-position as Director of Public Works, are as follows:

1.  Petitioner's alleged failure to cooperate with an Office of Inspector General investigation into alleged misconduct of Parking Control Officers – since debunked by the Civil Service Commission and the Fourth Circuit Court of Appeal;

2.  Petitioner's alleged interference and tampering of witnesses in a Sexual Harassment investigation of  a DPW worker Alton Sterling – summarily rejected as groundless by the

Civil Service Commission and never addressed by the Court of Appeal;

3.  Petitioner's alleged overstepping her authority to negotiate a reduction in discipline of subordinate worker Giara Mahogany, where it was proven that Petitioner was within her traditional and understood authority, that the reduction in discipline was suggested to Petitioner as approved by Jernigan by defendant Linda Copeland – Jernagin's assistant, either via mistake, incompetence or design to create controversy and undermine the petitioner considering this relatively minor episode was listed by Jernigan as justification to Terminate your Petitioner, a 31-year employee. This ground for Termination was also summarily rejected as groundless by the Civil Service Commission and never addressed by the Court of Appeal;

4. Petitioner's alleged "Retaliation" against her subordinate Valarie Petty where Petty complained about a change in her job responsibilities, without demotion or salary reduction, and wrote an E-mail complaining about it AFTER Petition, within her authority to move subordinates to different leadership positions, had chosen to do so and announced these moves BEFORE Petty's complaint to Jernigan.  Jernigan used as grounds for Petitioner's Termination the ridiculous and false claim that Petitioner retaliated against Petty because of her E-mail of complaint, whereas evidence and testimony proved the decision to change subordinate responsibilities including Petty's predated her complaint. This ridiculous ground for Termination was summarily rejected as groundless by the Civil Service Commission and never addressed by the Court of Appeal;

**IV.**

14

After the election of the Landrieu Administration in early 2010, a committee was formed for the Curb Management Contract Selection.  As a matter of course, Petitioner was appointed to this committee as her department was to be the most affected by the chosen vendor.   Petitioner, as the Parking Administrator, was also appointed the "Subject Matter Expert" to the Curb Management Contract Selection Committee, as it was her role as Parking Administrator to attend national conferences and keep up with the latest innovations and technology offered in this field.  From the very outset of the Committee's formation and meetings, Petitioner found it concerning that the committee and the meetings seemed populated by Landrieu Administration political appointees having no experience in Parking Management, and that these political persons, led by Landrieu political operative Allen Square, who seemed openly determined to steer the contract and tailor the specifications of the bid to favor Duncan Solutions, a company well known to parking professionals nationwide as having a sub-par record of performance where they were awarded significant contracts.

In July, 2011, Petitioner was copied on an E-mail (CS Exh. 6) where the political members of the committee were discussing meeting with Duncan Solutions to discuss the contract, in clear violation of the Mayor's Executive Order of June 3, 2010 regarding the competitive bidding/procurement process. (CS Exh. 7).  Then, in August of 2011, she was noticed of a meeting regarding the Curb Management Contract Selection Committee where ONLY Duncan Solutions would be discussed (CS Exh. 8), again in violation of the Mayor's Executive Order as well as other bid laws.  This pattern continued for many months and at that point she made a verbal complaint to the Office

of Inspector General ("OIG") via their Investigator  Aaron Malone. On October 24, 2011, the OIG copied Petitioner on their letter to Deputy Mayor Cedric Grant announcing their office's review of the "parking management contract". (CS Exh. 9). It is telling that the OIG's response to the Petitioner's complaint was for the OIG to issue to your Petitioner a list of demands for documents with an immediate deadline, with the letter very terse, accusatory, and prosecutorial in tone. (CS Exh. 29) Finally, it is telling that the OIG copied only the Petitioner's main two protagonists in the Curb Management contract process – Allen Square and Andy Kopplin (who became involved in promoting Duncan for the contract later in the process) – and no others.

On March 19, 2012, Committee member Jorge Hernandez, a Parking Analyst who worked often with Petitioner, sent his own memorandum (CS Exh. 9A)   to Mr. Jernigan expressing severe misgivings as to the behavior of certain other committee members, including Mr. Square, in suspecting that the outcome of the search committee was pre-determined based upon the behavior of the members aligned with the Landrieu Administration political appointees.

During a June 18, 2012 Committee meeting, members were asked to fill out forms evaluating the proposals made by the particular Curb Management Contract bidders. Appellant, as the Subject Matter Expert, was to have her evaluations given some weight in the determination of which bidders would be strongly considered.  When Petitioner issued a less than favorable evaluation to Duncan Solutions (CS Exh. 10), Landrieu political operative Allen Square became visibly angry, and articulated that aloud that he was unhappy with her.   At some point shortly thereafter, CAO Andy

Kopplin (second in command at City Hall to the Mayor) verbally informed Petitioner that he was not happy with my performance as the Parking Administrator, and that her performance was not to an "acceptable level". This occurred in year 2012 when Petitioner's Job Performance Ratings were "Excellent" (CS Exh. 2).

Shortly thereafter, Landrieu political operative and committee member Allen Square verbally spread false rumors about Petitioner claiming that Petitioner was attempting to steer this contract to another vendor other than Duncan Solutions. This is and was patently untrue, and your Petitioner had never favored any or disfavored any particular bidder for any personal or extraneous reasons. Petitioner expressed her unhappiness with these attacks upon her integrity by Mr. Square in a June 1, 2012 memorandum sent by Petitioner to her immediate superior, Mr. Jernigan (CS Exh. 11). Some time later, Mr. Jernigan verbally discussed these problems with Appellant, informing her that "Andy Kopplin is driving that train", and that the implication was that Petitioner should avoid crossing Mr. Kopplin on the Curb Management contract, less she lose that "battle".

On or about June 10 through 14, 2012, Appellant attended an out-of-town parking conference, the International Parking Institute Conference, which was held in Phoenix, Arizona involving parking management professionals, as the City of New Orleans regularly sent her to such conferences in her role as the head Parking Administrator for the City of New Orleans, and this conference was attended by vendors from different companies promoting or marketing different products to the different cities and jurisdictions that have parking management.

While at a reception that is a regular part of these conferences, as Petitioner stood next to her husband JOHN EDMONDS, a Black male approximately 60-70 years old, who she was acquainted with through these parking conferences but whose name she can not remember for certain, extended his greetings to her, and to the best of her hearing and recollection happily and loudly stated the following as he laughed and seemed to enjoy informing your Petitioner of the following: "We're coming to New Orleans.  We're going to get the contract.  It's a done deal.  Now, don't look for me to do a lot of work because I'm a retired grandfather, but I'll be coming and working with them. We're getting that contract.   It's a done deal." Petitioner then exchanged a few more seconds of conversation, then the man left us. Petitioner was a bit taken aback and explained to her husband that the man worked for a contract vendor (applicant) and claimed to have a lock on a contract where the winning bidder had not even been decided or awarded yet.  Petitioner's husband, JOHN EDMONDS, was standing next to your Petitioner and heard the entire conversation as it occurred.  He attaches his sworn Affidavit attesting to same (Please see attached Affidavit of John Edmonds). Petitioner told her husband immediately after the man exited their space that "I am telling Cedric (Grant – the Deputy Mayor) about this as soon as I get back".  And she did

On June 19, 2012, Petitioner and Jorge Hernandez, a Parking Operations Analyst and a valuable assistant to Petitioner in the Parking Division, and who worked directly with her on the contract as she gathering information on the bidders/applicants, issued a joint report to DPW head Mark Jernigan explaining to him the pricing/costs involved ("Pricing Matrix") for each of the bidders still being considered for the Curb Management

Contract, as the candidates were now down to three after withdrawals and elimination of many of the original bidders. The memorandum (CS Exh. 12) explained in detail that the Duncan Solutions bid and proposal was over $900,000.00 more costly to the City than the two other remaining bids, as well as explaining how Duncan Solutions had received sub-par evaluations for their performance in other cities.  Petitioner heard nothing from Mr. Jernigan in response to this report.

