# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF THE STATE OF LOUISIANA

| | |
|---|---|
| **Zepporiah Edmonds** | **CIVIL ACTION  No.    16  cv  00298** |
| **VERSUS** | **JUDGE:**            I. Lemelle |
| **City of New Orleans,** **Mark D. Jernigan and** **Linda Copeland** | **MAGISTRATE:**      D. Knowles |

### Affidavit of Petitioner ZEPPORIAH EDMONDS with evidence attached to Support her Motion for Reconsideration

I, ZEPPORIAH EDMONDS, until my Termination from employment on January 11, 2016 (Exh. 1), worked for 31-plus years as an employee with the City of New Orleans, working my way up from an entry-level position and earning promotions and pay increases until appointed the head Parking Administrator for the City of New Orleans, Department of Public Works ("DPW"), first on an interim basis in 2006, and then officially appointed to that position in 2009.  My positions were entirely Civil Service positions and at no time was I ever a political or "Unclassified" employee serving without the earned Civil Service protections gained over my tenure.

I had an exemplary employment record, with superior Job Ratings for the years 2012, 2013 and 2014 (Exh. 2, in globo), despite missing a good portion of work due to a debilitating illness and multiple surgeries involving recurring kidney infections and treatment for chronic bladder and bi-lateral ureter problems, with my having suffered

complications from the surgery and enduring a very long recovery in 2013 and 2014 (Exh. 3), and often working from home during that period. My immediate superior responsible for issuing my Job Performance Ratings, DPW Head Mark Jernigan, refused to release my 2014 Job Performance Ratings, but did allow me to "see it", where again I had an "Excellent" Job Rating. Mr. Jernigan refused to compile or release a 2015 Job Performance Rating for me, which is in strict violation of Civil Service rules. The refusal of my immediate superior to compile or release my Job Performance Ratings are part of the deterioration of my workplace treatment and protections.

The workplace treatment of me and the conditions of my employment began to deteriorate from the time after I verbally and in written form, reported to my superiors and the Office of Inspector General in 2012 what I believed to be an illegal and inappropriate attempt on the part of several members of the Landrieu Administration to steer or wrongly favor the award of a very lucrative Parking Division contract, namely the "Curb Management Contract", to a particular vendor, Duncan Solutions. Part and parcel to the deterioration of my workplace conditions involved my being disinvited to the Curb Management Selection Committee meetings, my being involuntarily detached as the "Subject Matter Expert" for the same committee and "unofficially" replaced by Edward Kerkow, a Landrieu Administration political appointee with no expertise in the field of parking or "Curb Management", my being written up or verbally disciplined for very minor or non-existent infractions, having co-worker Linda Copeland, a newly-hired assistant to my immediate superior DPW Head Mark Jernigan, either purposefully or recklessly undermine my authority and demoralize the lower level employers in my direct responsibility and supervision, as well as having Copeland in her capacity as the Human Resources Director for the DPW issue directives and communications that were

2

inaccurate and led directly to one of four alleged violations of policy that provided the alleged grounds for my Termination, as well as having Mr. Jernigan ignore my and others complaints of Ms. Copeland's abusive behavior towards myself and other Parking Division employees, as well as her attempting to order or coerce myself and others to illegally release impounded vehicles of her friends and others. Instead of following up or disciplining Ms. Copeland, Mr. Jernigan rewarded her with a job upgrade and a very lucrative pay raise. Details and evidence of this will be provided in detail below.

The workplace conditions for myself further deteriorated into late 2015 when, as properly performing my duties as the Parking Administrator, I in good faith, issued poor work performance evaluations to the Landrieu Administration's chosen vendor for that Curb Management Contract, Duncan Solutions (Exh. 4). The deterioration culminated with my forwarding a signed letter outlining the substandard work performance of Duncan Solutions to my immediate superior, Mark Jernigan (Head of the Department of Public Works) on June 16, 2015 (Exh. 5), I was served the very next day by Mr. Jernigan hand-delivering to me an Office of Inspector General Report (Exh. 5A) alleging my failure to cooperate with their requested investigations – for all intents and purposes a precursor and firm indication that my employer would be soon seeking to Terminate me from my long-term employment..

