# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF THE STATE OF LOUISIANA

| | |
|---|---|
| **Zepporiah Edmonds** | **CIVIL ACTION  No.    16  cv  00298** |
| **VERSUS** | **JUDGE:             Lemelle** |
| **City of New Orleans, Mark D. Jernigan and Linda Copeland** | **MAGISTRATE:** |

## Plaintiff's Updated Memorandum in Support of her Motion seeking Reconsideration, Review, Relief and Reversal of this Court's earlier June 19, 2017 ruling dismissing Plaintiff's Claims, filed here Pursuant to recent Court Order, Rec. Doc. 128

Now Into Court comes Plaintiff, ZEPPORIAH EDMONDS, who files her  reduced Memorandum in Support of her Rule 59 (a)(1)(B) Motion For New Trial/ Rule 60 Motion for Relief, seeking reconsideration of this Court's June 19, 2017 ruling dismissing all of Plaintiff's claims. This motion is filed pursuant to Court Orders of October 18, 2017, instructing Petitioner to file this Motion to Reopen Case AFTER the conclusion of all state court proceedings, that are now exhausted. Plaintiff files here again a reduced Memorandum, within specified page limits, in response to the Court's most recent orders for same.

1. Since October 18, 2017, state law proceedings are completed as Appeal of plaintiff's Termination was heard and ruled upon by the City of New Orleans Civil Service Commission ("CSC"). On September 5, 2017, the CSC held that Ms.

1

Edmonds "did engage in misconduct" regarding the OIG investigation, but that "such misconduct did not warrant termination." (Exh. #1) The CSC remanded the matter to a Hearing Examiner ("HE") who actually conducted her nine-day trial of her Termination Appeal, HE for the appropriate level of discipline. The HE then concluded the Petitioner be assessed a one-day suspension.

2. On November 16, 2017, the Commission then rendered a second 2-1 decision (See Exh. #2). The CSC majority declined to follow the recommendation of the HE, favored the employer DPW/Landrieu Administration in holding that plaintiff engaged in "serious misconduct" and found "involuntary demotion to a lower classification" to be an appropriate penalty. The CSC also ordered DPW to reinstate Ms. Edmonds to the position of Assistant Parking Administrator "at a step that would result in no greater than a $3,000/yr. reduction in salary."

3. Both Petitioner and DPW then appealed the decisions of the CSC to Louisiana Fourth Circuit Court of Appeal.

4. On December 5, 2018 the Louisiana Fourth Circuit Court of Appeal three-judge panel ruled unanimously in your Petitioner's favor, holding that the CSC had committed "manifest error" and reversed the Involuntary Demotion of your Petitioner, in a total rebuke to defendants CITY OF NEW ORLEANS and DPW.

5. Petitioner's Exhibits original to this Memorandum will be labeled simply "Exhibit #1, et seq.. Those only other Exhibits referred to here are earlier introduced Civil Service Appeal exhibits, listed as "CE Exh. #1, et seq., part of the Civil Service record referred to throughout this memorandum).

**Argument for Reversal of This Court's Previous Dismissal of the Petitioner's Claims via Dispositive Motions Granted.**

Petitioner respectfully asserts that there exist overwhelming evidence, testimony, argument and law sufficient to restore her previously dismissed, and previously inadequately presented and explained tort claims. Petitioner posits the grounds for which this Court should reinstate each claim:

**A.   Proof of Petitioner's Title VII Retaliatory Discharge Claim relative to the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq).**

Petitioner offers ample evidence necessary to provide grounds for proving that her Termination was a Retaliatory Discharge, particularly in light of both the CSC, the HE and the La. 4th Circuit eviscerating the defendants' four alleged grounds for her termination and ordering an immediate reinstatement of the plaintiff to her former position. (Exh. #'s 1, 2 and 3)**,** proving that the reasons provided by the defendant employer were merely a pretext for that Retaliatory Discharge. Perhaps the most pointed proof of her Retaliatory Discharge is the fact that she was first noticed of her Termination Process (the required process of hearings, notices, etc.) by her employer and immediate supervisor, defendant JERNIGAN, less than ONE DAY after she issued and made public a report that she had authored criticizing the performance of the favored vendor that was awarded the contract for "Curb Management" which created the two-year long pattern of Hostile Work Environment that she was forced to endure prior to her Termination Process beginning. The Petitioner's original reports to the City's OIG, her reports of abuse of the Curb Management Contract process, the employer's