On July 2, 2012, Petitioner sent a follow-up E-mail to Mr. Jernigan asking if there were any updates or developments regarding our June 19, 2012 report on the Pricing Matrix (Exh. 13). Petitioner was, as Parking Administrator, interested in moving forward with this contract and replacing horribly outdated equipment used by her employees with the Parking Division. Petitioner heard nothing from Mr. Jernigan in response, but she was hand delivered a copy of my July 2, 2012 e-mail with Deputy Mayor Cedric Grant's jotting on it – "I need to see her today".  Petitioner soon met with Mr. Grant in his office where he essentially used profanities, stated that he wasn't "going to jail" with the others, and that Petitioner needed to stay clear of the machinations of those manipulating the Curb Management Contract.

On July 10, 2012, Petitioner as part of her duties as Parking Administrator sent to the members of the committee her evaluation of the remaining bidders (CS Exh. 14). There was a suggestion made prior to this that the committee solicit "Best and Final Offers" from each remaining bidder, and Petitioner reminded the committee in that E-mail that such an undertaking was in violation of the Mayor's Executive orders and likely in violation of public bid laws.

On July 25, 2012, Petitioner sent a detailed memorandum to her immediate superior Mark Jernigan expressing her concerns with the manipulation of the Curb Management Contract and the inappropriate involvement of Landrieu political appointees at the committee meetings and their improper influence upon the contract selection process (CS Exh. 15).  On July 30, 2012, the Committee had a meeting at which point there were serious discussions involving the choice of a contract selection winner.  When it appeared to the Landrieu Administration political people attending the meeting that Duncan Solutions might not be awarded the contract, Landrieu political appointee Ed Kerkow convinced the committee majority NOT to vote on the contract, but to reschedule for a later date. The notes and bidder evaluations made by Appellant at that meeting are attached here (CS Exh. 16). At a meeting held October 15, 2012 a vote was eventually taken awarding the contract to another more-qualified vendor (CS Exh. 16A). In 2014, after a committee's vote awarding the contract to that more-qualified vendor, and then after some litigation involving the award of the contract filed by Duncan Solutions, the Committee finally in 2014 awarded Duncan Solutions the Curb Management Contract.  Petitioner eventually voted for Duncan to get the contract in that 2014 meeting/vote because she was out-numbered in the vote and this would be the outcome no matter how she voted, and in order to lessen hostilities with the Landrieu Administration appointees, who had grown increasingly hostile and who had openly attempted to remove or fire other career City Government professionals for not going along with their manipulations of contract awards.  By that point, the Landrieu political

people controlled a majority of the committee votes and would award the contract to their chosen vendors pro forma.

As Parking Administrator, it was Petitioner's duty to the City and to her employees to attempt to make this contract work for the Parking Division.  Petitioner was in the course of her duties as Parking Administrator compelled to issue honest evaluations of the Duncan Solutions performance of the Curb Management contract.  In a great many areas, their performance of Duncan was substandard, expensive, and less than productive. Appellant's evaluations reflected that in February, 2015, (CS Exhs. 4, 5).

On June 16, 2015, Petitioner forwarded a draft of a periodic evaluation for Duncan Solutions revealing a very poor work performance (CS Exh. 5) to her immediate superior, Mark Jernigan for his approval.  On the very next day, June 17, 2015, Mr. Jernigan hand delivered to your Petitioner a copy of a Report of Administrative Investigation conducted by the OIG alleging Petitioner's lack of cooperation with the OIG offices and investigators (CS Exh. 5A). Petitioner immediately knew that the report was a precursor to issued to the employer beginning the process of her Termination of employment with the defendant CITY OF NEW ORLEANS, despite thirty years of excellent service.  On September 11, 2015, Petitioner contacted the Louisiana Ethics Administration Program, Ms. Lisa Hudson – the Personnel Director for the City of New Orleans, Mayor Mitch Landrieu, and Mr. Michael Cowan, Chair of the New Orleans Ethics Review Board, all in writing, seeking redress for her Wrongful Termination/Retaliatory Discharge, as well as seeking "Whistleblower" Protections. (See

attached CS Exhibit 26, *in globo*, with letters to each entity as well as attachments mailed).

The conditions of ongoing harassment, alienation, diminishment of her authority, hostile working environment suffered by your Petitioner continued from it's origination in mid-2012 continuously and without letup until the Petitioner's January 11, 2016 Termination from employment, in an ongoing series of episodes culminating in the Petitioner Terminated from her employment based upon falsehoods and grounds manufactured by her immediate supervisor, defendant MARK JERNIGAN, and ratified and supported and allowed by the defendant/employer CITY OF NEW ORLEANS and more particularly members of the former Mayor Mitchell Landrieu Administration. These episodes are described and expanded upon below in separate paragraphs and headings, separating the various claims brought here by your Petitioner, as well as itemizing the torts alleged and damages caused by these defendants.

## V.

**Petitioner's Retaliatory Discharge Claims, and Proof Presented in this record**

Petitioner insists that she offers ample evidence necessary to provide grounds for proving that her Termination was a Retaliatory Discharge, particularly in light of both the CS Commission, Hearing Examiner and Court of Appeal eviscerating the defendants' four alleged grounds for termination and ordering an immediate reinstatement of the Appellant to her former position as Parking Administrator, and essentially. proving that the reasons provided by the defendant employer were merely a pretext for that

Retaliatory Discharge. While the Petitioner does indeed believe that the activity described immediately above was indeed "protected" as her concerns and complaints precipitated an "investigation" contemplated by Title VII, assuming, *arguendo*, that the defendants are correct on this single point, then the Petitioner's complaints to the EEOC filed in November, 2014 and then in July, 2015 claiming Racial, Hostile Working Environment and other discriminations are absolutely those protected activities contemplated to be protected under Title VII (see CS Reply Brief Exhs. #8 and #9). The emphasis on her complaints regarding the Curb Management contract process were emphasized here in order to provide the "causation" between the "protected activity", and the adverse employment actions of her superior Jernigan (who we suspect but cannot prove performed these actions on behalf of the Landrieu Administration)  Her complaints about the Curb Management contract led to the Petitioner's immediate supervisor Jernigan's unlawful reaction to those complaints – the Harassment, Hostile Work Environment, Racially Disparate treatment and undue scrutiny compared to peer-level White employee Linda Copeland, a prosecutorial reaction to her from the OIG simply for reporting unethical activity, a failure to accommodate her ADA-recognized disability, and her ultimate Termination by defendant Jernigan.  The Curb Management complaints by the Petitioner led to the hostility and illegal treatment of the Petitioner in the workplace, which led to her filing both internal grievances where Petitioner in an internal Grievance Procedure filed 7/13/2015 accuses both Jernigan and Copeland of retaliating against her by creating a Hostile Work Environment due to her original complaints in November, 2014 to the EEOC, as well as for Petitioner filing her internal

Grievance Complaint of July 15, 2015 whereupon she reports to Jernigan that supervisors under her authority, and that of Jernigan's authority, have allowed mandatory Ethics Training to become corrupted, and then wrongly blamed upon her, thus increasing the illegal workplace harassment and hostility towards her. These complaints referenced above are in evidence in the Civil Service Appeal Hearing Record.

The standard for establishing a claim of retaliatory discrimination is as follows: A plaintiff may establish a prima facie case of retaliation by demonstrating that: "(1) she participated in a Title VII protected activity, (2) she suffered an adverse employment action by her employer, and (3) there is a causal connection between the protected activity and the adverse action." *Stewart v. Miss. Transp. Comm'n,* 586 F.3d 321, 331 (5th Cir.2009). "Summary judgment is appropriate if the plaintiff cannot support all three elements." *Id.* If, however, a "plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate ... non-retaliatory reason for its employment action. If the employer meets this burden of production, the plaintiff then bears the burden of proving that the employer's reason is a pretext for the actual retaliatory reason." *Aryain v. Wal-Mart Stores Texas LP,* 534 F.3d 473, 484 (5th Cir.2008) (internal quotation marks and citations omitted). *Davis,* 448 Fed. Appx. at 492. Petitioner maintains that the a part of her "protected activity" in this case was the 2011 and 2012 memoranda and communications to her superiors and the OIG regarding the suspected steering of the Curb Management contract to a specific bidder, her ongoing honest grading and evaluations of the bidders which angered high level members of the

Landrieu Administration, as well as her ongoing honest grading and evaluations of the winning Curb Management bidder – Duncan Solutions – who she was charged to  work with and evaluate as part of her duties as the Parking Administrator, as well as her pre-Termination EEOC Complaints filed in 2014 and 2015.