I address in detail these items via my Affidavit here in order to economize on the Court gathering this same information from my civil Service appeal testimony, which is in a length of over 500 pages. I address in detail by particular category of interest below:

**My Concerns Regarding the Illegal Manipulation of the Curb Management Application and Bidding Process, as well as My Informing the Proper Superiors and Authorities of my Concerns:**

The concept of integrating into one company/management all of the computers, technology and information regarding parking violations, parking tickets, booting, towing and other technological aspects of the Parking Division, as well as to provide all equipment and management of these processes, originated at least 2 years prior to the beginning of the bidding process for the "Curb Management" Contract, which promised to be a very lucrative and long-term contract for the winning vendor, with the term calling for a five year contract with a renewal possibility for five years. After the election of the Landrieu Administration in early 2010, a committee was formed for the Curb Management Contract Selection.  As a matter of course, I was appointed to this committee as my department was to be the most affected by the chosen vendor.  I, as the Parking Administrator, was also appointed the "Subject Matter Expert" to the Curb Management Contract Selection Committee, as I had the career experience in the management of parking systems, and it was my role as Parking Administrator to attend national conferences and keep up with the latest innovations and technology offered in this field.  From the very outset of the Committee's formation and meetings, I found it concerning that the committee and the meetings seemed populated by Landrieu Administration political appointees having no experience in Parking Management, and that these political persons seemed determined to steer the contract and tailor the specifications of the bid to favor Duncan Solutions, a company well known to parking professionals nationwide as having a sub-par record of performance where they were awarded significant contracts.

In July, 2011, I was copied on an E-mail (Exh. 6) where the political members of the committee were discussing meeting with Duncan Solutions to discuss the contract, in

violation of the Mayor's Executive Order of June 3, 2010 regarding the competitive bidding/procurement process. (Exh. 7). Then, in August of 2011, I was noticed of a meeting regarding the Curb Management Contract Selection Committee where ONLY Duncan Solutions would be discussed (Exh. 8), again in violation of the Mayor's Executive Order as well as other bid laws. My suspicions were heightened when at certain committee meetings the City's Chief Information Officer (CIO), Mr. Allen Square and members of his team, Mr. Edward Kerkow and Mr. Michael McKenna, began to attend committee meetings and began to openly steer discussions and favorable comments about Duncan Solutions. This pattern continued for many months and at that point I made a verbal complaint to the Office of Inspector General ("OIG") via their Investigator Aaron Malone. On October 24, 2011, the OIG copied me on their letter to Deputy Mayor Cedric Grant announcing their office's review of the "parking management contract". (Exh. 9).

On March 19, 2012, Mr. Jorge Hernandez, a Parking Analyst who reported directly to me, sent his own memorandum (Exh. 9A) to Mr. Jernigan expressing severe misgivings as to the behavior of Mr. Square, Mr. Kerkow and Mr. McKenna (named the Technical Review Committee) in suspecting that the outcome of the bid for the Curb Management Contract was pre-determined based upon the behavior of the members aligned with the Landrieu Administration political appointees. I made it clear to the "Technical Review Committee" that I would not participate in any inappropriate conduct regarding the bid for the Curb Management Contract.

Shortly thereafter, Landrieu Administration political appointee and CIO Square verbally spread false rumors about myself claiming that I was attempting to steer this contract to another vendor other than Duncan Solutions. This is and was patently untrue,

5

and I have never favored any or disfavored any particular bidder for any personal or extraneous reasons. I made recommendations solely based upon the facts presented and references provided. I expressed my unhappiness with these attacks upon my integrity by Mr. Square in a June 1, 2012 memorandum sent by me to my immediate superior, Mr. Jernigan (Exh. 11). Sometime later, Mr. Jernigan verbally discussed these problems with me, informing me that "Andy is driving that train", and that the implication was that I should avoid crossing Andy Kopplin, the City's Chief Administrative Officer (the "CAO"), second in command only to The Mayor, less I lose that "battle".

On or about June 10 through 14, 2012, I attended an out-of-town parking conference, the International Parking Institute Conference, which was held in Phoenix, Arizona involving parking management professionals, as the City of New Orleans regularly sent me to such conferences in my role as the head Parking Administrator for the City of New Orleans, and this conference was attended by vendors from different companies promoting or marketing different products to the different cities and jurisdictions that have parking management.