3

subsequent mistreatment and denigration of her, despite her concerns and subsequent EEOC Complaints claiming Racial, Hostile Working Environment and other discriminations are absolutely those protected activities contemplated to be protected under Title VII. The emphasis here on her complaints regarding the Curb Management contract process are emphasized here in order to provide the "causation" between her "protected activity", and the adverse employment actions of her immediate superior, defendant Jernigan (who we suspect but cannot prove performed these actions on behalf of the Landrieu Administration)  Her complaints about the Curb Management contract led to the Petitioner's immediate supervisor Jernigan's unlawful reaction to those complaints – the constant Harassment, an unexpectedly new and pervasive Hostile Work Environment, Racially Disparate treatment and undue scrutiny compared to peer-level White employee Linda Copeland, a gratuitously prosecutorial reaction to her from the OIG simply for reporting unethical activity regarding the Curb Management contract, the employer's hardball-like failure to accommodate her ADA-recognized disability, and her ultimate Termination on proven specious grounds by defendant Jernigan.  The Curb Management Contract complaints by the Petitioner led to the hostility and illegal treatment of the Petitioner in the workplace, which led to her filing internal Grievance Complaints of July 13 and 15, 2015 whereupon she reports to Jernigan that supervisors under her authority and that of Jernigan, have allowed mandatory Ethics Training to become corrupted, and with the employer then wrongly blamed upon her, thus increasing the illegal workplace harassment and hostility towards her. In response, defendant Jernigan does nothing to discourage or stop the hostility toward the plaintiff. Further, Jernigan then attempts unsuccessfully to recruit Petitioner's

co-worker Sherida Emery to fabricate present damaging evidence against petitioner, and Ms. Emery testified under oath to same in the CS Commission hearing on June 30, 2016 where she testified that the Petitioner did consistently instruct her to cooperate with the OIG (Emery CSC Testimony, pgs. 105-122)**,** that Jernigan attempted to coerce Ms. Emery into lying about the Petitioner (Emery CSC Testimony, pgs. 123-131, and 164-167), and then Emery testified as to Linda Copeland's harassment and retaliation threats against both herself and the Petitioner regarding their refusal to illegally release an impounded vehicle at Copeland's demand (Emery CSC Testimony, pgs.135-146). Under cross-examination Ms. Emery's testimony remained steadfast (Emery CSC Testimony, pgs. 147-164)

Petitioner's EEOC complaints are indeed "protected activity" under the Title VII, but those complaints led to an even more progressively worsening workplace treatment and her ultimate Wrongful Termination. As defendants almost never admit Retaliation, the employee usually must prove it by circumstantial evidence. Here, the circumstantial evidence is easy to see, including the four roundly rejected fabricated "grounds" for her Termination that were engineered, made up, and promoted by defendant Jernigan in a mission to remove the Petitioner and point to a full scale Retaliation and Retaliatory Discharge of the Petitioner. Again, the Petitioner's June, 2015 Report critical of the Landrieu Administration's choice of the Curb Management contract, is also "protected activity",  the timing of that event providing evidence of "causation" of the employer first putting Petitioner on notice of her termination process – two events a mere single day apart.  The facts that the Petitioner's supervisor Jernigan made up four separate and now-debunked "grounds" to terminate your Petitioner is *prima facia* evidence of

Retaliation. That the Landrieu Administration-aligned CSC does not find Retaliation, the CSC ignores and misses evidence and testimony of the years 2014 and 2015 to come up short of a full finding of Retaliation (an issue never before the Louisiana Fourth Circuit Court), and further takes not into account the extended absence from the workplace due to illness and multiple surgeries in 2012, 2013 and 2014 (Exh. #4, Plaintiff's Reply Brief Affidavit). The Petitioner here has provided the necessary "protected activity", the adverse employment action, and the hard circumstantial proof of a causal link between her Termination and Retaliation..

After the election of the Landrieu Administration in early 2010, a committee was formed for the Curb Management Contract Selection. Petitioner, as the Parking Administrator, was also appointed the "Subject Matter Expert" to the Committee. From the outset Petitioner found it concerning that the meetings seemed dominated by Landrieu political appointees having no experience in Parking Management, and that these persons, led by Landrieu political operative Allen Square, who seemed openly determined to steer the contract and tailor the specifications of the bid to favor Duncan Solutions, a company well known to parking professionals nationwide as having a sub-par record of performance.

In July, 2011, Petitioner was copied on an E-mail (CS Exh. 6) where the political members of the committee were discussing meeting with Duncan Solutions to discuss the contract, in clear violation of the Mayor's Executive Order of June 3, 2010 regarding the competitive bidding/procurement process. (CS Exh. 7). Then, in August of 2011, she was noticed of a meeting regarding the Curb Management Contract Selection Committee where ONLY Duncan Solutions would be discussed (CS Exh. 8), again in

violation of the Mayor's Executive Order as well as other bid laws.   This pattern continued for many months and at that point she made a verbal complaint to the Office of Inspector General ("OIG") via their Investigator  Aaron Malone. On October 24, 2011, the OIG copied Petitioner on their letter to Deputy Mayor Cedric Grant announcing their office's review of the "parking management contract". (CS Exh. 9). It is telling that the OIG's response to the Petitioner's complaint was for the OIG to issue to your Petitioner a list of demands for documents with an immediate deadline, with the letter very terse, accusatory, and prosecutorial in tone. (CS Exh. 29) Finally, it is telling that the OIG copied only the Petitioner's main two protagonists in the Curb Management contract process – Allen Square and Andy Kopplin (who became involved in promoting Duncan for the contract later in the process) – and no others.