Here, Petitioner meets all three criteria necessary to bring a Title VII claim here for Retaliatory Discharge.  Petitioner was certainly engaged in protected activity where she reported suspicious contract "steering" activity to those superiors and entities for which she reported same.  Her employment was negatively affected by deteriorating conditions, then Termination. And there is a causal connection between the two given none of these negative conditions existed prior to her engaging in the complaints claimed here protected activity, the four alleged grounds for her Termination are specious and now, after state court litigation and Appellate Court holdings, found to be entirely disproven, and while not addressed (given the state court limited scope of reinstatement or ratifying her Termination), where essentially exposed as pretext for her Retaliatory Discharge, and finally there is the timing – on the day after she harshly grades and demands better performance from politically-protected contract winner Duncan Solutions, she was served the very next day with her employer's Office of Inspector General Report alleging her failure to cooperate with their requested investigation – for all intents and purposes a "weather report" and firm indication to her informing her that her employer will be soon seeking her Termination. (CS Exh. 5A).

Your Petitioner assets here that none of these asserted grounds for Termination actually existed, and instead were pretexts to her retaliatory discharge in order to terminate her from her position of employment in retaliation for her resisting and reporting the actions of certain members of that Landrieu Administration to the lucrative Curb Management contract to their politically favored winning bidder, Duncan Solutions, who performed in a substandard manner, and your Petitioner's scrutiny of the company once it was awarded the contract, in her role as Parking Administrator.

The timing of your Petitioner's process of termination, with the OIG report of her alleged "non-cooperation" issued as a precursor for termination on the day after she had produced a draft of the report critical of politically-favored vendor Duncan Solutions, is telling. Further, Parking Division Management Operations Specialist Jorge Hernandez, who worked closely with your Petitioner on the Curb Management contract vetting of bidders, testified at the Petitioner's Civil Service Appeal Hearing (CS Exh. 30) that he was "intimately familiar" with the Curb Management contract (CS #30,  p.100), that it was obvious to him that the contract was targeted to one vendor (CS #30, p.104), and that Duncan "should never have gotten that contract".(CS #30, p.102).   He further testified that your Petitioner was "unfairly" targeted after the process involving the Curb Management contract (CS 30, p. 117-119), and that your Petitioner was the best direct report (supervisor) that he had ever worked for in almost 40 years in the business (CS 30, p.100). He further testified that he accompanied your Petitioner to meet with both the OIG and Deputy Mayor Grant to express heir concerns about the Curb Management contract process (CS #30, p. 134-137, 139-141).   He testified that in the most recent

round of promotions and pay raises, he alone did not receive a pay raise (CS #30, p.115-117), evidence of Hernandez being retaliated against himself for his vocal resistance to the Curb Management contract process.

An employee such as your Petitioner can give great weight to a claim of Retaliatory Discharge if able to show that the stated grounds for the Termination were false or did not truly exist.  Your Petitioner here, one by one, offers sworn Civil Service Hearing evidence and testimony of competent witnesses, as well as documentation from her tenure as head of the Parking Division, which prove that each of the four grounds provided by the Employer for her Termination simply did not exist, but were a specious and ungrounded pretext to her wrongful Termination and Retaliatory Discharge.

In response to Petitioner's complaints, defendant Jernigan steps up the harassment and attempts to undermine the Petitioner in her position of employment, as, Jernigan attempts unsuccessfully to recruit Petitioner's co-worker Sherida Emery to suborn false witness against Petitioner fabricate present damaging evidence against her, and Ms. Emery testified under oath to same in the CS Commission hearing on June 30, 2016 (see Petitioner's 2017 Reply Brief Exh. #1-e), where Ms. Emery testified that the Petitioner did consistently instruct her to cooperate with the OIG (CS Hearing Exh #31-e, pgs. 105-122), that Jernigan attempted to coerce her into lying about the Petitioner (Exh 31-e, pgs. 123-131, and 164-167), and then testified as to Linda Copeland's harassment and retaliation threats against both herself and the Petitioner regarding their refusal to illegally release an impounded vehicle at Copeland's demand (Petitioner's 2017 Reply Brief Exh #1-e, pgs.135-146). Under cross-examination Ms.

Emery's testimony remained steadfast (Petitioner's 2017 Reply Brief Exh #1-e, pgs. 147-164)

Petitioner's several EEOC complaints are clearly categorized as "protected activity" under the Title VII guidelines and jurisprudence, and those complaints led to an even more progressively worsening workplace treatment of the Petitioner, and her ultimate Termination.  The defendants in cases such as this one almost never admit Retaliation, and the employee usually must prove it by circumstantial evidence. Here, the circumstantial evidence is easy to see, including the four roundly rejected fabricated "grounds" for her Termination that were engineered, made up, and promoted by defendant Jernigan, as well as Jernigan seeking to suborn false witness from at least one of your Petitioner's co-workers, reveal Jernigan on a mission to remove the Petitioner from her position for false grounds, and point to a full scale Retaliation and Retaliatory Discharge of the Petitioner.

The Petitioner's June, 2015 Report critical of the department and administration's choices, written in her capacity as Parking Administrator and in evaluating the contractor and administration's choice and protection of that contractor, is also "protected activity" contemplated by the federal prohibitions on Retaliation.  The main importance of the Petitioner's June, 2015 Report submitted to Jernigan is that it was immediately followed by the Petitioner being put on notice by Jernigan that she was under investigation by the OIG, which the Petitioner knew well to be a predicate to the Landrieu Administration seeking her removal given her experience of decades with City Government, and with he timing of that event in proving "causation" of the employer first

28

putting Petitioner on notice of the beginning her termination process – two events that were a mere single day apart.  The fact that the Petitioner's supervisor Jernigan made up four separate and now-debunked "grounds" to terminate your Petitioner is *prima facia* evidence of Retaliation.  That the Civil Commission decision comes up short in finding full retaliation is correctable here, as the Commission ignores and misses much of the evidence and testimony of same in the years 2014 and 2015 to come up short of a full finding of Retaliation, and takes not into account the extended absence from the workplace due to illness and multiple surgeries in 2012, 2013 and 2014 (See CS Record, Reply Brief Exhs. #4, 5 and Petitioner's Reply Brief Affidavit). The Petitioner here has provided the necessary "protected activity", the adverse employment action, and the hard circumstantial proof of a causal link between the two.

**VI.**

Petitioner in good faith believes these workplace conditions began to deteriorate due to two changes in her condition of employment:  First, the 2010 election of Mayor Mitchell Landrieu which coincided with the appointment of non-City Hall career

supervisors, many unfamiliar with City government and many non-African American employee supervisors appointed by the new Mayor Landrieu Administration.  For a period of time the Petitioner was able to function at a high level with these new supervisors, but, after a series of incidents where the Petitioner refused favors for certain politically connected White superiors, favors involving the impoundment of illegally parked vehicles and her refusal to waive fees and charges for politically connected Landrieu Administration employees and friends, the Petitioner found herself subject to unfounded workplace scrutiny, hostile behavior from certain White co-workers, and a step-by-step undermining of her authority and inclusion in departmental decision making which she had previously been regularly involved in.  There over time existed a palpable racial animus against her and other Black employees, perceptible to many.  Over time, there were complaints and workplace evaluations that further undermined the Petitioner's employment position.  As a result of the stress and hostility in the workplace, the Petitioner's unrelated health issues – serious in their own right – worsened, with her health deteriorating.  Again, all of these problems were presented to the Petitioner by her newly appointed White superiors. In the year 2015 began to involve an outright effort by defendant Jernigan (a White superior and Landrieu appointee) who began an intense effort to have the Petitioner terminated from her employment position.  Jernigan's efforts further involved the scheduling of employment termination hearings while the Petitioner was on medical leave and unable to properly defend herself or assist counsel, and there was a pattern of the Employer City of New Orleans allowing these violations (of the ADA and of the Civil Rights Acts) to go forward

without pause despite the Petitioner's plea that there at least be a pause in her Termination hearings until she had recovered from her illnesses and late 2015 multiple surgeries.  Instead, the defendant Employer and Jernigan moved forward and ultimately terminated Petitioner Edmonds for no real or good reason.