While at a reception that is a regular part of these conferences, as I stood next to my husband JOHN EDMONDS, a Black male approximately 60-70 years old, who I was acquainted with through these parking conferences but whose name I cannot remember for certain, extended his greetings to me, and to the best of my hearing and recollection happily and loudly stated the following as he laughed and seemed to enjoy informing me of the following:

> "We're coming to New Orleans. We're going to get the
> contract. It's a done deal. Now, don't look for me to do a lot

6

>of work because I'm a retired grandfather, but I'll be coming and working with them. We're getting that contract. It's a done deal."

I then exchanged a few more seconds of conversation, then the man left us. I was a bit taken aback and explained to my husband that the man worked for a contract vendor (applicant) and claimed to have a lock on a contract where the winning bidder had not even been decided or awarded yet. I told my husband immediately that "I am telling Cedric (Grant – the Deputy Mayor) about this as soon as I get back". And I did.

During a June 18, 2012 Committee meeting, members were asked to fill out forms evaluating the proposals made by the particular Curb Management Contract bidders. I, as the Subject Matter Expert, was to have my evaluations given some weight in the determination of which bidders would be strongly considered. When I issued a less than favorable evaluation to Duncan Solutions (Exh. 10), CAO Kopplin became visibly angry, and articulated that aloud that he was unhappy with me. At some point, thereafter he verbally informed me that he was not happy with my performance as the Parking Administrator, and that my performance was not to an acceptable level. This occurred when my Job Performance Ratings were "Excellent" (Exh. 2).

On June 19, 2012, I and Parking Operations Analyst Jorge Hernandez, a valuable assistant to me in the Parking Division, and who worked directly with me on the contract in gathering information on the bidders/applicants, issued a joint report to DPW Head Mark Jernigan explaining to him the pricing/costs involved ("Pricing Matrix") for each of the bidders still being considered for the Curb Management Contract, as the candidates were now down to three after withdrawals and elimination of many of the original bidders. The memorandum (Exh. 12) explained in detail that the Duncan Solutions bid and

proposal was over $900,000.00 more costly to the City than the two other remaining bids, as well as explaining how Duncan Solutions had received sub-par evaluations for their performance in other cities. I heard nothing from Mr. Jernigan in response to this report.

On July 2, 2012, I sent a follow-up e-mail to Mr. Jernigan asking if there were any updates or developments regarding our June 19, 2012 report on the Pricing Matrix (Exh. 13). I was, as Parking Administrator, interested in moving forward with this contract and replacing horribly outdated equipment used by my employees with the Parking Division. I heard nothing from Mr. Jernigan in response, but I was hand delivered a copy of my July 2, 2012 e-mail with Deputy Mayor Cedric Grant's jotting on it – "I need to see her today". I soon met with Mr. Grant in his office where he essentially used profanities, stated that he wasn't "going to jail" with the others, and that I needed to "stop sending emails about this" and to stay clear of the machinations of those manipulating the Curb Management Contract.

On July 10, 2012, I, as part of my duties as Parking Administrator, submitted to the members of the committee, my evaluation of the remaining bidders' pricing (Exh. 14). There was a suggestion made prior to this that the committee solicit "Best and Final Offers" from each remaining bidder, and I reminded the committee in that e-mail that such an undertaking was in violation of the Mayor's Executive orders and likely in violation of public bid laws.

On July 25, 2012, I sent an exhaustive and detailed memorandum to my immediate superior Mark Jernigan explaining all of my concerns with what I believed to be the manipulation of and steering of the Curb Management Contract to a certain bidder, as well as my misgivings of what I considered the inappropriate involvement and

8

attendance of Landrieu political appointees at the committee meetings and their improper influence upon the contract selection process (Exh. 15).

On July 30, 2012, the Committee had a meeting at which point there were serious discussions involving the choice of a contract selection winner. When it appeared to the Landrieu Administration political people attending the meeting that Duncan Solutions might not be awarded the contract, Landrieu political appointee Ed Kerkow convinced the committee majority NOT to vote on the contract, but to reschedule for a later date. The notes and bidder evaluations made by me at that meeting are attached here (Exh. 16).