On March 19, 2012, Committee member Jorge Hernandez, a Parking Analyst who worked often with Petitioner, sent his own memorandum (CS Exh. 9A)    to Mr. Jernigan expressing severe misgivings as to the behavior of certain other committee members, including Mr. Square, in suspecting that the outcome of the search committee was pre-determined based upon the behavior of the members aligned with the Landrieu Administration political appointees.

During a June 18, 2012 Committee meeting, members were asked to fill out forms evaluating the proposals made by the particular Curb Management Contract bidders. Appellant, as the Subject Matter Expert, was to have her evaluations given some weight in the determination of which bidders would be strongly considered.  When Petitioner issued a less than favorable evaluation to Duncan Solutions (CS Exh. 10), Landrieu political operative Allen Square became visibly angry, and articulated that

aloud that he was unhappy with her.  At some point shortly thereafter, CAO Andy Kopplin (second in command at City Hall to the Mayor) verbally informed Petitioner that he was not happy with my performance as the Parking Administrator, and that her performance was not to an "acceptable level".  This occurred in year 2012 when Petitioner's Job Performance Ratings were "Excellent" (CS Exh. 2).

Shortly thereafter, Landrieu operative and committee member Allen Square verbally spread false rumors claiming that Petitioner was attempting to steer this contract to another vendor other than Duncan Solutions. Petitioner expressed her unhappiness with these attacks upon her integrity by Mr. Square in a June 1, 2012 memorandum sent by Petitioner to her immediate superior, Mr. Jernigan (CS Exh. 11). Some time later, Mr. Jernigan verbally discussed these problems with Appellant, informing her that "Andy Kopplin is driving that train", and that the implication was that Petitioner should avoid crossing Mr. Kopplin on the Curb Management contract, less she lose that "battle".

On or about June 10 through 14, 2012, Appellant attended an out-of-town parking conference held in Phoenix, Arizona involving parking management professionals in her role as the head Parking Administrator for the City of New Orleans, attended by vendors from different companies promoting or marketing different products to the different cities and jurisdictions that have parking management.

While Petitioner stood next to her husband JOHN EDMONDS, a Black male approximately 60-70 years old, who she was acquainted with through these parking conferences happily and loudly approached: "We're coming to New Orleans.  We're going to get the contract.  It's a done deal.  Now, don't look for me to do a lot of work

because I'm a retired grandfather, but I'll be coming and working with them. We're getting that contract. It's a done deal." Petitioner was a bit taken aback and explained to her husband that the man worked for a contract vendor (applicant) and claimed to have a lock on a contract where the winning bidder had not even been decided or awarded yet. Petitioner's husband, JOHN EDMONDS, was standing next to your Petitioner and heard the entire conversation as it occurred. He attaches his sworn Affidavit attesting to same (Exh. #5 – Affidavit of John Edmonds).

On June 19, 2012, Petitioner and Jorge Hernandez, a Parking Operations Analyst and a valuable assistant to Petitioner in the Parking Division, issued a joint report to DPW head Mark Jernigan explaining to him the pricing/costs involved ("Pricing Matrix") for each of the bidders still being considered for the Curb Management Contract, as the candidates were now down to three after withdrawals and elimination of many of the original bidders. The memorandum (CS Exh. 12) explained in detail that the Duncan Solutions bid and proposal was over $900,000.00 more costly to the City than the two other remaining bids, as well as explaining how Duncan Solutions had received sub-par evaluations for their performance in other cities. Petitioner heard nothing from Mr. Jernigan in response to this report.

As Parking Administrator, it was Petitioner's duty to the City and to her employees to attempt to make this contract work for the Parking Division. Petitioner was in the course of her duties as Parking Administrator compelled to issue honest evaluations of the Duncan Solutions performance of the Curb Management contract. In a great many areas, their performance of Duncan was substandard, expensive, and less than productive. Appellant's evaluations reflected that in February, 2015, (CS Exhs. 4, 5).