## VII.

Petitioner further asserts that in numerous instances since the beginning of the mid-2012 deterioration of her employment conditions, that defendants Mark D. Jernigan and Linda Copeland with the tacit approval of their Employer defendant City of New Orleans, as well as others unidentified or unnamed herein, worked to fabricate a perception that Petitioner Edmonds was not competent or capable of properly or competently performing her job through a series of baseless and false charges brought against her to Terminate her employment, despite Petitioner's three decades of having a great employment record.  These fabrications are now part of the public record, now rife with false accusations of her alleged grounds for termination, as well as her actual Termination, and each item proved false is a separate item of defamation and slander against the Petitioner's reputation, career record, and future employability, all causing damage to your Petitioner and her future employment possibilities, and contribute to her filed charges of Workplace Retaliation, Hostile Work Environment, Age Discrimination and Racial Discrimination as alleged in her EEOC Complaints and lawsuit herein.

## VIII.

Petitioner reasonably believes that there existed, other than the racial animus and discrimination exhibited by her white workplace superiors in the relatively new Landrieu Administration, there was a second set of circumstances contributing to the hostile work environment and ultimate termination and slander suffered by her, and that is because in mid-2012 she initiated reports to the Office of Inspector General (OIG) regarding concerns of misconduct by some city officials during the selection process for the procurement and subsequent award of a multi-million dollar contract for a program entitled "Curb Management". Petitioner's reports to the OIG included numerous violations of city policy, possible ethics violations and the blatant disregard of <u>Executive Order MJL 10-05: Professional Services Contract Reforming.</u>  This set of events also contributes to her filed charges of Retaliation, Hostile Work Environment, Age Discrimination and Racial Discrimination as alleged in her EEOC Complaints and lawsuit herein.

In 2012, Mr. Jorge Hernandez, Management Development Specialist II and Petitioner Edmonds met privately with Chief OIG Investigator, Mr. Howard Schwartz and Senior OIG Investigator, Mr. William (Bill) Bonney to discuss their concerns. All attendees were quite candid in their discussions and also presented documents to support their claim that a specific group of city officials, Mr. Allen Square, Mr. Edward Kerkow and Mr. Michael McKenna had re-written RFP No. 5001-01241 and had become "intensely involved" with actions that were specific to members of the designated Selection Committee in order to ensure that a "pre-determined vendor" was selected. It was clear to Petitioner and others in the Department of Public Works that as

Parking Administrator and a member of the Selection Committee, these same city officials were looking for Petitioner Edmonds to simply rubber stamp their *fait accompli*. Nonetheless, Petitioner has never received an official follow-up or response from the OIG in reference to her reports.

In addition to her reports to the OIG, Petitioner Edmonds made numerous verbal complaints to the Chief Procurement Officer (CPO), Ms. Mary Kay Kleinpeter-Zamora, Executive Director of the New Orleans Sewerage Board, Mr. Cedric Grant and Selection Committee Chairman, LTC Mark D. Jernigan.  She had also submitted numerous written correspondences and other related documents to LTC Jernigan, which expressed Petitioner's grave concerns about the irregularities with the review and selection process, ongoing pricing manipulations, several ethics violations and suspicious behavior that could have possibly involved illegal activity.  In a letter date June 1, 2012, Petitioner Edmonds suggested that her group engage the OIG to investigate the entire process, including the questionable involvement of this particular group of city officials: Mr. Allen Square, Mr. Edward Kerkow and Mr. Michael McKenna, who were later referred to as the "Technical Review Committee."

Petitioner Edmonds made it clear that she would not participate in any unethical practices and announced that the OIG was concerned about the continuous undue delays with the selection process.  Petitioner followed-up on her concerns in writing and submitted the document to the Selection Committee, the OIG and the CPO.

As a result, Petitioner Edmonds' position did not garner favor with some members of the Selection Committee and the "Technical Review Committee."  On Tuesday, July

3, 2012, LTC Jernigan privately handed Petitioner Edmonds a printed copy of an email that she had previously sent to Jernigan citing her concerns about the inappropriate actions of Mr. Allen Square, who served as the head of the "Technical Review Committee." Petitioner's email also explained how the undue delay with selecting a vendor for the Curb Management contract was negatively impacting the Parking Division's operations. On this same email was a handwritten note from Executive Director Cedric Grant, which stated: *"I need to see her today."*   A meeting was held in Mr. Grant's office on this same day. It was short and to the point. Petitioner Edmonds was read the "riot act" for her open objections to the unethical process to select a vendor for the Curb Management Contract AND it was strongly recommended that she "stop sending emails about this issue."

In an illegal retaliation and position transfer, Petitioner Edmonds' active role in selecting a new vendor was eliminated.  Petitioner lists the following examples:

1)    Petitioner Edmonds was no longer acknowledged as the City's subject matter expert for curb management.  Mr. Edward Kerkow was then acknowledged as the "parking expert" for the Technical Review Committee and for certain other members of the Selection Committee although Mr. Kerkow offered no experience in curb management and is a former employee of the then incumbent vendor (Xerox, formerly known as ACS).  It was also well-known in the Petitioner's workplace and area of employment that Mr. Kerkow had close ties to the Technical Review Committee's preselected vendor.

2)    The CPO directed Petitioner Edmonds to conduct reference checks for each of the shortlisted vendors. However, upon presenting the reference checks during a Selection Committee meeting, the Petitioner's work product were dismissed and questioned by the Technical Review Committee even though all sources contacted were credible. It was noted that 80 percent of these reference checks showed that the Technical Review Committee's pre-selected vendor had a history of poor performance.

3)    Petitioner Edmonds' review found that the Technical Review Committee's pre-selected vendor's pricing was over $916K more per year. First Deputy Mayor and Chief Administrative Officer, Andrew Kopplin, openly dismissed Petitioner's findings and tasked the Technical Review Committee with presenting additional information for the Selection Committee to consider. This action by Kopplin was made in hostility to your Petitioner, dishonored her work product and efforts, diminished her stature in the workplace, alienated her and reduced her authority, and ultimately caused another unnecessary delay with selecting a new vendor.

Due to Ms. Edmonds' whistle blowing to the OIG in 2012, the harassment and retaliation continued and escalated in March 2014, through LTC Jernigan and Ms. Linda Copeland, Human Resources Manager.  Their inappropriate actions, including the fabrication of the four baseless grounds for her Termination, have been a dominant factor in creating a hostile and unendurable work environment for Ms. Edmonds.  In numerous separate documents entered into the Civil Service Appeal record and

attached to her memoranda filed here, and previously in 2017, Petitioner has chronicled the defendants' discriminatory actions, the hostile work environment, the undermining of her authority, racial and age discrimination, and their abuse of authority; all of which clearly demonstrates the continuous harassment and retaliation of Ms. Edmonds.  This alienation, discouragement, reduction in authority and hostility toward your petitioner continued from 2012 until her January, 11, 2016 actual Termination.  It continued for at least 18 months after her Termination where she and her family were forced to endure severe financial hardships, including Bankruptcy, due to being denied her salary and benefits.

## IX.

The hostility and workplace alienation, after a good employment record and situation for almost 30 years until the conditions became hostile, and has exacerbated the Petitioner's health issues which were serious in 2012 and have worsened greatly through the present 2019 date. Petitioner Edmonds is receiving for her severe work-related stress.  Additionally, your Petitioner is actively receiving counseling and therapy. Petitioner Edmonds is also dealing with a very serious unrelated medical condition, which has been exacerbated by the ongoing stress of these work related issues. Petitioner Edmonds was placed under additional pressures and mental duress by having her own and her family's medical benefits and her livelihood taken away, for no good reason, and the Defendant Employer's decision to (wrongly) Terminate her and deny her salary and benefits, forcing her and her family to live in reduced financial

circumstances for at least 18 months of her Termination without pay, has created for her an undue hardship and an outrageous injustice.