At a Selection Committee Meeting held October 15, 2012 a vote was eventually taken (Exh. 16A). Duncan was not selected as the vendor that offered the best value to the City. Duncan protested and sometime thereafter, the Committee awarded Duncan Solutions the Curb Management Contract. I eventually voted for them to get the contract in order to lessen hostilities with the Landrieu Administration appointees, who had grown increasingly hostile and who had attempted to remove or fire other career City Government professionals for not going along with their manipulations of contract awards. By that point, they controlled a majority of the committee votes and would award the contract to their chosen vendors pro forma.

As Parking Administrator, it was my duty to the City and to my employees to attempt to make this contract work for the Parking Division. Over time, I was in the course of my duties as Parking Administrator compelled to issue honest evaluations of the Duncan Solutions performance of the Curb Management contract. In a great many areas, their performance was substandard, expensive, and less productive than it should have been. My evaluations reflected that.

On June 16, 2015, I forwarded a draft of a very poor work performance evaluation for Duncan Solutions and a letter regarding their substandard performance (Exh. 5) to my immediate superior, Mark Jernigan (Head of the Department of Public Works).  Shortly afterwards, The City issued to me a letter with a Notice of Termination of my employment the City, via a letter issued by the same Mr. Jernigan.  Thereafter, on September 11, 2015, I contacted the Louisiana Ethics Administration Program, Ms. Lisa Hudson – the Personnel Director for the City of New Orleans, Mayor Mitch Landrieu, and Mr. Michael Cowan, Chair of the New Orleans Ethics Review Board, all in writing, seeking redress regarding Mark Jernigan's wrongful attempt to termination my employment and his retaliatory actions, as well as seeking "Whistleblower" Protections. (See attached Exhibit 26, in globo, with letters to each entity as well as attachments mailed).

**My Rebuttal to The Four Alleged Separate Grounds for My Termination contained in the January 16, 2016 Notice of Termination (Exh. 1)**

I present my attestations and where appropriate evidence explaining my rebuttals to the alleged grounds for Termination, which I fully dispute here, as follows:

**1.  Alleged failure to be responsive and to cooperate with an OIG Investigation:**

   I have never refused to cooperate with or to fully be forthcoming with any investigation or inquiry into my work performance or my department. I have always asked each and every employee under my charge with cooperating with any such investigation also.  Exhibit 20 attached here shows constant e-mail communications between myself and the OIG Investigators concerning my working with them to produce or obtain the

10

information requested – which I did to the very best of my ability. Even when I was home and out of the office with serious illness (Exh. 3. previously entered and referenced) I worked hard to comply with the OIG's requests to the very best of my abilities.   Attached Exhibit 21 here shows additional e-mails between myself and the OIG personnel, as well as additional integrated e-mails between myself and DPW Supervisor Sherida Emery requesting that she cooperate with the OIG to provide whatever information was available.  At no time have I ever been less than cooperative or forthcoming with any such investigation. Once again, this is a baseless allegation used by the City to Terminate me for simply doing my job in recommending the best choices for important contracts, and for holding their politically-favored bid-winners to satisfactory job performance.

.

**2. Alleged Interference with DPW Investigation into allegations of sexual harassment against employee Alton Jones:**

I attest here under oath that I did not interfere or in any way influence the investigation of or any witnesses involved with the sexual harassment allegations made against Alton Jones.  The witness statements entered into evidence at the Civil Service Hearing of my Appeal (Exh. 17) clearly states that the investigation was not influenced or interfered with by me in any way. The City of New Orleans offered no evidence, no witness testimony, no e-mails or documents – nothing, that even began to prove or intimate any inappropriate action here by me.  All they offered at the hearing was Mr. Jernigan's unsupported claims that I had influenced the witnesses to somehow aid Mr. Jones in avoiding justice. This is absurd.  I have daughters exactly the same age as those alleging to have been harassed by Mr. Jones, and as a God-fearing, Christian

Woman, I am very sensitive and sympathetic to such harassment. As a professional Administrator and manager of people, I have ZERO TOLERANCE for any sexual abuse or harassment or discrimination under my charge and supervision. As I have testified in my Civil Service Appeal, I had nothing to gain by interfering in such an investigation, and I have no reason to jeopardize my own peace of mind or reputation or workplace in doing such a thing.