On June 16, 2015, Petitioner forwarded a draft of a periodic evaluation for Duncan Solutions revealing a very poor work performance (CS Exh. 5) to her immediate superior, Mark Jernigan for his approval.  On the very next day, June 17, 2015, Mr. Jernigan hand delivered to your Petitioner a copy of a Report of Administrative Investigation conducted by the OIG alleging Petitioner's lack of cooperation with the OIG offices and investigators (CS Exh. 5A). <u>Petitioner immediately knew that the report was a precursor to issued to the employer beginning the process of her Termination of employment with the defendant CITY OF NEW ORLEANS, despite thirty years of excellent service.</u>  On September 11, 2015, Petitioner contacted the Louisiana Ethics Administration Program, Ms. Lisa Hudson – the Personnel Director for the City of New Orleans, Mayor Mitch Landrieu, and Mr. Michael Cowan, Chair of the New Orleans Ethics Review Board, all in writing, seeking redress for her Wrongful Termination/Retaliatory Discharge, as well as seeking "Whistleblower" Protections. (See attached CS Exhibit 26, *in globo*, with letters to each entity as well as attachments mailed).

Petitioner insists that she offers ample evidence necessary to provide grounds for proving that her Termination was a Retaliatory Discharge, and that the reasons provided by the defendant employer were merely a pretext for that retaliation, and that the evidence and testimony attached here as applied to the controlling case law regarding Title VII claims provide clear material issue of fact necessary to have this Court reconsider the granting of the defendant CITY OF NEW ORLEANS's Motion for Summary Judgment granted via Record Doc. 85.

The standard for establishing a claim of retaliatory discrimination is as follows:

A plaintiff may establish a prima facie case of retaliation by demonstrating that: "(1) she participated in a Title VII protected activity, (2) she suffered an adverse employment action by her employer, and (3) there is a causal connection between the protected activity and the adverse action." _Stewart v. Miss. Transp. Comm'n,_ 586 F.3d 321, 331 (5th Cir.2009). "Summary judgment is appropriate if the plaintiff cannot support all three elements." _Id._ If, however, a "plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate ... non-retaliatory reason for its employment action. If the employer meets this burden of production, the plaintiff then bears the burden of proving that the employer's reason is a pretext for the actual retaliatory reason." _Aryain v. Wal-Mart Stores Texas LP,_ 534 F.3d 473, 484 (5th Cir.2008) (internal quotation marks and citations omitted). _Davis,_ 448 Fed. Appx. at 492. Petitioner maintains that the protected activity in this case was the 2011 and 2012 memoranda and communications to her superiors and the OIG regarding the suspected steering of the Curb Management contract to a specific bidder, her ongoing honest grading and evaluations of the bidders which angered high level members of the Landrieu Administration, as well as her ongoing honest grading and evaluations of the winning Curb Management bidder – Duncan Solutions – who she was charged to  work with and evaluate as part of her duties as the Parking Administrator, as well as her pre-Termination EEOC Complaints filed in 2014 and 2015.

Here, Petitioner meets all three criteria necessary to bring a Title VII claim here for Retaliatory Discharge.  Petitioner was certainly engaged in protected activity where she reported suspicious contract "steering" activity to those superiors and entities for

which she reported same, and then her immediate Notice of Termination Process beginning the day after her unfavorable evaluation of the vendor on June 16, 2015.  Her employment was negatively affected by deteriorating conditions, culminating in her baseless and wrongful Termination. And there is a causal connection between the two given none of these negative conditions existed prior to her engaging in the complaints claimed here protected activity, the four alleged grounds for her Termination are specious and now, after state court litigation and Appellate Court holdings, found to be entirely disproven, and while not addressed (given the state court limited scope of reinstatement or ratifying her Termination), where essentially exposed as pretext for her Retaliatory Discharge, and finally there is the timing – on the day after she harshly graded and demanded better performance from politically-protected contract winner Duncan Solutions, she was served the very next day with her employer's Office of Inspector General Report alleging her failure to cooperate with their requested investigation – for all intents and purposes a "weather report" and firm indication to her informing her that her employer will be soon seeking her Termination. (CS Exh. 5A).

Your Petitioner assets here that none of these four asserted grounds for Termination actually existed, and instead were pretexts to her retaliatory discharge in order to terminate her from her position of employment in retaliation for her resisting and reporting the actions of certain members of that Landrieu Administration to the lucrative Curb Management contract to their politically favored winning bidder, Duncan Solutions, who performed in a substandard manner, and your Petitioner's scrutiny of the company once it was awarded the contract, in her role as Parking Administrator.

The timing of your Petitioner's process of termination, with the OIG report of her alleged "non-cooperation" issued as a precursor for termination on the day after she had produced a draft of the report critical of politically-favored vendor Duncan Solutions, is telling. Further, Parking Division Management Operations Specialist Jorge Hernandez, who worked closely with your Petitioner on the Curb Management contract vetting of bidders, testified at the Petitioner's Civil Service Appeal Hearing (CS Exh. 30) that he was "intimately familiar" with the Curb Management contract (CS #30,  p.100), that it was obvious to him that the contract was targeted to one vendor (CS #30, p.104), and that Duncan "should never have gotten that contract".(CS #30, p.102).   He further testified that your Petitioner was "unfairly" targeted after the process involving the Curb Management contract (CS 30, p. 117-119), and that your Petitioner was the best direct report (supervisor) that he had ever worked for in almost 40 years in the business (CS 30, p.100). He further testified that he accompanied your Petitioner to meet with both the OIG and Deputy Mayor Grant to express heir concerns about the Curb Management contract process (CS #30, p. 134-137, 139-141).  He testified that in the most recent round of promotions and pay raises, he alone did not receive a pay raise (CS #30, p.115-117), evidence of Hernandez being retaliated against himself for his vocal resistance to the Curb Management contract process.