# X.

**Proof supporting Petitioner's Hostile Work Environment Claim:**

The Petitioner's claims of enduring a Hostile Working Environment are fully presented above in her detailed explanation of her Retaliation Claims made above, and in her 9/4/2017 filed Reconsideration brief. Her Affidavits both here and supporting her Reconsideration brief also support this proposition.  Petitioner , a Black female, belongs to a protected group.  She suffered unwelcome harassment as memorialized above (undue scrutiny, harassment by co-worker Copeland, a newly-found and progressively worsening workplace environment, Racially Disparate treatment and scrutiny by superior Jernigan as compared to peer-level White employee Linda Copeland, a prosecutorial reaction to her from the OIG simply for reporting unethical activity, a failure to accommodate her ADA-recognized disability, and her ultimate Termination for the four separate and now-debunked charges). The harassment did affect her privilege of employment; worsening her ability to perform her work and affecting her health and recovery from her serious medical condition (see CS Reply Brief Exhs. #4, 5, 6, 7, 8 and 9). The employer knew or should have known of the harassment as it was conducted by both Copeland, and then once Copeland was complained of, then came harassment and poor treatment by both Copeland and superior Jernigan.  The Petitioner's filing of internal grievance complaints and the two EEOC complaints certainly called this

harassment to the employer's attention (again, see CS Reply Brief Exhs. #6, 7, 8 and 9).

Additional evidence of thePetitioner enduring a Hostile Work Environment created by defendants MARK JERNIGAN and LINDA COPELAND , and ratified and allowed by defendant/employer CITY OF NEW ORLEANS, are as follows:

Petitioner's alleged failure to be responsive and to cooperate with OIG Investigations was an absolute falsehood exposed by witness testimony and the evidence, with this position part of the Court of Appeal's holding in finding the Civil Service Commission to be in manifest error to have determined otherwise. To have this "cause" for Termination fabricated by defendant JERNIGAN, and supported byb the OIG, reveal and belie a promotion of a Hostile Work Environment by these employee, co-workers.  It is telling that when the Petitioner and co-worker Jorge Hernandez reported their concerns about the integrity of the Curb Management Contract process to the OIG, the OIG instead of investigating those reported to them, instead immediately issued a threatening and "prosecutorial style" leter to your Petitioner demanding that she immediately produce her evidence and documentation to the OIG, less the Petitioner be disciplines, Further, and astonishingly, the OIG instead of working with the Petitioner to explore her legitimate concerns and complaints about the Curb Management contract, instead immediately COPIED the OIG "prosecutorial style" response letter addressed to Petitioner to Landrieu operatives Andy Kopplin and Allen Square with the letter confirming the Petitioner's complaints against them, guaranteeing there being friction and tenseness between the Petitioner and the subjects of

Petitioner's complaints. This furthered the Petitioner's enduring a Hostile Work Environment.

Even when Petitioner was was home and out of the office with serious illness (CS Exh. 3.), she attests that she worked hard to comply with the OIG's requests to the very best of her abilities.   Attached (CS Exh # 21) here shows an additional volume of E-mails between herself and the OIG personnel, as well as additional integrated E-mails between Petitioner and DPW Supervisor Sherida Emery requesting that she (Emery) cooperate with the OIG to provide whatever information was available.   The defendant/employer seeking her Termination on these false grounds of non-cooperation where she continued working on this project to cooperate while out sick with serious illness furthered the Petitioner's enduring a Hostile Work Environment.

Petitioner's Termination for alleged Interference with DPW Investigation into allegations of sexual harassment against employee Alton Jones was again disproven by evidence and witness testimony here, and was also rejected by the Commission, as the evidence and testimony in the record prove this claim to be absolutely unfounded and ridiculous,   and these accusations, defense, threat to lose her job over these false accusations, and actual Termination and denial of salary and benefits, contributed to and furthered the Petitioner's enduring a Hostile Work Environment..

Petitioner's alleged Retaliation against Parking Division supervisor Valarie Petty was again disproven by evidence and witness testimony here, and was also rejected by the Commission, as the evidence and testimony in the record prove this claim to be absolutely unfounded and ridiculous,  and these accusations, defense, threat to lose her

job over these false accusations, and actual Termination and denial of salary and benefits, contributed to and furthered the Petitioner's enduring a Hostile Work Environment.

The Petitioner's being accused and Terminated for an alleged unauthorized settlement of disciplinary actions against DPW employee Giara Mahogony was again disproven by evidence and witness testimony here, and was also rejected by the Commission, as the evidence and testimony in the record prove this claim to be absolutely unfounded and ridiculous, and these accusations, defense, threat to lose her job over these false accusations, and actual Termination and denial of salary and benefits, contributed to and furthered the Petitioner's enduring a Hostile Work Environment.

## XI.

## Culmulative Proof of Racially Disparate Treatment of Employees by DPW Head Mark Jernigan, Amounting to Illegal Racial Discrimination against the Petitioner.

In the Department of Public Works, Dept. Head Mark Jernigan, a white male supervisor, blatantly and obviously treated his two Senior Level employees differently – with your Petitioner, a Black woman, being subject to undue scrutiny, criticism, alienation and ultimately Termination for no good reason despite superior Job Performance ratings (CS Exh. #2), while Linda Copeland, who abused employees, threatened employees, who either recklessly or intentionally created havoc in the Parking Division by without authority promising employees promotions (see CS Exh. 28), pay raises and additional uniform allowances (Exh. 23A), was instead promoted

and given a significant pay raise, despite DPW employees putting Mr. Jernigan on notice of her negative behavior (See attached Affidavit of Sherida Emery).  Petitioner insists that the two employees, - herself and Copeland – were blatantly treated differently in a rising to a level of unlawful Racial Discrimination.  The legal tests for proving her claims are as follows:

 42 U.S.C. 2000e-2 provides in pertinent part:

(a) Employer practices
It shall be an unlawful employment practice for an employer--
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....


Tracking the language in 42 U.S.C. 2000e-2, La.R.S. 23:1006B(1) provides:

It shall be unlawful discrimination in employment for an employer to:
(a) Intentionally fail or refuse to hire, refer, discharge, or to otherwise intentionally discriminate against or in favor of an individual with respect to compensation, terms, conditions, or privileges of employment because of race, color, religion, sex, disability as defined in R.S. 51:2232(11), or national origin.


In the systemic Disparate Treatment context, the focus shifts from the individual decision maker to the employer as an entity. As with individual Disparate Treatment, the ultimate inquiry remains framed in terms of state of mind. "To succeed on a claim of systemic Disparate Treatment, a plaintiff must show that the employer intentionally discriminated, whether by acting pursuant to an express policy of treating members of different groups differently or, in the absence of an express policy, by engaging in a

pattern or practice of discrimination." *See Slack v. Havens,* 522 F.2d 1091, 1092-93 (9th Cir.1975). Because employers rarely adopt expressly discriminatory policies in the face of Title VII, most systematic Disparate Treatment claims are pattern or practice cases.

Petitioner insists that her experience with her tenure with the DPW after the hiring of co-worker Copeland in 2014 demonstrates blatant disparate treatment on the part of the immediate supervisor and Appointing Authority, Mark Jernigan, which rise to a level of pattern and practice of favoring the white employee, and disfavoring the Black employee, rising to a level of illegality.

In a very telling October, 2014 episode, Linda Copeland appeared at the City Auto Pound on North Claiborne Avenue attempting to intimidate Auto Pound employees into illegally releasing an automobile owned by one of her friends or acquaintances. When the Auto Pound employees refused to release the vehicle, she verbally abused and threatened the employees. She then called by telephone Parking Division Supervisor Sherida Emery, and attempted to get her to release the vehicle. When Ms. Emery informed her that she could not legally release the vehicle, Ms. Copeland blatantly threatened Ms. Emery and the Petitioner (who was not at the scene), stating that "You and Zepp will hear from me in regards to this".  Ms. Emery informed DPW Head Jernigan of this situation via an E-mail chain attached here as CS Exh #22.  To date, Ms. Emery and your Petitioner are unaware of any discipline or correcting of Ms. Copeland for her antics of that date, but Mr. Jernigan did reveal the complaints of Ms. Emery to others, which disturbed Ms. Emery as evidenced by her additional E-mails to

Mr. Jernigan (CS Exh. 22), and in her attached Affidavit, where Mr. Jernigan accused Ms. Emery of "violating his trust" by her reporting Copeland's behavior and threats to others after Jernigan failed to act upon Emery's complaints (again, See Affidavit of Sherida Emery).   (CS Exhibit 23) attached include a set of E-mails to superiors and complaints lodged by Petitioner and Parking Analyst Jorge Hernandez seeking relief from Ms. Copeland's ongoing attempts to sow dissension within our department.