**3.  Alleged Retaliation against Parking Division Supervisor Valarie Petty:**

The employer claims as a ground for my Termination that I retaliated in changing job duties of a Parking Division supervisor, Valerie Petty, based upon her allegedly complaining to my superiors about my management of the department and my allegedly learning of the complaint, then retaliating against her by changing her job duties.  First, this is patently untrue as I never retaliated against her or any other employee.  Second, it is impossible for me to have retaliated against her unless I was able to read her mind some five weeks ahead of her complaint, as the evidence entered in the Civil Service Appeal record and attached here clearly proves that I, as Parking Administrator had made the decision via memorandum on April 5, 2015 (Exh. 18) to rotate duties amongst my supervisors, including Ms. Petty but also including others, as part of my attempt to try different supervisors in different positions in an attempt to match the best aptitudes with the best positions.   Ms. Petty issued her e-mail to my supervisors/co-workers complaining about my management of the department on May 8, 2015 (Exh. 18A), over one month AFTER I had already made the decision and had issued the April 5, 2012 memorandum. Further, Ms. Petty was not demoted, took no pay cut, took no diminishment of her authority, and was essentially unaffected by the change or rotation of

duties amongst her peer supervisors.  This charge is baseless, as are the other three. Also attached (Exh. 18B) is an email that I sent to Ms. Petty, explaining my reason for rotating the duties of ALL staff and my offer to meet with her after normal working hours in my earnest effort to alleviate her concerns.

**4. The alleged unauthorized settlement of disciplinary actions against DPW employee Giara Mahogony:**

The City of New Orleans and Mr. Jernigan claim that one of the four grounds for my Termination are that I had overstepped my authority in allegedly unilaterally reducing the suspension of DPW employee Giara Mahogany from 45 to 30 days and that I had given this same employee the incorrect date to return to work before her suspension ended. The facts are that reduction in that suspension was caused by a miscommunication by the DPW's Human Resources Director, Linda Copeland, erroneously providing me with the incorrect return date for Giara Mahogany. (Exh. 19, page 1).  Her e-mail apologizing to me for this error is contained in the above exhibit, page 1.

Further, during the course of my tenure as a Senior Level Administrator, I have regularly negotiated and settled disciplinary matters with employees under my charge, without any directive or instruction that I receive or review direction from my immediate supervisor prior to doing same.  After the Giara Mahogany situation was completed, I negotiated and settle THREE additional employees' disciplinary matters without oversight or direction or restriction from Mr. Jernigan.  In fact, the Giara Mahogany matter – which Mr. Jernigan claims is an overstepping of my authority in negotiating a reduction – is the singular instance where Mr. Jernigan has ever shown an interest in restricting or claiming that I lacked the authority to negotiate employee disciplinary settlements.  My position on

13

this was supported by the testimony at the Civil Service Hearing of Mr. Richard Boseman, a 25-year Senior Level City Government employee who had prior to my appointment served as Parking Administrator, and who testified that the Parking Administrator has always served as the Department's Representative in Civil Service and as such, possessed the authority to negotiate employee disciplinary matters without the approval or oversight of the DPW Head.

In closing, I attest here that at no point prior to the settlement or consideration of the Giara Mahogany matter had Mr. Jernigan ever instructed me that her discipline was to be of a certain period or time limit, and that I was not to negotiate the settlement or shorten her time to be suspended.  Nonetheless, my sole reason for requesting that the employee return to work by that certain date was because of the erroneous communication made to me by Linda Copeland informing me <u>when</u> the employee should return to work. Although Ms. Copeland apologized for her error as noted in  Exhibit 19, page 1, Mr. Jernigan's insistence upon blaming me for this situation, and Terminating me for it, proves again their baseless reasons for Terminating me from my employment position.


**Racially Disparate Treatment of Employees by DPW Head Mark Jernigan.**

In the Department of Public Works, Dept. Head Mark Jernigan blatantly and obviously treated his two Senior Level employees differently – with myself, a Black woman, being subject to undue scrutiny, criticism, alienation and ultimately Termination for no good reason despite superior Job Performance ratings (Exh. 2), while Linda Copeland, who abused employees, threatened employees, who either recklessly or intentionally created havoc in the Parking Division by without authority promising

14

employees promotions, pay raises and additional uniform allowances, was instead promoted and given a significant pay raise, despite employees putting Mr. Jernigan on notice of her negative behavior.