An employee such as your Petitioner can give great weight to a claim of Retaliatory Discharge if able to show that the stated grounds for the Termination were false or did not truly exist.  Your Petitioner here, one by one, offers sworn Civil Service Hearing evidence and testimony of competent witnesses, as well as documentation from her tenure as head of the Parking Division, which prove that each of the four grounds

provided by the Employer for her Termination simply did not exist, but were a specious and ungrounded pretext to her wrongful Termination and Retaliatory Discharge. The rebuttal to each alleged ground for Termination are made here as follows:

## B.   Proof supporting Petitioner's Hostile Work Environment Claim:

The Petitioner's claims of enduring a Hostile Working Environment are fully presented above in her detailed explanation of her Retaliation Claims made above, and in her 9/4/2017 filed Reconsideration brief. Petitioner, a Black female, belongs to a protected group as per the ADEA.  She suffered  continuous unwelcome harassment as memorialized above (undue scrutiny, harassment by co-worker defendant Linda Copeland, a newly-found and progressively worsening workplace environment, Racially Disparate treatment and scrutiny by superior Jernigan as compared to peer-level White employee Linda Copeland, a prosecutorial reaction to her from the OIG simply for reporting unethical activity, harassment from defendants Copeland and Jernigan (additional examples below), a failure to accommodate her ADA-recognized disability, and her ultimate Termination for the four separate and now-debunked charges). The workplace mistreatment, and uneven scrutiny and discipline leading to her groundless Termination and continued denial of full authority and benefits despite Court Orders that the employer do so, did affect her privilege of employment; worsening her ability to perform her work, undermining her authority in the workplace and affecting her health and recovery from her serious medical condition. The Plaintiff's filing two EEOC complaints certainly called this harassment to the employer's.

Here, Petitioner is clearly a member of a protected group, she was qualified for her position and performed extremely well given her job performance evaluations already in evidence, and she suffered the adverse employment action of a progressively worsening workplace environment, then wrongful, baseless Termination. The defendants' replacement of the Petitioner with another Black employee is not a be-all, end-all defense for many months of humiliation and harsh, racially disparate treatment by a White supervisor, Jernigan, bent upon punishing the Petitioner for an animus germinated in her ethical concerns, reporting and scrutiny of an important Curb Management contract and politically favored vendor. The animus against her manifested in illegal racially disparate treatment as it concerned herself and peer-level co-worker Linda Copeland. The mistreatment and dare say abuse of the Petitioner is not excused or dismissed abusive actors hire a Black face to replace the Petitioner in her position – a position that she is now ordered reinstated to by the CS Commission's decision 9/5/17.  The fact that her immediate superior, defendant JERNIGAN, created four fictitious "grounds" to Terminate the Petitioner as she performed at a high level, while promoting and giving raises to inept and troublesome White co-worker Copeland, plus allowed Copeland to harass, threaten, undermine and create unrest within the Petitioner's subordinates, further implicates Jernigan in his illegal racial discrimination against the Petitioner. We cannot read Jernigan's mind, but know that his behavior in sum reveals an illegal pattern of racially disparate treatment rising to illegal racial discrimination against your Petitioner.

In the Department of Public Works, Dept. Head Mark Jernigan blatantly and obviously treated his two Senior Level employees differently – with your Petitioner, a Black

woman, being subject to undue scrutiny, criticism, alienation and ultimately Termination for no good reason despite superior Job Performance ratings (CS Exh. #2), while Linda Copeland, who abused employees, threatened employees, who either recklessly or intentionally created havoc in the Parking Division by without authority promising employees promotions (see CS Exh. 28), pay raises and additional uniform allowances (Exh. 23A), was instead promoted and given a significant pay raise, despite DPW employees putting Mr. Jernigan on notice of her negative behavior (See attached Affidavit of Sherida Emery).  Petitioner insists that the two employees, - herself and Copeland – were blatantly treated differently in a rising to a level of unlawful Racial Discrimination.  The legal tests for proving her claims are as follows:

 42 U.S.C. 2000e-2 provides in pertinent part:

(a) Employer practices
It shall be an unlawful employment practice for an employer--
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....