Then there is episode concerning the Giara Mahogany suspension reduction, which was alleged to be one of the four separate grounds for Petitioner's Termination – an episode caused in fact by the mistakes or carelessness of co-worker Linda Copeland,.(CS Exh. 19, page 1), at no fault of your Petitioner despite Mr. Jernigan's continued insistence otherwise.

On June 1, 2014, Petitioner responded to the verbal "counseling" and scrutiny of her performance by her immediate superior, Mark Jernigan, by sending to him an extensive eight page correspondence where she rebuts case by case his criticisms of her, as well as detailing instances of co-worker Copeland creating dissension within the workplace. (CS Exh. 27).   This correspondence memorializes the unfairness of Jernigan's continuing criticism and negative scrutiny of the Petitioner.

While Petitioner was subject to micro-scrutiny,  white co-worker Linda Copeland had a pattern of workplace mistakes, problems, fomenting hostility and of causing dissension within the Parking Department workforce, and nonetheless, the immediate superior Mark Jernigan, who is white, chose to award white co-worker Linda Copeland a job title and position promotion with a pay raise, while your Petitioner simultaneously

experiences harassment, alienation, then Termination from this same white immediate superior despite superior work performance. Only one person controlled the outcome of both situations – Mr. Mark Jernigan – a White male.   Your Petitioner, a Black woman, performed at a high level and was eventually Terminated.   Ms. Copeland, a White woman, performed at a less superior level and was promoted with a pay raise. Perhaps the Petitioner may be forgiven for feeling that Race governed this disparate treatment. If Race had nothing to do with it, then Retaliation for her scrutiny and demands upon Duncan Solutions must have.  There is no other explanation for the disparate treatment suffered by your Petitioner here.

Here, Petitioner is clearly a member of a protected group, she was qualified for her position and performed extremely well given her job performance evaluations already in evidence, and she suffered the adverse employment action of a progressively worsening workplace environment, then wrongful, baseless Termination. The defendants' replacement of the Petitioner with another Black employee is not a be-all, end-all defense for many months of humiliation and harsh, racially disparate treatment by a White supervisor, Jernigan, bent upon punishing the Petitioner for an animus germinated in her ethical concerns, reporting and scrutiny of an important Curb Management contract and politically favored vendor. The animus against her manifested in illegal racially disparate treatment as it concerned herself and peer-level co-worker Linda Copeland. The mistreatment and dare say abuse of the Petitioner is not excused or dismissed abusive actors hire a Black face to replace the Petitioner in her position – a position that she is now ordered reinstated to by the CS Commission's

decision 9/5/17.  The fact that her superior defendant MARK JERNIGAN purposefully created four fictitious "grounds" to Terminate the Petitioner as she performed at a high level, while promoting and giving raises to inept and troublesome  White co-worker Copeland, plus allowed Copeland to harass, threaten, undermine and create unrest within the Petitioner's subordinates, further implicates Jernigan in his illegal racial discrimination against the Petitioner. We cannot read Jernigan's mind, but know that his behavior in sum reveals an illegal pattern of racially disparate treatment rising to illegal racial discrimination against your Petitioner.


**XII.**

**Proof of Due Process Violations and the failure of the Employer to properly accommodate Petitioner's request to postpone the Pre-Termination Hearing of December 14, 2015, in violation of the ADA**

The U.S Supreme Court in _Cleveland Bd. Of Educ.  v. Loudermill,_ 470 U.S. 532, 546, 105 S. Ct. 1487,  84 L.Ed.2d 494 (1985) held that "The essential requirements of due process …. Are notice and the opportunity to respond …. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story".  Here, Petitioner put the employer on full and proper notice of her bonafide medical reasons for not being able to attend the Pre-Termination Hearing.  Her superior, Jernigan, was impatient to Terminate her, he went forward with the hearing despite the medical documentation properly justifying a delay of that hearing. Jernigan chose to deny her

the opportunity to defend herself, in addition to making up specious grounds for which to terminate her to begin with.  Petitioner's illness, Vesicoureteral Reflux (VUR) is a short-term disability, that unfortunately has persisted long-term for the Petitioner, and is plainly covered by the ADA Amendment Act of 2008.  Petitioner attaches her Medical Records of her diagnosis and post-surgery instructions (see CS Reply Brief Exhs. #4 and 5). Petitioner's Pre-Termination hearing was held illegally and went forward in violation of the law, the Petitioner's actual Termination was unlawful. The Civil Service Commission erred in failing to hold that, and this Court should recognize and correct this injustice forthwith as an actionable tort herein.

**XIII.**

**Testimony of Deputy Mayor Cedric Grant reveals blatant direct evidence of the Age Discrimination against the Petitioner by the defendant/employer, or at minimum a desire to remove her fro her position for no good reason.**

Part and parcel to the mistreatment and workplace hostility suffered by the Petitioner prior to her Wrongful Termination was the suspected Age Discrimination that she suffered at the hands of the post-2010 election of the Landrieu Administration. During the Petitioner's Civil Service Appeal of her Termination, where three of the four grounds of her Termination were summarily exposed as baseless and without foundation, and where Commission ruled the fourth alleged ground for her dismissal not proper or allowable for upholding your Petitioner's Termination, the then-current Deputy Mayor Cedric Grant, a direct subordinate of Mayor Mitchell Landrieu and with authority over the DPW and both your Petitioner and her direct superior Mark Jernigan, was

46

subpoenaed to testify at the appeal (see attached Exhibit #51A – Edited Testimony of Cedric Grant).

Deputy Mayor Grant's testimony blatantly reveals an aminus  that the Landrieu Administration had against older  and civil service protected administrators that were holdovers from previous administrations, no matter the quality of the work performed or the proposition that Civil Service protections were to protect those employees' job status in that new administration.  During Deputy Mayor Grant's testimony of July 7, 2016, he admitted that at a minimum his thoughts were, and generally that of the Landrieu Administration, was that because the Petitioner had worked into her early 50's, had built up a Retirement Benefit and had worked for an extended tenure, that she should simply step away, despite her performance and age well below Retirement age, because that was simply how he thought it should proceed.  Under questioning, the exact response given by Deputy Mayor Grant follows:

Question. (By Petitioner's Attorney Dominic Varrecchio)

"Based on the totality of your knowledge of Ms. Edmonds, and her work record, and your personal interactions with her, is it fair to say there may be some merit to her complaints?"

Answer. (By Deputy Mayor Cedric Grant)

"Well, let me say this, maybe, but what I would say is that I find this extremely interesting that we're sitting here for someone who, technically,

<u>has served the city, generally, well, for a time, and had reached retirement and chose to continue and got involved in a series of situations that they now feel the need to complain about.</u>(emphasis added). My point is we have – The management system in this government has changed to the point where what used to be is not now. <u>We manage harder and, at some point, you get to the point where maybe it's time for you to move on because we just do things differently now.</u> The accountability is higher. As I told you, I served three mayors of the City of New Orleans. The accountability when I worked for the first to where I work for the third is dramatically different. So, you know, at some point, people don't get along. At some point, people are not going to be able to work together, but, you know, I suggest this to many of my employees, <u>if you've gotten to the point where you've reached the ability to get your benefits it may be time for you to go do something else. It just might really be because things change by the day around here.</u> This is a fast moving -- trying to be, progressive government."

(see attached  Exhibit #51A, pages 151, 152)

    In sum, Deputy Mayor Cedric Grant testified, in the public record, that despite the Petitioner being in her 50's no where near traditional or expected Retirement Age, despite her job performance being in the "excellent" range, despite her dedicated years of service and the protections of the ADEA, that your Petitioner should "find something else to do" simply because she had "reached retirement …. (and) the ability to get her benefits".  This sentiment is indeed suspicious. Deputy Mayor Grant remembered very little details about the Petitioner, her job performance, or details of her having particular complaints against her or and episodes involving her, even when presented with E-mail

communications between the Petitioner and himself (attached Exhibit #51A, pages 130-133), but he DID remember that the Petitioner was near not Retirement Age, but had indeed "earned her benefits" and that it would be easier for all involved – including the Landrieu Administration – if she would simply find the good sense "to go do something else".