In October, 2014, Linda Copeland appeared at the City Auto Pound on North Claiborne avenue attempting to intimidate Auto Pound employees into illegally releasing an automobile owned by one of her friends or acquaintances.  When the Auto Pound employees refused to release the vehicle, she verbally abused and threatened the employees. She then called by telephone Parking Division Supervisor Sherida Emery, and attempted to get her to release the vehicle. When Ms. Emery informed her that she could not legally release the vehicle, Ms. Copeland blatantly threatened Ms. Emery and myself, stating that "You and Zepp will hear from me in regards to this".  Ms. Emery informed DPW Head Jernigan of this situation via an E-mail chain attached here as Exhibit 22.  To date, Ms. Emery is unaware of any discipline or correcting of Ms. Copeland for her antics of that date, but Mr. Jernigan did reveal "his disappointment" to Ms. Emery when she revealed her concerns about Ms. Copeland's threats to his superiors and other City Officials, which disturbed Ms. Emery as evidenced by her additional E-mails to Mr. Jernigan (Exh. 22).  Exhibit 23 attached include a set of E-mails to superiors and complaints lodged by myself and Parking Analyst Jorge Hernandez seeking relief from Ms. Copeland's ongoing attempts to sow dissension within our department.  Then there is the Giara Mahogany suspension reduction and her early return date, which was alleged to be a cause for my Termination – the early return date, in fact caused by the mistakes or carelessness of Linda Copeland by erroneously informing me of an incorrect return date for this employee. (Exh. 19, page 1).

While I was subject to micro-scrutiny – an example being that I was harshly criticized and disciplined for being late to a Community Information meeting in Algiers when I was specifically prevented from going by the Deputy Mayor Cedric Grant insisting upon my meeting with him at the exact same time that I was due at the Algiers meeting, all the while doing a superior job based upon the Job Performance Ratings and properly managing low-paid workers and getting them to perform at a high level – Linda Copeland had a pattern of mistakes, problems, fomenting issues with the workforce, and nonetheless gets promoted with a pay raise, while I get harassed, alienated, then Terminated. One person controlled the outcome of both situations – Mr. Mark Jernigan – a White male.  I, a Black woman, performed at a high level and was eventually Terminated.  Ms. Copeland, a White woman, performed at a less superior level and was promoted with a pay raise. Forgive me for feeling that Race governed this disparate treatment. If Race had nothing to do with it, then Retaliation for my scrutiny and demands upon Duncan Solutions must have.

**Due Process Violations and the failure of the Employer to properly accommodate my request to postpone the Pre-Termination Hearing of December 4, 2015, in violation of the ADA**

I was physically unable to attend due to illness the December 14, 2015 Pre-Termination Hearing at which a hearing was held in my absence and where I was Terminated.  The attached e-mail from City of New Orleans ADA Administrator Paige McCranie to DPW Head Mark Jernigan recommending the department make accommodations for my illness by postponing the hearing weighs in favor of a finding that the Employer violated the ADA requirements as well as my Due Process rights in

going forward with the hearing.  Attached Exhibit 25 contains several communications between myself, my attorneys and the defendant employer almost begging them to delay the December 14, 2015 hearing, with medical documentation of my ordered absence attached thereto.  Mr. Jernigan seemed intent upon going forward with my Termination, justice or rules be set aside. And that he did.  This Court should correct this.

The preceding is true and correct to the best of my recollection and belief.
Sworn and attested to by me, ZEPPORIAH EDMONDS, this 4th day of September, 2017.

Signed _____
ZEPPORIAH EDMONDS  -   AFFIANT

Sworn and attested to before me, Dominic N. Varrecchio, Notary Public, Louisiana Bar No. 19456,   this 4th day of September, 2017, in New Orleans (Orleans), Louisiana.

_____
Dominic N. Varrecchio – Notary Public,  La. Bar No. 19456

Respectfully submitted,

*Dominic N. Varrecchio*
_____
Dominic N. Varrecchio (# 19456)
300 Lafayette Street, Suite 103
New Orleans,  LA  70130
Telephone:  (504) 524-8600
Email: knic55@cox.net
*Attorney for Plaintiff Zepporiah Edmonds*

## CERTIFICATE OF SERVICE

      I certify that a copy of the above and foregoing has been served upon counsel for all parties by the USDC Court Electronic Filing System, this 4th of September, 2017.

*Dominic N. Varrecchio*

_____
DOMINIC N. VARRECCHIO