Tracking the language in 42 U.S.C. 2000e-2, La.R.S. 23:1006B(1) provides:

It shall be unlawful discrimination in employment for an employer to:
(a) Intentionally fail or refuse to hire, refer, discharge, or to otherwise intentionally discriminate against or in favor of an individual with respect to compensation, terms, conditions, or privileges of employment because of race, color, religion, sex, disability as defined in R.S. 51:2232(11), or national origin.


In the systemic Disparate Treatment context, the focus shifts from the individual decision maker to the employer as an entity. As with individual Disparate Treatment, the ultimate inquiry remains framed in terms of state of mind. "To succeed on a claim of

systemic Disparate Treatment, a plaintiff must show that the employer intentionally discriminated, whether by acting pursuant to an express policy of treating members of different groups differently or, in the absence of an express policy, by engaging in a pattern or practice of discrimination." *See Slack v. Havens,* 522 F.2d 1091, 1092-93 (9th Cir.1975). Because employers rarely adopt expressly discriminatory policies in the face of Title VII, most systematic Disparate Treatment claims are pattern or practice cases.

All of these incidents described herein are proof of Racially Disparate Treatment and Retaliatory Discharge.  At minimum, these incidents are cumulative proof of the plaintiff suffering a Hostile Work Environment and Racially Disparate Scrutiny and Treatment.  At maximum, these incidents stand on their own as separate, actionable causes of action in violation of Title VII.

**C.     ALL of the FOUR separate grounds for the Petitioner's Termination have been adjudicated to have been baseless, and are themselves Proof of a Hostile Working Environment promoted and created by the Defendant CITY OF NEW ORLEANS and DPW, and should also provide Proof of Retaliatory Discharge, given the timing and specious quality of the alleged Termination Grounds involved, as examined below:**

**a. Alleged Failure to Cooperate with OIG Investigation:**

Petitioner attests in her attached Affidavit (Exh. 6), as well as in her Civil Service Appeal Testimony, that she has never refused to cooperate with or to fully be forthcoming with any OIG investigation or inquiry into her department.  She further attests that she has always asked each and every employee under her charge with cooperating with any such investigation.  (CS Exh # 20) attached here shows constant E-mail communication between Petitioner and the OIG Investigators concerning her working with them to produce or obtain the information requested – which she attests

that she did to the very best of her ability. Even when she was home and out of the office with serious illness (CS Exh. 3.), she attests that she worked hard to comply with the OIG's requests to the very best of her abilities.  Attached (CS Exh # 21) here shows an additional volume of E-mails between herself and the OIG personnel, as well as additional integrated E-mails between Petitioner and DPW Supervisor Sherida Emery requesting that she (Emery) cooperate with the OIG to provide whatever information was available.

The attached Affidavit of Sherida Emery (Exh. #7) reveals that the Petitioner instructed her supervisory personnel to fully cooperate with and produce all items sought by the OIG.. Parking Division Management Operations Specialist Jorge Hernandez, who worked closely with your Appellant, testified at the Appellant's CSC Appeal Hearing (CS Exh. 30) that he assisted the Appellant in responding to the OIG investigation (CS #30, p.107), that Petitioner ordered her staff to cooperate with the IOG investigations, and that Petitioner continued to cooperate with the OIG investigations even when she was ill  (CS #30,  p.109, 159). In sum, Hernandez testified that any claim that the Appellant refused to cooperate with the OIG investigations is "nonsense and false".(CS #30, p.110-111)

Once again, this "Non-Cooperation" claim by the employer was a baseless allegation used by the defendants to Terminate the Petitioner for simply doing her job in recommending the best choices for important contracts

**b.  Petitioner's Termination for alleged Interference with DPW Investigation into allegations of sexual harassment against employee Alton Jones.**

Your Petitioner attests in her attached Affidavit, under oath, that she did not interfere or in any way influence the investigation of or any witnesses involved with the sexual harassment allegations made against Alton Jones (Exh. #6).  The witness statements entered into evidence at the Civil Service Hearing (CS Exh. # 17) clearly states that the witness was not influenced or interfered with by Petitioner in any way. The City of New Orleans offered no evidence, no witness testimony, no e-mails or documents – nothing, that even began to prove or intimate any inappropriate action here by your Petitioner. All the defendant/employer offered at the hearing was defendant Jernigan's unsupported claims that Petitioner had influenced the witnesses to somehow aid Mr. Jones in avoiding justice, As the Plaintiff has plainly testified in her Civil Service Appeal, she had nothing to gain by interfering in such an investigation, and she had no reason to jeopardize her own peace of mind or reputation or workplace in doing such a thing.