The Federal Age Discrimination in Employment Act (ADEA) forbids discrimination against job applicants and employees 40 years or older because of their age. ADEA protection, which applies to employers with 20 or more workers, covers hiring, training, benefits, compensation, promotion, firing, layoffs and other terms and privileges of employment. Individuals suffering from unlawful age discrimination under the ADEA must file a charge of discrimination with, and obtain a right to sue from, the EEOC before going to court.  The petitioner ZEPPORIAH EDMONDS was in her early 50s at the time of her 2015 termination, and the defendant employer CITY OF NEW ORLEANS at all times pertinent hereto employed more than 20 employees.  Petitioner properly filed her EEOC Complaint alleging Age Discrimination on November 4, 2014 after being interviewed by the EEOC on October 27, 2014.

After the filing of her original Complaint/Petition for Damages here, this Court dismissed the Petitioner's Age Discrimination portion of her claims in an earlier ruling and order occurring BEFORE the 2017 granting of the dispositive motions dismissing the Petitioner's claims in total.  The Petitioner sought review and relief of the Court's earlier dismissal of her Age Discrimination claims, with the Court DENYING that relief, all of this occurring PRIOR TO the completion of the Petitioner's Civil Service Appeal

and prior to the ability of her to buttress her Age Discrimination claims with the testimony of defendant CITY OF NEW ORLEANS Deputy Mayor Cedric Grant – which Petitioner enters here and believes provides direct evidence of the defendant employer's Age Discrimination.  Petitioner has filed a FOURTH EEOC Complaint lodged on December 4, 2017, again alleging Age Discrimination, amongst other claims, many involving the defendant/employer refusing to Reinstate her to her original position and pay/benefit scale in the position of Parking Administrator, and instead forcing her to live for almost 18 months at paltry, lowered forced Retirement Wages, and suffer myriad financial hardships and related emotional suffering due to those financial difficulties. To date, almost 60 days after the Louisiana Fourth Circuit Court of Appeals has ruled that ALL of the grounds for her Termination were groundless and illegally, and where the Court ordered her reinstated to her original employment position, pay scale, emoluments and back pay, the defendant CITY OF NEW ORLEANS illegally and in defiance of the Courts and with no pending Appeal or Rehearing delay, simply refuses to provide comportment with the Court Orders.

**XIV.**

**<u>Your Petitioner has suffered myriad, ongoing financial hardships due to her Illegal/Wrongful Termination, with her being deprived her full salary and benefits. Petitioner has had to endure her family suffering an extended financial downturn and deprivation of her financial support due to the tortuous actions of the defendants here.</u>**

Amongst Petitioner's related federal tort claims, flowing from her being discriminated and retaliated against here, included are those claims for financial suffering by the

Petitioner and her family many involving the defendant/employer CITY OF NEW ORLEANS refusing to Reinstate her to her original position and pay/benefit scale in the position of Parking Administrator, and instead, after having forced her to live for almost 18 months at paltry, lowered forced Retirement Wages while Terminated illegally from her position of employment, and then with many months after that delaying her illegally withheld back pay, and then refusing to pay the differential owed but not paid by the defendant/employer, the Petitioner and her family were made to suffer myriad financial hardships and related emotional suffering due to those financial difficulties.  These losses and episodes of tortuous conduct by the defendant/employer have caused the following costs and losses to your Petitioner, and her family:

1. Petitioner forced to pay substantial legal fees for Civil Service and related representation while not earning her City of New Orleans employment salary due to illegal Termination, with costs and legal representation payments incurred as a result of this and litigation related to her illegal Termination;

2. Petitioner's health issues were exacerbated by ongoing work-related and then Termination-financial downturn stress; with treatment and costs for medical treatment increased;

3. Petitioner lost her employment-related Health Insurance, was limited in her much needed health care coverage, and had her premiums increased substantially once converted to non-active employee due to her illegal Termination;

4.  Petitioner's and family members' Student Loans defaulted, with the family unable to meet monthly payments due to Petitioner's Termination-related financial losses and limitations;

5.  Petitioner and family members forced to borrow money from non-immediate family members to pay for much needed medication and surgeries due to Petitioner's Termination-related financial losses and limitations;

6.  Petitioner's Income reduced from $4600 monthly to unemployment benefits at $225 weekly due to Petitioner's Termination-related financial losses and limitations;

7.  Unable to meet monthly mortgage payments; forced to file for Bankruptcy, due to Petitioner's Termination-related financial losses and limitations;

8.  Petitioner fell behind in payments for son's private high school tuition, which led a family member, Elgin Edmonds having to pay for son's tuition, again due to Petitioner's Termination-related financial losses and limitations;

9.  Petitioner's son unable to participate in extra curriculum activities at private high school, again due to Petitioner's Termination-related financial losses and limitations;

10. Petitioner's family unable to take planned trip to Alabama for a church retreat due to Petitioner's Termination-related financial losses and limitations;

11. Petitioner's family unable to take planned trip to Dallas, Texas for a planned family vacation due to Petitioner's Termination-related financial losses and limitations;

12. Petitioner unable to repair/replace inoperable vehicle; forced to rely on sharing daughter's vehicle due to Petitioner's Termination-related financial losses and limitations;

13. Petitioner's family at times unable to purchase food due to Petitioner's Termination-related financial losses and limitations;

14. Upon DROP money received and monthly pension payments began, most of the funds had to be used as follows:  to pay back loans, to pay for mounting legal fees due to ongoing litigation, to catch up overdue mortgage payments as foreclosure loomed; to catch up overdue utilities (lights, gas, water, etc.) again due to Petitioner's Termination-related financial losses and limitations;

Petitioner and her family were made to suffer tremendously due to her Termination and the financial difficulties.  Under federal law, the defendants are liable to your Petitioner for all losses flowing from their tortuous, discriminatory practices and activities suffered by the Petitioner.  The previous Civil Service Commission and appeal to the State Appellate Courts were of a very narrow and limited scope – allowing solely for Reinstatement to her position of employment, back pay, and very limited reimbursement for attorney's fees.  This is the sole venue to allow this Petitioner recovery for her actual general damages and losses, liquidated damages, general damages for pain and

suffering, health damages and the like.   The Petitioner has offered here evidence, sworn testimony from the Civil Service proceedings directly related to the episodes sued for here, argument and law necessary to maintain a successfully recoverable set of claims herein.

**XV.**

Petitioner Edmonds, prior to her Termination, made countless unsuccessful attempts to have these work-related issues addressed through her Departmental Chain of Command beginning with the Public Works Director and her direct report, defendant Mark Jernigan, and then through Jernigan's direct report, then Executive Director Grant. Additionally, in accordance with CAO Policy Memoranda No 4 - Grievance Procedure of the City of New Orleans, Petitioner Edmonds completed and submitted three (3) separate Employee Grievance Forms and also reached out to the Chief Administrative Office for intervention and assistance. Regrettably, all of her efforts were to no avail.

Petitioner pursuant to Federal law filed prerequisite complaints with the Equal Opportunity Employment Commission as delineated above, thus properly following all administrative requirements and remedies.

Petitioner Edmonds possesses all items and correspondence referenced above, and copies of all items should be included within the workplace records. Petitioner Edmonds stands ready to produce those items for evidence here.

**XVI.**

Petitioner Edmonds avers that the defendants herein intentionally discriminated against her in violation of the provisions of the Title VII of the Civil Rights Act of 1964 and 1991, all applicable federal law, The US Department of Labor and Executive Orders establishing same, as well as the Americans with Disabilities Act of 1990 which prohibits discrimination on the basis of disability by public entities, and as such they are liable to your petitioner herein for compensatory damages together with related benefits and reasonable attorney's fees and all costs to these proceedings.

**XVII.**

Petitioner Zepporiah Edmonds avers that as a result of the actions of the defendants herein she has suffered loss of her employment position, loss of income, humiliation, shame, indignation and psychological injuries her wrongful and unfair termination due, as well as suffering stress, anger and anxiety that she suffered as a result of the defendants' actions and omissions.