**c.   Petitioner's alleged Retaliation against Parking Division supervisor Valarie Petty was again disproven by evidence and witness testimony:**

. First, this is patently untrue as Petitioner under oath attests that she has never retaliated against Petty or any other employee (CS Record, various places).  Second, it is impossible for Petitioner to have retaliated against Ms. Petty, unless Petitioner was able to read Petty's mind some five weeks ahead of her filing any complaint, as the evidence entered in the Civil Service Appeal record and attached here clearly proves that your Petitioner as Parking Administrator had made the decision via memorandum on April 5, 2015 (CS Exh. 18) to rotate duties amongst the Parking Division supervisors, including Ms. Petty but also including others, FIVE WEEKS prior to Ms. Petty ever making a complaint about such a transfer. Plaintiff's was instead attempting

to try different supervisors in different positions in an attempt to match the best aptitudes with the best positions.  Ms. Petty issued her e-mail on May 8, 2015 (CS Exh. 18A) to Petitioner's supervisors/co-workers complaining about her management of the department over one month AFTER Petitioner had already made the decision and had issued the April 5, 2012 memorandum. This is squarely corroborated by Parking Division Management Operations Specialist Jorge Hernandez (CS #30, p.123), and that Ms. Petty's claims of retaliation for that change in duties was "nonsense". (CS #30, p.123). Further, Ms. Petty was not demoted, took no pay cut, took no diminishment of her authority, and was essentially unaffected by the change or rotation of duties amongst her peer supervisors.  This charge for Termination was totally baseless.

**d.   The Petitioner's alleged unauthorized settlement of disciplinary actions against DPW employee Giara Mahogony was again disproven by evidence and witness testimony here:**

The facts here are that reduction in that suspension was resulted from the DPW's Human Resources Director, Linda Copeland, to Petitioner, erroneously informing Petitioner of the wrong suspension return date. (CS Exh. 19, page 1).  Copeland's E-mail apologizing to Petitioner for this error is contained in the above exhibit, page 1.

During the course of Petitioner's tenure as a Senior Level Administrator, she has regularly negotiated and settled disciplinary matters with employees under her charge, without any directive or instruction that she receive or review direction from her immediate supervisor prior to doing same.  After the Giara Mahogany situation was completed, Petitioner negotiated and settled THREE additional employees' disciplinary matters without oversight or direction or restriction from Mr. Jernigan.  In fact, the Giara

Mahogany matter is the singular instance where Mr. Jernigan has ever shown an interest in restricting or claiming that Appellant lacked the authority to negotiate employee disciplinary settlements.  Your Petitioner's position on this was supported by the testimony at the Civil Service Hearing of Richard Bozeman, a 25 year Senior Level City Government employee who had prior to Petitioner's appointment served in the Parking Division, as well as the CSC testimony of Robert Otis, (CS Exh. #31) that he had worked with the Petitioner  for 28 years, the past ten with her as his superior (CS #31, p.166), and that she was a "great supervisor" (CS #31, p.163), and that he understood that the Petitioner had authority to negotiate and settle disciplinary issues with employees in her division without the oversight of Mr. Jernigan. (CS  #31, p.166-169, 172-173). The Civil Service Commission agreed with the Petitioner, holding this alleged reason for the Petitioner's Termination to be baseless.

Petitioner insists that her experience with her tenure with the DPW after the hiring of co-worker Copeland in 2014 demonstrates blatant disparate treatment on the part of the immediate supervisor and Appointing Authority, Mark Jernigan, which rise to a level of pattern and practice of favoring the white employee, and disfavoring the Black employee, rising to a level of illegality.

In a very telling October, 2014 episode, Linda Copeland appeared at the City Auto Pound on North Claiborne Avenue attempting to intimidate Auto Pound employees into illegally releasing an automobile owned by one of her friends or acquaintances. When the Auto Pound employees refused to release the vehicle, she verbally abused and threatened the employees. She then called by telephone Parking Division

Supervisor Sherida Emery, and attempted to get her to release the vehicle. When Ms. Emery informed her that she could not legally release the vehicle, Ms. Copeland blatantly threatened Ms. Emery and the Petitioner (who was not at the scene), stating that "You and Zepp will hear from me in regards to this".  Ms. Emery informed DPW Head Jernigan of this situation via an E-mail chain attached here as CS Exh #22.  To date, Ms. Emery and your Petitioner are unaware of any discipline or correcting of Ms. Copeland for her antics of that date, but Mr. Jernigan did reveal the complaints of Ms. Emery to others, which disturbed Ms. Emery as evidenced by her additional E-mails to Mr. Jernigan (CS Exh. 22), and in her attached Affidavit, where Mr. Jernigan accused Ms. Emery of "violating his trust" by her reporting Copeland's behavior and threats to others after Jernigan failed to act upon Emery's complaints (again, See Affidavit of Sherida Emery).  (CS Exhibit 23) attached include a set of E-mails to superiors and complaints lodged by Petitioner and Parking Analyst Jorge Hernandez seeking relief from Ms. Copeland's ongoing attempts to sow dissension within our department.