**XVII.**

The said incidents of wrongful termination, discrimination in employment, hostile work environment, all cited above, along with resulting injuries sustained by your Petitioner Zepporiah Edmonds, were caused solely, directly, and proximately through the fault of the defendants, City of New Orleans, Mark D. Jernigan and Linda Copeland, and any potentially other supervisors or co-workers employed by the defendant CITY OF NEW ORLEANS, and by lawful extension their insurers, in the following particulars:

A. Defendant City of New Orleans' failure to maintain proper vigilance and supervision of it's supervisory employees Mark D. Jernigan and Linda Copeland, who intentionally, wrongfully and illegally targeted your petitioner for a groundless and baseless pattern of harassment, defamation and slander, blatant and open racial discrimination, retaliation, eventual wrongful termination, and created a hostile working environment prior to the baseless, illegal wrongful Termination of Petitioner;

B. Defendant City of New Orleans' failing to maintain reasonable and proper control of the working environment at the petitioner's workplace, leading to the baseless, illegal wrongful Termination of Petitioner;

C. Defendant City of New Orleans' failing to properly investigate and act on the incidents and conditions present that resulted in the ongoing hostile working environment, and leading up to your petitioner's baseless wrongful termination.

D. Defendant City of New Orleans' carelessly and/or knowingly allowing certain employee supervisors, particularly defendants Mark D. Jernigan and Linda Copeland, to harass and discriminate against other employees as well as your petitioner, as well as to favor other employees in such a manner as to further exacerbate the hostile workplace environment, leading to the baseless, illegal wrongful Termination of Petitioner;

E. Defendants Mark D. Jernigan and Linda Copeland, who intentionally, wrongfully and illegally targeted your petitioner for a groundless and baseless pattern of harassment, defamation and slander, blatant and open racial discrimination,

56

retaliation, eventual wrongful termination, and created a hostile working environment prior to the wrongful termination of your Petitioner;

F.   Defendants Mark D. Jernigan and Linda Copeland for creating the racial discrimination, alienation of and hostile work environment suffered by the petitioner;

G.   Defendants City of New Orleans, Mark D. Jernigan and Linda Copeland intentionally discriminating against your petitioner;

H.   Defendants City of New Orleans, Mark D. Jernigan and Linda Copeland intentionally undermining the workplace authority of your Petitioner, as well as suborning others to bear false witness and false testimony against youir Petitioner in the workplace, in the context of attempting to Ternminate your Petitioner from her position of employment;

I.   Defendants all participating in a Retaliation and Retaliatory Discharge of your Petitioner for acts protected under federal law;

J.   dmoydiscriminating against your petitioner;

K.

L.   Defendants Mark D. Jernigan and Linda Copeland's harassment and discrimination against your petitioner, as well as their obvious disfavoring of petitioner in such a manner as to further exacerbate the hostile workplace environment;

M.   Defendant City of New Orleans, Mark D. Jernigan and Linda Copeland's slander and damage to the reputation of your petitioner by intentionally denigrating your petitioner to other employees and superiors prior to the wrongful termination of your petitioner, and to the larger community at large due to the actual termination of your

petitioner, as well as any pendant state law claims in their promoting untrue and slanderous statements into the public record of her Civil Service employment hearing;

N. Defendant City of New Orleans' breach of petitioner's implied employment contract via termination of same without good cause, with all attorney's fees, awards, penalties and costs awarded to your petitioner as appropriate by law;

O. ALL DEFENDANTS'  for slandering and damaging the reputation of your petitioner by providing negative references and inaccurate or otherwise damaging information to your petitioner's post-termination prospective employers via inclusion of same in employment records and within the public record;

P. Any and all other acts and/or omissions which may appear through investigation, discovery and at the trial on the merits of this matter;

All of the above acts of negligence were in violation of the laws of the United States of America and the State of Louisiana, which are hereby pleaded and which are adopted by this reference as is set forth at point *in extensio*.

## XVI.

Petitioner Zepporiah Edmonds avers that as a direct and proximate cause of the aforementioned acts and omissions, your petitioner sustained damages, losses, and disability in the following non-exclusive list of particulars:

- Past, present, and future emotional and mental anguish;

- Past, present, and future lost wages, missed benefits, unpaid monies owed, damages for lost position and authority, damages for missed work, and damaged job and/or credit rating, and missed employment and/or educational opportunities due to wrongful termination and wrongful demotion;

- Loss of reputation, employment prospects, employability, and all other related losses due to falsehoods and slander involved in the wrongful termination;

- Loss of reputation, employment prospects, employability, and all other related losses due to slander involved in the dissemination to third parties and creation of a public record including those falsehoods promoted by the defendants in achieving her  wrongful termination;

- Intentional infliction of emotional distress by defendants;

- Slander and intentional damage to the reputation of your petitioner;

- Loss of enjoyment of life;

- Loss of pay and loss of insurance coverage (due to wrongful termination) during an active serious illness, thus exponentially increasing the hardships faced by the Petitioner and her family via loss of insurance coverage and the related mental stress as well as real denial of real medical care due to this lost benefit flowing from the wrongful termination of this employee – with the Petitioner entitled to all losses flowing from same;

- Real and future wage losses due to loss of position of employment due to wrongful termination, and the damage to future or ongoing employability due to

slanderous and defamatory claims by defendants now part of the public and employment records;

- All losses, compensation and remedies associated with the defendants' wrongful termination of the plaintiff described herein;

- Damages for Petitioner forced to pay substantial legal fees for Civil Service and related representation while not earning her City of New Orleans employment salary due to illegal Termination, with costs and legal representation payments incurred as a result of this and litigation related to her illegal Termination;

- Damages for Petitioner's health issues were exacerbated by ongoing work-related and then Termination-financial downturn stress; with treatment and costs for medical treatment increased;

- Damages for Petitioner lost her employment-related Health Insurance, was limited in her much needed health care coverage, and had her premiums increased substantially once converted to non-active employee due to her illegal Termination;

- Damages for Petitioner's and family members' Student Loans being defaulted, with the family unable to meet monthly payments due to Petitioner's Termination-related financial losses and limitations;

- Damages for Petitioner and family members being forced to borrow money from non-immediate family members to pay for much needed medication and surgeries due to Petitioner's Termination-related financial losses and limitations;

- Damages for Petitioner's Income reduced from $4600 monthly to unemployment benefits at $225 weekly due to Petitioner's Termination-related financial losses and limitations;

- Damages for Petitioner and her family being unable to meet monthly mortgage payments; forced to file for Bankruptcy, due to Petitioner's Termination-related financial losses and limitations;

- Damages for Petitioner falling behind in payments for son's private high school tuition, which led a family member, Elgin Edmonds having to pay for son's tuition, again due to Petitioner's Termination-related financial losses and limitations, as well for any embarrassment suffered for same;

- Damages for Petitioner's son unable to participate in extra curriculum activities at private high school, again due to Petitioner's Termination-related financial losses and limitations;

- Damages for Petitioner's family unable to take planned trip to Alabama for a church retreat due to Petitioner's Termination-related financial losses and limitations;

- Damages for Petitioner's family unable to take planned trip to Dallas, Texas for a planned family vacation due to Petitioner's Termination-related financial losses and limitations;

- Damages for Petitioner unable to repair/replace inoperable vehicle; forced to rely on sharing daughter's vehicle due to Petitioner's Termination-related financial losses and limitations;

- Damages for Petitioner's family at times unable to purchase food due to Petitioner's Termination-related financial losses and limitations;

- Damages for Petitioner being forced to use DROP money received and monthly pension payments began, most of the funds had to be used as follows:  to pay back loans, to pay for mounting legal fees due to ongoing litigation, to catch up overdue mortgage payments as foreclosure loomed; to catch up overdue utilities (lights, gas, water, etc.) again due to Petitioner's Termination-related financial losses and limitations;

- Reasonable attorney's fees and all costs of these proceedings;

- All other damages and/or costs found reasonable through the rendering of this matter.

WHEREFORE, Petitioner ZEPPORIAH EDMONDS prays that the defendants be duly served and cited to appear and answer this petition, all as provided by law; that after legal delays and due proceedings, there be a judgment in favor of the petitioner and against defendants Defendant City of New Orleans, Mark D. Jernigan and Linda Copeland, all jointly, severally, and *in solido* to compensate your petitioner for her damages and losses claimed herein, reasonable attorney's fees, all costs and fees involved in bringing this prosecution, and penalties or exemplary damages found applicable, and any and all other losses as which may be determined at the trial of this

matter, together with legal interest thereon from the date of judicial demand until paid, for all costs of these proceedings and for all general and equitable relief.

Sincerely,

*Dominic N. Varrecchio*

DOMINIC N. VARRECCHIO
Attorney for Petitioner
300 Lafayette Street, Suite 103
New Orleans, LA 70130
Louisiana Bar Number 19456
Phone No.: (504) 524-8600