Then there is episode concerning the Giara Mahogany suspension reduction, which was alleged to be one of the four separate grounds for Petitioner's Termination – an episode caused in fact by the mistakes or carelessness of co-worker Linda Copeland,.(CS Exh. 19, page 1), at no fault of your Petitioner despite Mr. Jernigan's continued insistence otherwise.

On June 1, 2014, Petitioner responded to the verbal "counseling" and scrutiny of her performance by her immediate superior, Mark Jernigan, by sending to him an extensive eight page correspondence where she rebuts case by case his criticisms of her, as well as detailing instances of co-worker Copeland creating dissension within the

workplace. (CS Exh. 27).   This correspondence memorializes the unfairness of Jernigan's continuing criticism and negative scrutiny of the Petitioner.

While Petitioner was subject to micro-scrutiny,  white co-worker Linda Copeland had a pattern of workplace mistakes, problems, fomenting hostility and of causing dissension within the Parking Department workforce, and nonetheless, the immediate superior Mark Jernigan, who is white, chose to award white co-worker Linda Copeland a job title and position promotion with a pay raise, while your Petitioner simultaneously experiences harassment, alienation, then Termination from this same white immediate superior despite superior work performance. Only one person controlled the outcome of both situations – Mr. Mark Jernigan – a White male.   Your Petitioner, a Black woman, performed at a high level and was eventually Terminated.  Ms. Copeland, a White woman, performed at a less superior level and was promoted with a pay raise. Perhaps the Petitioner may be forgiven for feeling that Race governed this disparate treatment. If Race had nothing to do with it, then Retaliation for her scrutiny and demands upon Duncan Solutions must have.  There is no other explanation for the disparate treatment suffered by your Petitioner here.

**Proof of Due Process Violations and the failure of the Employer to properly accommodate Petitioner's request to postpone the Pre-Termination Hearing of December 14, 2015, in violation of the ADA**

The U.S Supreme Court in *Cleveland Bd. Of Educ.  v. Loudermill,* 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L.Ed.2d 494 (1985) held "The essential requirements of due process …. Are notice and the opportunity to respond …. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the

employer's evidence, and an opportunity to present his side of the story".   Here, Petitioner put the employer on notice of her medical reasons for not being able to attend the Pre-Termination Hearing.   Her superior, Jernigan, illegally went forward with the hearing and  chose to deny plaintiff the opportunity to defend herself. Petitioner's illness, Vesicoureteral Reflux (VUR) is a short-term disability, that unfortunately has persisted long-term for the Petitioner, and is plainly covered by the ADA Amendment Act of 2008. Petitioner attaches her Medical Records of her diagnosis and post-surgery instructions <u>(see CS Reply Brief Exhs. #4 and 5)</u><u>.</u> Petitioner's Pre-Termination hearing was held illegally and went forward in violation of the law, the Petitioner's actual Termination was unlawful. The Civil Service Commission erred in failing to hold that, and this Court should recognize and correct this injustice forthwith as an actionable tort herein.

## <u>CONCLUSION:</u>

The Petitioner's original 2017 MSJ opposition was filed in haste, amidst Petitioner's counsel's serious illness and limitations, and was filed because the defendants had filed their motion AFTER the deadline to do so. The Petitioner's counsel, while very ill, filed a quickly cobbled together MSJ opposition brief lacking the necessary exhibit attachments. The Court's very granting of this hearing of the Petitioner's Motion for Reconsideration is a sign that this Court believes the serious illness of the Petitioner's counsel, and the potential merits of this Plaintiff's claims.

For the foregoing reasons and evidence provided, Plaintiff, ZEPPORIAH EDMONDS, prays that this Honorable Court Reconsider the June 19, 2017 granting of the defendants' Motion for Summary Judgment, justifiably reversing that decision given

the evidence and record testimony supporting the Petitioner here, and taking Judicial Notice and consideration of the testimony, exhibits and reasoning used by the CS Commission in its decision of September 5, 2017 in rejecting the all of the defendants' grounds for the Termination of the Petitioner here, as well as the Louisiana Fourth Circuit Court of Appeal's December 5, 2019 decision rejecting any claim on the part of the defendant/employer, and that this Court reopen this matter for proper matriculation to trial, and return this matter to this Court's trial docket and rightfully allowing this plaintiff to pursue her federal claims herein.

Respectfully submitted,

*Dominic N. Varrecchio*

_____

Dominic N. Varrecchio (# 19456)
300 Lafayette Street, Suite 103
New Orleans,  LA  70130
Telephone:  (504) 524-8600
Email: knic55@cox.net
*Attorney for Plaintiff Zepporiah Edmonds*

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing has been served upon counsel for all parties via the USDC Court Electronic Filing System, this  8th day of March, 2019.

*Dominic N. Varrecchio*

_____

DOMINIC N. VARRECCHIO