

# CITY OF NEW ORLEANS

CITY CIVIL SERVICE COMMISSION

**DEPARTMENT OF CITY CIVIL SERVICE**
**SUITE 900 – 1340 POYDRAS ST.**
**NEW ORLEANS LA 70112**
**(504) 658-3500   FAX NO. (504) 658-3598**

MICHELLE D. CRAIG, CHAIRPERSON
RONALD P. MCCLAIN, VICE-
                    CHAIRPERSON
JOSEPH S. CLARK
TANIA TETLOW
STEPHEN CAPUTO

MITCHELL J. LANDRIEU
MAYOR

Tuesday, September 5, 2017

LISA M. HUDSON
DIRECTOR OF PERSONNEL

Mr. Dominic N. Varrecchio
300 Lafayette Street, Suite 103
New Orleans, LA 70130

Re:   **Zepporiah Edmonds  VS.**
      **Department of Public Works**
      **Docket Number:  8444**

Dear Mr. Varrecchio:

Attached is the decision of the City Civil Service Commission in the matter of your appeal.

This is to notify you that, in accordance with the rules of the Court of Appeal, Fourth Circuit, State of Louisiana, the decision for the above captioned matter is this date - 9/5/2017 - filed in the Office of the Civil Service Commission at 1340 Poydras St. Suite 900, Orleans Tower, New Orleans, Louisiana.

If you choose to appeal this decision, such appeal must conform to the deadlines established by the Commission's Rules and Article X, 12(B) of the Louisiana Constitution.  Further, any such appeal shall be taken in accordance with Article 2121 et. seq. of the Louisiana Code of Civil Procedure.

For the Commission,

Doddie K. Smith
Chief, Management Services Division

cc:   Dani E. Galloway
      Elizabeth S. Robins
      Jim Mullaly
      Zepporiah Edmonds

      file

"AN EQUAL OPPORTUNITY EMPLOYER"

# CITY OF NEW ORLEANS

CITY CIVIL SERVICE COMMISSION

DEPARTMENT OF CITY CIVIL SERVICE
SUITE 900 – 1340 POYDRAS ST.
NEW ORLEANS LA 70112
(504) 658-3500   FAX NO. (504) 658-3598

MICHELLE D. CRAIG, CHAIRPERSON
RONALD P. MCCLAIN, VICE-CHAIRPERSON
JOSEPH S. CLARK
TANIA TETLOW
STEPHEN CAPUTO

MITCHELL J. LANDRIEU
MAYOR

Tuesday, September 5, 2017

LISA M. HUDSON
DIRECTOR OF PERSONNEL

Mr. Dominic N. Varrecchio
300 Lafayette Street, Suite 103
New Orleans, LA 70130

Re:   **Zepporiah Edmonds  VS.**
**Department of Public Works**
**Docket Number:  8467**

Dear Mr. Varrecchio:

Attached is the decision of the City Civil Service Commission in the matter of your appeal.

This is to notify you that, in accordance with the rules of the Court of Appeal, Fourth Circuit, State of Louisiana, the decision for the above captioned matter is this date - 9/5/2017 - filed in the Office of the Civil Service Commission at 1340 Poydras St. Suite 900, Orleans Tower, New Orleans, Louisiana.

If you choose to appeal this decision, such appeal must conform to the deadlines established by the Commission's Rules and Article X, 12(B) of the Louisiana Constitution.  Further, any such appeal shall be taken in accordance with Article 2121 et. seq. of the Louisiana Code of Civil Procedure.

For the Commission,

Doddie K. Smith
Chief, Management Services Division

cc:   Dani E. Galloway
Elizabeth S. Robins
Jim Mullaly
Zepporiah Edmonds

file

# CITY OF NEW ORLEANS



DEPARTMENT OF CITY CIVIL SERVICE
SUITE 900 – 1340 POYDRAS ST.
NEW ORLEANS LA 70112
(504) 658-3500   FAX NO. (504) 658-3598

CITY CIVIL SERVICE COMMISSION

MICHELLE D. CRAIG, CHAIRPERSON
RONALD P. MCCLAIN, VICE-
                                      CHAIRPERSON
JOSEPH S. CLARK
TANIA TETLOW
STEPHEN CAPUTO

MITCHELL J. LANDRIEU
MAYOR

LISA M. HUDSON
DIRECTOR OF PERSONNEL

Tuesday, September 5, 2017

Mr. Dominic N. Varrecchio
300 Lafayette Street, Suite 103
New Orleans, LA 70130

Re:   **Zepporiah Edmonds  VS.**
      **Department of Public Works**
      **Docket Number:  8485**

Dear Mr. Varrecchio:

Attached is the decision of the City Civil Service Commission in the matter of your appeal.

This is to notify you that, in accordance with the rules of the Court of Appeal, Fourth Circuit, State of Louisiana, the decision for the above captioned matter is this date - 9/5/2017 - filed in the Office of the Civil Service Commission at 1340 Poydras St. Suite 900, Orleans Tower, New Orleans, Louisiana.

If you choose to appeal this decision, such appeal must conform to the deadlines established by the Commission's Rules and Article X, 12(B) of the Louisiana Constitution.  Further, any such appeal shall be taken in accordance with Article 2121 et. seq. of the Louisiana Code of Civil Procedure.

For the Commission,

Doddie K. Smith
Chief, Management Services Division

cc:   Dani E. Galloway
      Elizabeth S. Robins
      Jim Mullaly
      Zepporiah Edmonds

      file

"AN EQUAL OPPORTUNITY EMPLOYER"

CIVIL SERVICE COMMISSION
CITY OF NEW ORLEANS

| | |
|---|---|
| ZEPPORIAH EDMONDS | |
| vs. | DOCKET Nos.:  8444, 8467 & 8485 |
| DEPARTMENT OF PUBLIC WORKS | |

## TABLE OF CONTENTS

I.  Introduction  ……………………………………………………………  2

II.  Factual Background  ………………………………………………….  3

    A. DPW's Parking Division …………………………………………  3
    B. Civil Service Rule II, § 10.1 ………………………………………  3
        1. Appellant's Alleged Whistleblower Activities ………………  4
        2. Alleged Retaliation ………………………………………  6
    C. Alleged Misconduct ……………………………………………  8
        1. Failure to Cooperate with OIG Investigation ………………  8
        2. Interference with DPW Investigation …………………………  15
        3. Retaliation against Valerie Petty ……………………………  21
        4. Unauthorized Settlement of Civil Service Appeal ……………  24
    D. Pre-Termination Hearing ………………………………………..  26

III.  Standard ………………………………………………………………..  29

    A. Appeal Based Upon Allegation of Retaliation ……………………  29
    B. Appeal Based Upon Challenge to Sufficiency of Cause ………….  30

IV.  Analysis ………………………………………………………………..  31

    A. Appellant's Retaliation Claim ……………………………………  31
    B. Sufficiency of Cause/Occurrence of Misconduct  ………………..  33

        1.  Interference with OIG Investigation ….……………………  33
        2.  Interference with DPW Investigation ……………………..….  37
        3.  Retaliation Against Valerie Petty …………………………….  40
        4.  Unauthorized Settlement of Civil Service Appeal ……………..  43

    C. Adverse Impact on Appointing Authority …………………………  43
    D. Was Discipline Commensurate with Offense ……………...…..  45

V.  Conclusion …………………………………………………………….  47

Z. Edmonds
Nos. 8467 & 8485

## I. INTRODUCTION

Appellant, Zepporiah Edmonds, brings the instant appeal pursuant to Article X, §§ 8(A) of the Louisiana Constitution and this Commission's Rule II, §§ 4.1, 10.1.[1]  At all times relevant to the instant appeal, Appellant served as a Parking Administrator within the Department of Public Works for the City of New Orleans, (hereinafter "Appointing Authority" or "DPW") and had permanent status as a classified employee.

On January 11, 2016, the Commission issued an Order denying the Appointing Authority's motion for summary disposition related to Appellant's claims of retaliation and discriminatory treatment under Rule II, § 10.1.  In making its ruling, the Commission held that Appellant had sufficiently plead a claim of discriminatory treatment.  However, the Commission limited the scope of Appellant's retaliation claims to; 1) the DPW's scheduling of a pre-termination hearing (as well as any discipline that may result from such hearing), and 2) the DPW's imposition of an emergency suspension. The Commission went on to observe that "the success of [Appellant's] claims of retaliation and discriminatory treatment based on her whistleblower status depend upon her establishing a causal connection between her alleged whistleblowing activities and the adverse employment action she suffered." Appellant later amended her original appeal to include her termination and filed a new appeal alleging that the DPW lacked sufficient cause to terminate her employment.  (DPW Exh. 3). All three docket numbers, 8444, 8467 and 8485 are consolidated.

Between April 21, 2016 and March 13, 2017, a referee appointed by the Commission presided over an appeal hearing encompassing nine (9) sessions.  The undersigned Commissioners have reviewed the transcript and exhibits from this hearing as well as the referee's report.  The

---

[1] Rule II, § 10.1 is known colloquially as the "whistleblower rule" and provides a classified employee with a mechanism to challenge discipline or discriminatory treatment based upon such employee's reporting of conduct that violates the law or applicable regulations.

2

Z. Edmonds
Nos. 8467 & 8485

undersigned Commissioners also accept the Hearing Examiner's evidentiary rulings and adopt the inferences he recommended as a result of the Appointing Authority's failure to produce documents. The Commission observes that appointing authorities who flaunt the orders of hearing examiners on evidentiary matters do so at their own peril.

Based upon our review of the record, we render the following judgment.

## II. FACTUAL BACKGROUND

### A. DPW's Parking Division

The DPW consists of several divisions related to public infrastructure and services. One of these divisions is the Parking Division. And, within the Parking Division there are various units responsible for monitoring and enforcing parking ordinances throughout the City of New Orleans. These units include towing, booting, ticket writing, and residential permit parking. (Tr. v. 1 at 10:3-12). Appellant began working in the Parking Division on May 21, 1984 as a parking control officer (ticket writer) and occupied numerous positions over the course of her thirty-two-year career. *Id.* at 6:19-23. In 2006, Appellant began serving as the Parking Administrator – the highest ranking official in the Parking Division – and received permanent status in that classification in 2009. *Id.* at 9:1-16. As Parking Administrator, Appellant was responsible for the day-to-day operations of all Parking Division units. During the relevant period of time, Appellant reported to the Director of the DPW, Mark Jernigan, Lt. Col. (Retired).

### B. Civil Service Rule II, § 10.1

Appellant alleges that she became a "whistleblower" in 2012 when she raised a concern that the DPW and the City of New Orleans employed a bid rigging scheme in relationship to a curb management contract. (App. Letter of Appeal 9/15/15). Appellant alleged a scheme, executed by members of the bid review team, that purportedly violated mayoral executive order

3

Z. Edmonds
Nos. 8467 & 8485

MJL 10-05 related to the public bidding process for City contracts (referred to hereinafter as

"MJL 10-05").

Our Rules provide a mechanism through which employees who engage in "protected

activity" may appeal retaliatory discipline or discriminatory treatment:

> No employee shall be subjected to discipline or discriminatory treatment by an
> appointing authority because he or she gives information, testimony or evidence in
> a prudent manner to appropriate authorities concerning conduct prohibited by law
> or regulation which he or she reasonably believes to have been engaged in by any
> person(s). If the employee incurs such treatment despite this admonition, he or she
> shall have a right of appeal to this Commission.

Rule II, §10.1.

### 1. Appellant's Alleged Whistleblower Activities

During the latter part of 2011 or early 2012, Col. Jernigan appointed Appellant to serve on

the selection committee for the selection of a vendor in connection with a Curbside Management

Request for Proposals (hereinafter "RFP"). The successful vendor to the RFP would be

responsible for parking meter services as well as ticket processing. (Tr. v. 1 at 22:19-24). Initially,

eight vendors applied to the RFP, but the selection committee narrowed the field of candidates

down to three, Duncan Solutions, Xerox Solutions, and Standard Parking. *Id.* at 23:8-16.

Appellant testified that, based upon her review of bids, Duncan Solutions appeared to be "almost

a million dollars more than the other bidders." She also testified that Duncan Solutions had a poor

track record of performance with other municipalities. *Id.* at 24:1-15.

During the course of the review process, Appellant became convinced that Allen Square

(who was the City's IT Director at the time) and Edward Kurkow (an unclassified employee on

the Mayor's "Innovation Team") were attempting to steer the bid towards Duncan Solutions at the

direction of Andrew Kopplin, the City's Chief Administrative Officer. *Id.* at 25:17-23. Appellant

Z. Edmonds
Nos. 8467 & 8485

based her belief on several factors, the first of which was the alleged improper participation in the selection process by individuals not properly added to the selection committee. (App. Exh. 31).

In a July 25, 2012 letter to Col. Jernigan, Appellant alleged that Mr. Kurkow had improperly participated as a voting member of the selection committee and had failed to disclose possible conflicts of interest stemming from his former employment at Xerox and close relationship with Duncan Solutions. *Id.* Appellant believed that Mr. Kurkow's conduct violated Section 9 of MJL 10-05. *Id.*

Appellant also believed that Mr. Kurkow had violated MJL 10-05 when he sought to ask the three vendors for "best and final pricing." *Id.* To Appellant, this appeared to be an attempt to negotiate a lower price with the vendors prior to the actual selection, which would violate Section 11 of MJL 10-05. *Id.* Ultimately, Appellant informed Col. Jernigan that she found the actions of Mr. Square and Mr. Kurkow "highly questionable" and in violation of MJL 10-05. Appellant takes the position that her letter to Col. Jernigan constituted the provision of "information, testimony or evidence in a prudent manner to appropriate authorities concerning conduct prohibited by law or regulation which … she reasonably believe[d] to have been engaged in by" Mr. Kopplin, Mr. Square and Mr. Kurkow.

Appellant also met with investigators in the Office of the Inspector General for the City of New Orleans regarding concerns she had about the Curbside Management RFP. (DPW Exh. 16; Tr. v. 8 at 98:3-13). As a result of Appellant's meeting with the OIG Investigators, First Assistant Inspector General Howard Schwartz requested additional documentation and information related to the Curbside Management RFP. (App. Exh. 3). Mr. Schwartz requested that Ms. Edmonds provide the additional information no later than July 2, 2012 and copied Mr. Kopplin and Mr. Square on the request. *Id.* Thus, there is no dispute that the DPW was aware that Appellant had

Z. Edmonds
Nos. 8467 & 8485

contacted Col. Jernigan and the OIG regarding her belief that the bidding process for the Curb

Management RFP violated MJL 10-05. The OIG's investigation into Appellant's claims did not

result in any finding of impropriety.

### 2. Alleged Retaliation

The Commission's January 11, 2016 Order limited the scope of Appellant's whistleblower

claims to the DPW's scheduling of the pre-termination hearing and the imposition of an emergency

suspension.   The Commission also gave Appellant leave to amend her appeal and add any

discipline that resulted from the pre-termination meeting.   Appellant did eventually amend her

appeal and allege that her termination represented continued retaliation in response to her

whistleblowing activities.[2]

On October 27, 2015, the DPW issued Appellant correspondence regarding "notice of

emergency suspension and pre-termination hearing." (H.E. Exh. 1A).  In this correspondence, the

DPW referenced the following five instances of misconduct; 1) Appellant's lack of cooperation

and responsiveness to an OIG investigation, 2) Appellant's interference in departmental

investigations into allegations of sexual harassment against Alton Jones, 3) Appellant's improper

access to a fellow DPW employee's email account, 4) Appellant's retaliation against Valerie Petty,

and 5) Appellant's unilateral settlement of a civil service appeal hearing involving a DPW

employee. *Id.* Through the notice, the DPW informed Appellant that, if she failed to appear at the

pre-termination hearing scheduled for November 16, 2015, the hearing would proceed without her.

*Id.* The notice was signed by Col. Jernigan.

---

[2] On February 4, 2016, Appellant filed two appeals.  One alleged that her termination was the product of discrimination and retaliation in violation of Rule II, § 10.1.  (DPW Exh. 3).  The second February 4th appeal did not allege a violation of Rule II, § 10.1 but merely sought an appeal of Appellant's termination.

Z. Edmonds
Nos. 8467 & 8485

On November 16, 2015, Col. Jernigan issued Appellant a letter indicating that he had rescheduled the pre-termination hearing to November 30, 2015. (H.E. Exh. 1B). Through the November 16th correspondence, Col. Jernigan also notified Appellant that the emergency suspension issued on October 27th had been rescinded and that Appellant would remain out on annual leave pending the pre-termination hearing. *Id.* The letter goes on to observe that Appellant had exhausted her sick leave allotment. *Id.* Though it is not in evidence, there was apparently one additional notice issued to Appellant by Col. Jernigan rescheduling the pre-termination meeting from November 30, 2015 to December 14, 2015.

On or about December 11, 2015, Appellant's previous counsel, Willie Zanders, provided Col. Jernigan with medical documentation that indicated Appellant would not be able to return to work until January 4, 2016. (App. Exh. 24). As a result Appellant's illness, Mr. Zanders requested that the DPW refrain from conducting the pre-termination hearing until Appellant's return to work. *Id.* The DPW, through Senior Deputy City Attorney Cherrell Simms Taplin, declined to reschedule the pre-termination hearing and observed that it had already been rescheduled on numerous occasions. *Id.* Ms. Simms observed that the DPW was not asking Appellant to resume her job duties, but only to attend a pre-termination hearing. *Id.*

The pre-termination hearing proceeded on December 14, 2015. (H.E. Exh. 2). Present at the hearing were Col. Jernigan, Ms. Taplin and Deputy City Attorney Elizabeth Robins; neither Appellant nor her attorney attended. *Id.* After the pre-termination hearing, the DPW notified Appellant of its decision to terminate her employment based upon the following four allegations of misconduct: 1) lack of cooperation and responsiveness to an OIG investigation, 2) interference with an internal investigation regarding allegations of sexual harassment against a fellow DPW

7

employee, Alton Jones, 3) retaliation against a fellow DPW employee, Valerie Petty, and 4) settlement of a civil service appeal without authorization from Col. Jernigan. (H.E. Exh. 2).

Appellant alleges that there is no support for the above-cited allegations of misconduct and that the reasons provided in her disciplinary notice were pretext for the DPW's true retaliatory intent. In the alternative, Appellant alleges that the DPW lacked sufficient cause to terminate her employment.

### C. Alleged Misconduct

### *1. Failure to Cooperate with OIG Investigation*

2014 was a busy year for the OIG when it came to investigations pertaining to the Parking Division. During the relevant period of time, the OIG had five active investigations into various allegations of impropriety within the Parking Division, one of which included an allegation that a tow truck driver had accepted cash bribes to release vehicles about to be towed. Another investigation involved reports that Parking Control Officers ("PCOs") were loitering in various businesses in the CBD, including hotel lobbies. When the proprietors of the businesses asked the PCOs to leave, the PCOs allegedly began issuing retaliatory parking citations to the businesses' patrons and employees. (Tr. v. 2 at 49:20-50:17). It was this second investigation that served as the foundation for the first instance of misconduct cited in Appellant's termination letter.

Michael Centola, an investigator for the OIG, testified that he directed another investigator, Eddie Hernandez, to reach out to Appellant in order to gather information related to the allegations against PCOs. *Id.* at 49:20-24). According to Mr. Centola, Mr. Hernandez requested data and information related to parking citations issued by specific PCOs. *Id.* at 50:19-51:1. Mr. Hernandez testified that his initial request was for citations issued in 2012, 2013 and 2014 for a geographical area within the CBD; Mr. Hernandez also believed that he requested GPS data for PCOs operating

Z. Edmonds
Nos. 8467 & 8485

in that area. (Tr. v. 3 at 236:15-22). Mr. Hernandez recalled that his first meeting with Appellant regarding the OIG's investigation into PCOs occurred in August 2014. *Id.* at 245:1-8.

Appellant has a very different recollection of why the OIG had initiated an investigation into PCOs operating in the CBD. According to Appellant, Mr. Hernandez met with her on August 11, 2014 to discuss an investigation into PCOs sitting in coffee shops around the Federal Court Complex on Poydras Street. (Tr. v. 8 at 196:17-21; DPW Exh. 12). Appellant understood that Mr. Hernandez's girlfriend worked in the complex and would often receive parking tickets. (Tr. v. 8 at 196:21-24). Mr. Hernandez then showed Appellant a video he had captured on his cell phone that depicted three or four PCOs sitting in CBD coffee shops. *Id.* at 196:21-197:1. Appellant identified one of the PCOs as Andrea Easterling; Mr. Hernandez then indicated that it was PCO Easterling who had been issuing his girlfriend parking citations. *Id.* at 197:1-5.

Appellant asserted that, on August 11, 2014, Mr. Hernandez asked Appellant to produce "copies of parking tickets that were issued during a certain time frame near the Federal Complex." (DPW Exh. 12). Appellant initially told Mr. Hernandez that she and her staff could produce the information but needed more time due to staffing challenges and the Parking Division's transition from one ticket processing vendor to another. *Id.* According to Appellant, producing this information required a physical search through the Parking Division's paper records. *Id.* Appellant testified that Parking Division personnel never had access to that type of information Mr. Hernandez sought through Xerox (the original ticket processing vendor); hence the necessity to search through physical records. (Tr. v. 8 at 205:3-7).

On February 13, 2015, Appellant responded to a series of questions posed by Mr. Hernandez regarding the OIG's investigation into PCO misconduct. (App. Exh. 59). In this response, Appellant did the following:

9

Z. Edmonds
Nos. 8467 & 8485

- Confirmed that Brett Peze (vice-president with Xerox) was the contact person for pre-transition ticket information and reiterated her understanding that Mr. Hernandez would contact Mr. Peze.

- Stated that the city-issued cell phones carried by PCOs did not have GPS capacity.

- Informed Mr. Hernandez that searching ticket data maintained by Xerox required a specific request to Xerox but that Parking Division staff had direct access to Duncan's database to run a similar search for current citations.  According to Appellant's email, Parking Division staff did not have the capacity to generate a report on geographic ticket data maintained by Xerox for the years 2012-2014.

By March 2015, Mr. Centola stated that Appellant had still not provided any of the information or data Mr. Hernandez requested back in August.  This prompted Mr. Centola to direct Mr. Hernandez to reach out directly to Xerox and inquire as to the availability of the data. (Tr. v. 2 at 51:10-18).  Through Brett Peze, Xerox indicated that it was able to provide the information requested by the OIG. *Id*. at 52:1-7.  However, Mr. Peze also told Mr. Hernandez that no one from the City of New Orleans had ever requested the information. *Id*. at 52:8-9. Appellant testified that she did not reach out to Xerox to request any data because Mr. Hernandez stated that he would reach out to Xerox directly and make the request. (Tr. v. 8 at 210:9-25, 264:15-265:9). Based upon conversations Mr. Hernandez had with Xerox's vice-president, Mr. Centola believed that Xerox could have produced the requested data in August of 2014 at little to no cost. *Id*. at 71:9-13, 93:21-94:5. However, by the time Mr. Centola established that Xerox could produce the records, he determined that the cost of retrieving such records outweighed their usefulness. *Id*. at 71:14-24.

Mr. Centola perceived Appellant's delayed response as intentional because; 1) it contrasted dramatically from her prior interactions with OIG investigators, 2) Appellant waited six months to inform Mr. Hernandez that the Parking Division did not have GPS data related to the PCOs under investigation, 3) Mr. Centola believed that Appellant lied when she represented that Xerox could not produce the requested information, 4) Appellant failed to produce all citations issued in the

Z. Edmonds
Nos. 8467 & 8485

second quarter of 2014, and 5) Appellant belatedly produced prior discipline issued to a PCO for engaging in misconduct that was nearly identical to the misconduct the OIG was investigating. *Id*. at 52:18-10, 55:3-13.

During his testimony, Mr. Centola admitted that he did not recall whether or not Mr. Hernandez put his initial request for information to Appellant in writing and relied on Mr. Hernandez's claims as to the content of the initial request. Tr. v. 2 at 96:3-6. When pressed as to whether or not it was the OIG's policy to put requests in writing, Mr. Centola testified that "it is now" and pointed to Appellant's lack of cooperation as a reason for the OIG's policy change. *Id*. at 96:11-25. The new policy is allegedly – and flippantly – referred to as "the Zepporiah Rule." *Id*. at 96:21-25.

In fact, Mr. Hernandez did not put his initial request for information in writing. (Tr. v. 3 at 235:9-21). Mr. Hernandez himself testified that, once it became clear that he was not receiving the information he requested, he began to put requests in writing. (Tr. v. 3 at 195:14-19). The first document in the record that reflects a set of specific written requests from Mr. Hernandez to Appellant regarding the OIG's investigation into PCOs is a January 12, 2015 email From Mr. Hernandez to Appellant. (App. Exh. 10).

However, it is clear that Mr. Hernandez and Appellant communicated about various information requests between August 2014 and January 2015. Mr. Hernandez sent Appellant a text on August 12, 2014 requesting to speak with Appellant and another text on September 17, 2014, asking if "any of the items [are] available for pickup." *Id*.[3] Appellant responded to the September 17th text indicating that she would be able to produce something by the close of

---

[3] Via text message on August 6, 2014, Mr. Hernandez asked Appellant if there was "any more information regarding the GPS information." (DPW Exh. 1). Given that Mr. Hernandez sent this text prior to the August 11, 2014 meeting Mr. Hernandez held with Appellant regarding the PCO investigation, the Commission finds that this text pertained to one of the other OIG investigations running concurrently with the PCO investigation.

Z. Edmonds
Nos. 8467 & 8485

business and Mr. Hernandez wrote back that he would be able to come by the Parking Division on September 18, 2014. *Id.* Mr. Hernandez reported to the Parking Division's offices on the morning of September 18, 2014, but Appellant was not there and no documents were waiting. (App. Exh. 9 at p. 1). When he reached out to Appellant to determine why no documents were produced, she told him that she was at Tulane Hospital and would call him back when she could. *Id.*

The next written communications between Mr. Hernandez and Appellant occurred in November 2014. On November 12, 2014, Mr. Hernandez emailed Appellant and informed her that "I have yet to receive anything from the in-person request from this summer." (App Exh. 9). Appellant responded that she was out of the office due to an illness and expressed a belief that Mr. Hernandez had been working with Sherida Emery, another employee in the Parking Division, regarding the outstanding information request. *Id.* Mr. Hernandez indicated that he had reached out to Ms. Emery on two separate occasions in October 2014 and earlier in November 2014 but had not received any responsive documents or records. *Id.*

At all times, Mr. Hernandez was professional in his approach and tone. He went so far as to say he is sorry to bother Appellant with the requests while she is out sick. *Id.* Appellant indicated that she was "embarrassed" that her office had not been more responsive and offered to set up a call with Ms. Emery or conduct some amount of limited research from home. *Id.* On November 17, 2014 Mr. Hernandez again reached out to Appellant and asked if she would be in a position to provide a completion date for assembling the requested information. *Id.* Mr. Hernandez's emails establish that he did not agree to indefinitely defer his request for PCO citation data and was respectfully persistent in his pursuit of the information.

On December 18, 2014 Mr. Hernandez requested Appellant provide him with "a copy [of] the list of items that … [he and Appellant] discussed earlier this year." *Id.* Unfortunately, the

Z. Edmonds
Nos. 8467 & 8485

record does not contain Appellant's response to Mr. Hernandez's December 18th request. However, an email from Mr. Hernandez to Appellant on January 12, 2015 contains a series of detailed questions pertaining to procedures and records maintained by the DPW and its vendors. (App. Exh. 10). Appellant answered each of Mr. Hernandez's questions at some point in February 2015 but did not attach any documents or reports. *Id.*

As noted above, Mr. Hernandez claimed that, on August 11, 2014 he asked Appellant to produce data related to tickets issued by various PCOs during 2012 through 2014. *Id.* at 179:19-180:6. Based upon an interview with Xerox vice-president, Brett Peze, Mr. Hernandez understood that Xerox had access to the information sought by the OIG regarding parking citations but never received a request by the Parking Division for such information. *Id.* at 181:19-182:7, 218:1-7. Mr. Hernandez obtained Mr. Peze's contact information from Appellant and agreed to reach out to him during a conversation with Appellant. (Tr. v. 3 at 182:14-19; App. Exh. 10). The Commission finds that Appellant did not contact Xerox to obtain the data Mr. Hernandez requested in August of 2014 because she believed her staff were capable of producing the data. Thus, it did not occur to her to reach out to Xerox. Furthermore, the Commission accepts Appellant's testimony that Parking Division Staff did not have direct access to the historic citation data stored in Xerox's database and would have had to ask a Xerox project manager to compile a report. Eventually, Mr. Hernandez decided to contact Xerox in an attempt to secure records he had been asking Appellant to produce for five months.

In June 2015, the OIG released a report in which it concluded that PCOs were loitering in various businesses within the CBD. (Tr. v. 2 at 73:1-10; App. Exh. 15 at p. 1 of 6). OIG investigators were also able to establish that PCOs issued citations to law enforcement vehicles, even though such vehicles displayed proper identifiers indicating that they were in fact law

13

Z. Edmonds
Nos. 8467 & 8485

enforcement vehicles. *Id.* However, the report indicated that the OIG was unable to determine if

any citations issued by PCOs were retaliatory in nature. *Id.* The report goes on to state that:

> The OIG requested all citations issued to vehicles parked near the addresses of the
> complainants for the period of 2012 to 2015. The Parking Control Division [of the
> DPW] did not produce the requested documents. As a result of the Parking Control
> Division's inability to produce the requested documents, our office was unable to
> determine if other businesses had been subjected to any manner of retaliation by
> PCOs.

*Id.* The above-cited passage contained a footnote that read, "Parking Administrator (PA)

Zepporiah Edmonds related that manpower, funding issues, and the fact that Duncan Solutions

Inc., replaced Xerox as the City's ticket processing vendor contributed to their inability to produce

the requested documents." *Id.* The portion of the report addressing the Parking Division's failure

to cooperate with the OIG's investigation concluded with the following statement:

> It appears that the Parking Control Division could have fulfilled the request for
> information regarding the number of citations issued by location, types of
> violations, dismissed citations, and citations issued by particular PCOs simply by
> forwarding the request to its current ticket processing vendor. Instead, the Parking
> Control Division continued to insist that it was unable to provide the information
> that the OIG had requested.

*Id.* at p. 3 of 6.

Mr. Centola acknowledged that he had worked with Appellant on several prior cases and

found her cooperation to be "spotty" in that he would have to ask several times for certain pieces

of information. (Tr. v. 2 at 8:12-15). However, when pressed about the level of Appellant's

cooperation with OIG investigations Mr. Centola acknowledged that he was generally satisfied

with Appellant's conduct. *Id.* at 21:1-24:25. Mr. Centola testified that he was surprised that

Appellant failed to cooperate with the OIG's investigation into PCOs because "she kn[ew] how to

cooperate." *Id.* at 48:11-16. Mr. Hernandez acknowledged that Appellant never attempted to

14

Z. Edmonds
Nos. 8467 & 8485

dissuade him from pursuing the investigation and informed him that she was glad the OIG's office

was looking into PCO conduct.  (Tr. v. 3 at 246:14-19).

### 2.    *Interference in Departmental Investigations into Allegations of Sexual Harassment against Alton Jones*

Shanta Scott was an employee with the DPW for a brief period of time in the summer of

2015.  Ms. Scott worked primarily as a tow truck driver, and her supervisor was Alton Jones.  In

June 2015, Ms. Scott contacted the OIG and alleged that Mr. Jones had engaged her in

inappropriate and unprofessional conversations about her personal life. (App. Exh. 22).  On one

occasion, Ms. Scott alleged that Mr. Jones directed her to report to a location in the St. Roch

neighborhood at 7:00 p.m. where she thought she would be working as part of a towing task force.

*Id.*  When Ms. Scott arrived at the tow yard to sign in, Mr. Jones was not there.  When Ms. Scott

called Mr. Jones to ask where she should sign in for the night, Mr. Jones allegedly told her that he

did not want her to work but rather to have drinks with him at the location in question.  *Id.* As a

result of Ms. Scott's allegations, both the OIG and the DPW initiated investigations into Mr.

Jones's conduct.

On September 2, 2015, the OIG released a report prepared by Howard Schwartz regarding

its investigation into allegations of sexual harassment against Mr. Jones.  (App. Exh. 44).  In the

report, there is a summary of the allegations made by Ms. Scott against Mr. Jones which include

claims that Mr. Jones would often compliment Ms. Scott on her appearance during the workday,

inquire about Ms. Scott's romantic interests, and once invited Ms. Scott out for drinks.  *Id.*  There

was no mention in the OIG's report of Ms. Scott feeling threatened by Appellant.

The OIG also interviewed Ashley Terry, who is the sister of Ms. Scott.  Ms. Terry indicated

that the statement she provided to Ms. Copeland about Mr. Jones's alleged inappropriate behavior

was accurate and that ***no one asked her to withdraw or change her statement***.  *Id.* Ms. Terry

Z. Edmonds
Nos. 8467 & 8485

recalled discussing the matter with both her sister (Ms. Scott) and her father, whom she identified as an employee with the City of New Orleans. *Id.* The OIG did not make any recommendations or conclusions in its report. *Id.*

The report also referenced India Toney, a witness to the alleged harassment perpetrated by Mr. Jones. OIG investigators interviewed Ms. Toney and noted that, on June 22, 2015, Ms. Toney provided Linda Copeland (DPW's Director of Human Resources) with "a written statement regarding sexual harassment on the part of Alton Jones." *Id.* However, the report noted that Ms. Toney subsequently contacted Ms. Copeland and "asked if she could withdraw the statement because she did not want it to be used in any administrative action against a fellow employee." *Id.* Ms. Toney acknowledged that her first statement was accurate, and that the conversations she had with Mr. Jones were likely not appropriate for the work place, but she did not want the DPW to use the statement against Mr. Jones. *Id.* Ms. Toney went on to write that she felt compelled to provide a statement because a co-worker was present and provided a statement as well. *Id.* There is no mention in the OIG report that Ms. Toney's decision to withdraw her original statement was because of anything Appellant said or did.

Mr. Jones testified that he first learned of the DPW's investigation into Ms. Scott's allegations against him through a conversation with the City Attorney's office. (Tr. v. 2 at 179:19-180:4). According to Mr. Jones, the only communication he received from Appellant during the course of DPW's investigation was a phone call during which Appellant told Mr. Jones that Col. Jernigan wanted to see him. (Tr. v. 2 at 182:19-183:4). The record confirms that Col. Jernigan sent Appellant a text on June 22, 2015 informing Appellant that he would like to meet with Mr.

Z. Edmonds
Nos. 8467 & 8485

Jones on the morning of June 23, 2015.  (App. Exh. 44).[4]  After receiving the call from Appellant,

Mr. Jones reported to Col. Jernigan's office and briefly met with him.  (Tr. v. 2 at 184:1-15).

However, Col. Jernigan did not speak with Mr. Jones about the allegations of sexual harassment.

*Id.* at 183:16-19.  On June 26, 2015, Mr. Jones sent Col. Jernigan an email in which he thanked

Col. Jernigan for meeting with him earlier in the day and for "reevaluat[ing] this entire situation."

(App. Exh. 44).  Mr. Jones went on to thank Col. Jernigan for "not juking [him] around."  *Id.*

As part of the DPW's investigation, Col. Jernigan spoke with Ms. Toney about her desire

to withdraw her previous statement.  (Tr. v. 9 at 120:10-14).  During this conversation, Ms. Toney

again indicated that her original statement was accurate, but she still wanted to withdraw it.  She

also indicated that she had spoken with Appellant before requesting that her prior statement be

withdrawn.  *Id.* at 120:19-25.  Importantly, she did not claim that her actions were motivated by

anything Appellant said or did.  Nevertheless, based on his conversation with Ms. Toney and a

review of another DPW employee's (Ms. Rachel Cook) statement, Col. Jernigan believed that

Appellant had "contacted the witnesses prior to them giving me statements or in some cases after

they gave their original statement and caused them to either change their statement or change …

modify what they put on their statement."  *Id.* at 123:15-21. In the end, Col. Jernigan testified that

it "appeared" to him that his investigation was "tainted" by Appellant's interference.  *Id.* at 126:20-

23. Col. Jernigan reached this conclusion despite the fact that none of the witnesses he interviewed

claimed that Appellant threatened them or otherwise influenced their participation (or lack thereof)

in the DPW's investigation. (Tr. v. 5 at 133:18-22).

---

[4] Both Ms. Copeland and Col. Jernigan alleged that Appellant's contact with Mr. Jones was inappropriate and suggested that Appellant somehow coordinated Mr. Jones's use of sick leave.  Given that Col. Jernigan directed Appellant to contact Mr. Jones regarding a meeting, and Mr. Jones's testimony that Appellant did not tell him why Col. Jernigan wanted to see him, the Commission does not find that Appellant's contact with Mr. Jones was inappropriate.

17

Z. Edmonds
Nos. 8467 & 8485

Col. Jernigan prepared a report regarding the DPW's investigation into the allegations against Mr. Jones. (App. Exh. 45). In his report, Col. Jernigan noted that Ms. Scott had approached Ms. Copeland with allegations that Mr. Jones had engaged her in inappropriate and sexually themed conversations and advances. *Id.* Ms. Scott identified three witness to Mr. Jones's behavior, Ms. Toney, Ms. Cook and Ms. Terry. *Id.* Col. Jernigan noted that Ms. Copeland obtained statements from Ms. Terry and Ms. Toney, but Ms. Cook did not feel comfortable providing a statement to Ms. Copeland. *Id.* On July 27, 2017 Ms. Cook did eventually provide a statement regarding in which she confirmed that she did not initially provide a statement to Ms. Copeland because she did not feel comfortable doing so. (App. Exh. 49). She also acknowledged that she spoke with Appellant but that ***Appellant did not ask about Mr. Jones or the investigation but instead inquired about "how work was going."*** *Id.* In response to the question: "Have you heard or had any conversations started by Mr. Jones or any other supervisor within Towing directed towards you or any other employee that made you uncomfortable?" Ms. Cook simply wrote, "No." *Id.*

Ms. Copeland testified that Appellant contacted witnesses to Mr. Jones's sexual harassment and "threatened them not to testify. And then [the witnesses] rescinded their statements." (Tr. v. 4 at 24:24-25:6). When pressed about this testimony, Ms. Copeland claimed that Ms. Scott was one of the witnesses who was threatened by Appellant. *Id.* at 25:13-22. Ms. Copeland claimed that she had a statement from Ms. Scott that contained an allegation that Appellant threatened her. *Id.* at 26:3-11. Ms. Copeland further alleged that the female witnesses told investigators that they did not want to provide statements against Mr. Jones for fear of retaliation by Appellant and Mr. Jones. *Id.* at 27:17-23. This testimony is demonstrably false and gives the Commission a great deal of pause.

Z. Edmonds
Nos. 8467 & 8485

As a preliminary matter, the Commission notes that Ms. Scott did not withdraw or otherwise modify any claims or statements provided as part of the investigation into Mr. Jones. And, contrary to Ms. Copeland's testimony, there is no mention in the OIG's report that Ms. Toney's conversation with Appellant prompted her to withdraw her statement or that Ms. Toney feared that Appellant would retaliate against her for providing a statement. In withdrawing her original statement, Ms. Toney indicated that she was doing so because she "didn't want anything said or written to be used against any city employee." (App. Exh. 44).[5] She did not reference Appellant in her letter. Ms. Toney went on to write that the DPW could "use Ms. Smith's and Ms. Terry's statements, but I do not want to be a part of anything that will degrade any city employee." *Id.* If Ms. Toney had in fact told the OIG's investigator that her conversation with Appellant prompted her to change her story, the Commission would expect that the OIG would have included such an essential detail in his report. In fact, the only pressure Ms. Toney alleges she felt was applied by Ms. Copeland and Ms. Terry, not Appellant.

Ms. Copeland later tried to modify her testimony claiming that the person the witnesses had felt threatened by was Mr. Jones and that she had received an email alleging that Appellant was contacting witnesses. (Tr. v. 4 at 29:8-15). Given Ms. Copeland's testimony quoted below, the Commission is troubled by the clear contradiction:

> **Question to Ms. Copeland:** If I sent a subpoena asking for statements of witnesses that say that [Appellant] threatened them, do you still have those statements?

---

[5] Ms. Toney's original statement, dated June 22, 2015, recounts several instances during which Mr. Jones asked questions about her personal life. (DPW Exh. 22). Ms. Toney also alleged that Mr. Jones would engage her and another DPW employee, Takeisha Feast, in sexually explicit conversations that covered subjects like oral sex and the size of "private[s]." *Id.* The June 22nd statement also contained allegations that Ms. Feast and another DPW employee had access to a substance that would mask illegal or illicit drugs in urine. *Id.*

Z. Edmonds
Nos. 8467 & 8485

> **Answer by Ms. Copeland**: I should. The sixth floor has just undergone a renovation and we've had to move everything into boxes and the boxes are everywhere, but I could try to find them.

(Tr. v. 4 at 26:3-11). The DPW never attempted to introduce such statements and the Commission finds that the reason for this is that the statements do not exist. Indeed, Ms. Copeland eventually acknowledged that the phantom statements did not exist and her claims about Appellant's interference with witnesses was based upon a single vague email she received and the fact that one witness withdrew her statement. *Id.* at 30:6-23. Ultimately, the DPW failed to introduce any evidence or testimony that Appellant contacted witnesses to Mr. Jones's alleged sexual harassment in order to intimidate or threaten them.

Appellant recalled speaking with Col. Jernigan regarding the allegations against Mr. Jones at some point on June 22, 2014 while she was on sick leave. (Tr. v. 7 at 43:24-44:19). And, during his testimony, Col. Jernigan acknowledged calling Appellant about the investigation while Appellant was on sick leave. His reason for doing so was to inform Appellant about the investigation because he assumed that she would probably hear from members of the staff that Col. Jernigan was calling employees and talking to them. (Tr. v. 5 at 102:24-103:2). During their call, Appellant cautioned Col. Jernigan to be circumspect when assessing Ms. Scott's allegations because Ms. Scott had recently been terminated for her refusal to submit to a drug test. (Tr. v. 7 at 44:10-19).

After speaking with Col. Jernigan, Appellant received a call from Ms. Toney's aunt, with whom Appellant was/is good friends. (Tr. v. 7 at 44:23-25). Ms. Toney's aunt informed Appellant that Ms. Toney was very upset because she "believed that [the DPW] were trying to fire Alton based upon a statement [Ms. Toney] wrote." *Id.* at 46:17-19. According to Appellant, Ms. Toney's

aunt "begged" Appellant to call Ms. Toney. *Id.* at 19-21. Appellant did call Ms. Toney, but denies that she encouraged Ms. Toney to withdraw her original statement. *Id.* at 50:1-3, 51:10-52:14.

Appellant also acknowledged that she spoke with Ms. Cook. Ms. Cook told Appellant that she did not feel comfortable providing a statement to Ms. Copeland about Mr. Jones. *Id.* at 47:8-15. Prior to her conversation with Appellant, Ms. Cook had already refused to provide Ms. Copeland with a statement regarding the allegations against Mr. Jones. (App. Exh. 20).

Appellant denied speaking with Ms. Terry but did admit that she reached out to Ms. Terry's father, Thomas Terry, who worked for the City in the Department of Property Management. *Id.* at 49:23-50:1, 50:13-17. Appellant contacted Mr. Terry because she was concerned about the work environment within the Towing Unit and wanted to determine if Mr. Terry "knew what was going on." *Id.* at 50:18-25. Mr. Terry told Appellant that Mr. Jones had been harassing his daughters, and Appellant assured Mr. Terry that "we would get to the bottom of it." *Id.* at 50:24-51:4. Appellant denied that she asked Mr. Terry to get his daughters to withdraw their statements and was sympathetic to Mr. Terry's concerns because she has daughters about the same age as Mr. Terry's daughters. *Id.* at 51:4-9.

Appellant claimed that she had a very close working relationship with employees in the Parking Division and it was common for employees to call Appellant at "all hours of the night." (Tr. v. 7 at 52:4-11).

### 3.   *Retaliation Against Supervisor Valerie Petty*

Ms. Petty was a mid-level supervisor within the Parking Division. In late-2014 and early-2015, Ms. Petty was responsible for training all newly appointed PCOs and had held the position for some time as of June 2015. (Tr. v. 5 at 135:11-15). On May 8, 2015 Ms. Petty sent two emails in which she complained about Appellant's management of the Parking Division. (App. Exh. 25).

21

Z. Edmonds
Nos. 8467 & 8485

The first email went to both to Col. Jernigan and Ms. Copeland, the second was addressed just to Ms. Copeland. *Id.* Ms. Petty closed her second email with the following statement; "Please keep this confidential. It's ok to share with [Col. Jernigan] but I'm so afraid if others find out you will be having a new training coordinator and possibly a new supervisor I." *Id.* Despite the confidential nature of Ms. Petty's communication, Col. Jernigan testified that "somehow" Appellant obtained a copy of Ms. Petty's email and soon thereafter removed all training responsibilities from Ms. Petty. (Tr. v. 5 at 135:21-25).

Ms. Copeland speculated that Appellant became aware of Ms. Petty's email when Ms. Copeland inadvertently included the email in a series of documents she sent to Deputy Mayor Cedric Grant for signature. (Tr. v. 3 at 163:20-25). After inadvertently sending the email to Mr. Grant, Ms. Copeland claimed that an unidentified employee told her that Mr. Grant's secretary sent the email to Appellant. *Id.* at 165:5-17.

While she denied seeing the first May 8, 2015 email from Ms. Petty to Col. Jernigan, Appellant acknowledged that she did see an email chain between Ms. Petty and Ms. Copeland after Ms. Copeland had left the email on a table in Parking Division offices; upon reading the email Appellant reported it to Col. Jernigan and complained that the email was "highly inappropriate" and referred to "very minor issues that could be easily addressed." (Tr. v. 7 at 61:14-24). Appellant referenced the email exchange between Ms. Petty and Ms. Copeland in a letter dated June 24, 2015. (DPW Exh. 2).

Appellant admitted that she reassigned Ms. Petty on or about June 2015, but claimed that she made the decision to rotate Ms. Petty out of the role of trainer in April 2015. (*See* App. Exh. 6). Appellant testified that she met with Col. Jernigan in April 2015 and laid out new supervisory roles for various staff members through a memorandum approved by Col. Jernigan. (Tr. v. 7 at

Z. Edmonds
Nos. 8467 & 8485

62:21-63:13).  However, Ms. Petty is not directly mentioned in the memorandum in evidence as "Appellant Exhibit 6."  Rather, the memo indicates that Ms. Emery would be assuming the responsibilities pertaining to "all training for new hires and in-service training for the Unit." (App. Exh. 6). At the time Appellant drafted the memo, Ms. Delisia Crayton supervised and coordinated all training.  *Id.*  The changes laid out in the April 2015 memorandum were to be effective in June 2015.  *Id.*

On June 5, 2015 Ms. Petty sent an email to Appellant complaining about her reassignment and asking for an explanation.  (App. Exh. 7).  Appellant responded on the same day and instructed Ms. Petty to refer to a June 4, 2015 memorandum that evidently contained details of the reassignments.  *Id.*[6]  The reason Appellant provided to Ms. Petty for the reassignment was a need to rotate the responsibilities of supervisors within the Parking Division.  *Id.*  Appellant closed her email by offering to meet with Ms. Petty and answer any additional questions.  *Id.*  Despite Appellant's belief that she notified staff of the assignment changes in May, it is clear from Appellant's email that much of the staff were unaware of specific reassignments until June 4, 2015. (App. Exh. 7).  Col. Jernigan denied that rotating assignments among supervisors was standard practice and testified that he was unaware of any rotation of training duties since he assumed the role of director in 2011.   (Tr. v. 5 at 140:20-141:6). In contrast, Jorge Hernandez, a former Management Development Specialist II within the Parking Division, testified that it was standard operating procedure for supervisors within the Parking Division to rotate duties. (Tr. v. 1 at 123:15-24).  J. Hernandez served in the Parking Division for eight years and the Commission finds his experience with the rotation of assignments to be persuasive.

---

[6] This June 4th memorandum is not in the record.

23

Z. Edmonds
Nos. 8467 & 8485

There is no dispute that Ms. Petty's reassignment did not represent a demotion, change in classification, change in title, or a reduction in pay.

### 4.    *Settlement of Giara Mahogany Appeal Without Authorization or Approval from DPW Director*

On or about September 30, 2014, the DPW purportedly suspended Ms. Giara Mahogany for forty-five days.  (DPW Exh. 4).  Through a miscommunication between Appellant and Ms. Copeland, Ms. Mahogany ultimately only served thirty days of the forty-five-day suspension. (App. Exh. 40).  Despite only serving a portion of her suspension, Ms. Mahogany still appealed her discipline to the Commission.  Prior to proceeding to an appeal hearing, Assistant City Attorney Gregory Feeney entered into a settlement agreement with Ms. Mahogany – who was pro se – on or about February 2, 2015. (DPW Exh. 15).  The terms of the agreement provided that Ms. Mahogany would withdraw her appeal in exchange for the DPW reducing her suspension from thirty days to fifteen days. *Id.*

Prior to the implementation of Ms. Mahogany's initial forty-five-day suspension, Col. Jernigan met with Appellant and Ms. Copeland to discuss Ms. Mahogany's underlying misconduct and the appropriate response.  (Tr. v. 5 at 151:13-152:18).  Appellant and Ms. Copeland both lobbied Col. Jernigan to issue a suspension rather than fire Ms. Mahogany. *Id.* Ultimately, Col. Jernigan accepted the recommendation from Appellant and Ms. Copeland and issued Ms. Mahogany discipline in the form of a forty-five-day suspension and a demotion. *Id.*  Col. Jernigan alleged that Appellant settled the matter – by reducing the suspension to fifteen days – without consulting with and receiving authorization from him in violation of DPW practice and procedure. (H.E. Exh. 2).

Col. Jernigan testified that, based on the conversation he had with Appellant and Ms. Copeland related to the imposition of Ms. Mahogany's discipline, he believed that "it was

24

Z. Edmonds
Nos. 8467 & 8485

understood that this was going to be a 45 day suspension and any deviation from that needed to come back to me." (Tr. v. 5 at 153:15-20). The following exchange occurred when Appellant's counsel pressed Col. Jernigan on this point:

> **Question**: Are you absolutely certain that there was a discussion with Ms. Edmonds that created the picture that the 45 day suspension was not to be curtailed or limited?

> **Answer**: I felt that I was pretty clear that in our -- in the office when I met with both with Ms. Copeland and Ms. Edmonds this was a 45 day suspension instead of a termination and the letter I signed off said 45 days.

*Id.* at 153:21-154:7.

Col. Jernigan acknowledged that Appellant had settled disciplinary appeals with DPW employees in the past but claims that he did not expressly give Appellant such authority and only learned of the practice following Appellant's settlement in Ms. Mahogany's case. *Id.* at 155:16-156:16.[7] After he learned of the practice, he allegedly reached out to the City's Attorney's office to change the practice. Col. Jernigan believed that, even if there were prior instances where Appellant had unfettered discretion to settle appeals, his prior discussion with Appellant about Ms. Mahogany's suspension differentiated the case from others. *Id.* at 151:2-10.

Appellant asserted that she did not understand her conversations with Col. Jernigan regarding Ms. Mahogany's suspension to infer some restriction on her ability to settle appeals. (Tr. v. 7 at 87:2-17). Appellant testified that she had had the authority to settle appeal hearings before and after she allegedly overstepped her authority. *Id.* at 82:11-83:11. According to Appellant, following the settlement of Ms. Mahogany's case, she settled three other appeals related

---

[7] Col. Jernigan offered conflicting testimony regarding when he became aware that Appellant was settling appeals without first vetting the terms of the settlement agreements with him. (Tr. v. 5 at 157:6-13). The Commission struggles to reconcile this testimony with Col. Jernigan's earlier claims that the Mahogany case was when he first learned of the DPW's prior practice of allowing the Parking Administrator to settle appeals. Because we find that the Hearing Examiner's question was clear, direct and narrow in scope, we accept Col. Jernigan's first response – that the Mahogany case was the first he learned that Appellant had settled cases without first vetting the settlements with him – to be the accurate reflection of his memory.

Z. Edmonds
Nos. 8467 & 8485

to discipline without having to obtain Col. Jernigan's advance approval. *Id.* at 83:13-18, 84:22-85:22. At no point in time did Col. Jernigan or other DPW representative issue Appellant a directive regarding the parameters of her settlement authority. *Id.* at 86:22-87:1. Col. Jernigan acknowledged that he did not restrict or otherwise alter Appellant's authority to settle cases in writing. Instead, Col. Jernigan believed that his statements regarding Ms. Mahogany's suspension spoke for themselves.

Richard Boseman, is the administrative manager for the Parking Division's hearing center and has served in city government for approximately twenty-five years; much of his experience was with the DPW. *Id.* at 278:5-17. Mr. Boseman held several senior-level management positons within DPW and testified that Parking Administrators, like Appellant, had negotiated settlements related to disciplinary appeals in the past. (Tr. v. 3 at 291:17-292:14). On cross-examination he acknowledged that his experience with the disciplinary process occurred before Col. Jernigan's tenure as DPW director.

### D. Pre-Termination Hearing

Civil Service Rule IX, § 1.2 requires that an appointing authority conduct a pre-termination hearing prior to implementing an employee's termination when such an employee has permeant status in the classified service. This Rule is consistent with the U.S. Supreme Court's ruling in *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)(establishing that the minimum due process requirement for public employees facing dismissal is notice and a pre-termination opportunity to respond). The opportunity "need not be elaborate" but should serve as an initial inquiry into the substance of the allegations against the employee in order to "guard against mistaken decisions." *George v. Dep't of Fire*, 637 So.2d 1097, 1104 (La. Ct. App.1994).

Z. Edmonds
Nos. 8467 & 8485

On October 27, 2015 the DPW issued Appellant a letter regarding "notice of an emergency suspension and pre-termination hearing." (H.E. Exh. 1A). The pre-termination hearing was first scheduled for November 16, 2015. *Id.* The DPW later rescinded the emergency suspension and rescheduled the pre-termination hearing for November 30, 2015; in its rescheduling notice, the DPW observed that Appellant had exhausted her sick leave and would "remain on annual leave per your doctor's notification to the [DPW] until your new pre-termination hearing date on November 30, 2015." (H.E. Exh. 1B). On November 30th Appellant's predecessor counsel, Willie Zanders, sent an email to Col. Jernigan requesting that he reschedule the pre-termination hearing. (App. Exh. 23). Mr. Zanders attached a document to his email that purported to be from Appellant's physician indicating that Appellant should be excused from work. *Id.* There was no return date indicated.

On December 11, 2015, Mr. Zanders sent Col. Jernigan another letter, this time attaching a note from Appellant's physician indicating that Appellant would be unable to return to work until January 4, 2016. (App. Exh. 24). In light of the documentation attached to his December 11th correspondence, Mr. Zanders requested that Col. Jernigan refrain from holding a pre-termination meeting while Appellant was on sick leave. *Id.* Col. Jernigan referred the matter to the City Attorney's office. Senior Chief Deputy City Attorney Cherrell Simms Taplin responded on behalf of the DPW and indicated that Appellant's pre-termination hearing would proceed as scheduled on December 14, 2015. *Id.* Ms. Taplin pointed out that the DPW had rescheduled the pre-termination hearing on many occasions and the medical documentation provided indicated that there were "no restrictions" on Appellant's "regular activities."

Mr. Zanders responded to Ms. Taplin and indicated that Appellant's "continuing medical issues" prohibited her attendance at the pre-termination meeting and also hindered Appellant's

27

Z. Edmonds
Nos. 8467 & 8485

ability to prepare for the hearing. He closed by indicating that he was not in a position to effectively represent Appellant and reiterated his request that the hearing not be scheduled while Appellant was under a doctor's care. In the end, the DPW conducted the pre-termination hearing without Appellant or her attorney present on December 14, 2015. (H.E. Exh. 2).

As of December 14, 2015, Appellant had exhausted her sick leave and had been granted permission by the DPW to convert her accumulated annual leave to sick leave. (DPW Exh. 21). The Commission notes that our Rules do not limit the number of sick leave days an employee may accumulate, nor does it limit the number of sick leave days an employee may use in a calendar year. In fact, our Rules contemplate that an employee may use more than thirty sick leave days in one year. (*See* Rule VIII, § 2.2(d)). However, by October 2015 Appellant had exhausted all of her accumulated sick leave and was using annual leave. (DPW Exh. 21). A classified employee's use of annual leave as a replacement for sick leave is not addressed by our Rules and thus is within the discretion of the appointing authority to grant or deny. Based upon the communications between Mr. Zanders and Ms. Taplin, it is clear that the DPW had chosen to deny Appellant's use of annual leave as a replacement for sick leave for the duration of pre-termination hearing on December 14, 2015. If Appellant had any accumulated sick leave time or Family Medical Leave Act ("FMLA") time left as of December 14, 2015, the DPW would not have had the option of mandating Appellant's appearance at the pre-termination hearing. However, as of December 14, 2015 Appellant had used 886.4 hours of sick leave time during the course of the 2015 calendar year. This equates to approximately one hundred and twenty-six (126) days and far more than the twelve weeks required by the FMLA. (DPW Exh. 21).

As a result of the above findings of fact and law, the Commission finds that the DPW was not obligated to reschedule the December 14, 2015 pre-termination hearing once Appellant had

Z. Edmonds
Nos. 8467 & 8485

exhausted her sick leave and twelve-week allotment of FMLA leave.   Therefore, the pre-termination hearing held on December 14, 2015 was procedurally sufficient and in compliance with our Rules.

### III. LEGAL STANDARD

Appellant brought two types of appeals before the Commission.  One in which she alleged that the DPW retaliated against her for engaging in whistleblowing activities and a second one challenging whether or not the DPW had sufficient cause to terminate her.  For the sake of judicial expediency and efficiency, the Commission consolidated these appeals as they arose out of a common nucleus of operative fact.[8]

#### A. Appeal Based Upon Retaliation

Article X, § 8(B) of the Louisiana Constitution prohibits any appointing authority from discriminating against classified employees on the basis of political or religious beliefs, sex, or race. The classified employee bringing such an appeal bears the burden of proof and must establish that some adverse employment action was the product of a prohibited discriminatory motive. La. Con. art. X, § 8(B). Civil Service Rule II, §10.1 prohibits an appointing authority from disciplining or subjecting a classified employee to discriminatory treatment in retaliation for the employee's engagement in protected activity.  For the purposes of § 10.1, an employee engages in "protected activity" when "he or she gives information, testimony or evidence in a prudent manner to appropriate authorities concerning conduct prohibited by law or regulation which he or she *reasonably believes to have been engaged in by any person(s)*." Rule II, § 10.1 (emphasis added). Because a claim of retaliation under the Commission's Rules so closely resembles a claim of

---

[8] Appellant requested that the Commission sever her appeals and hear each one individually.  It was Appellant's belief that the consolidation of the cases would result in additional time and expense.  Through an Order issued on July 7, 2016, the Commission denied Appellant's request to sever the appeals observing that separating the cases would actually increase the time and expense of the appeals.

Z. Edmonds
Nos. 8467 & 8485

discrimination, the Commission has held that the appellant bears the burden of proof in such appeals.

In a post-hearing motion, the DPW asserted that Appellant must establish an actual violation of law in order to prevail in a retaliation claim based upon Civil Service Rule II, § 10.1. In support of its argument, the DPW cites to Louisiana Revised Statute § 23:967. The Commission does not dispute that Louisiana Courts have interpreted the state law regarding whistleblower claims to require an actual violation of law or regulation. However, the language of § 23:967 differs substantially from Rule II, § 10.1. In order to establish a prima facie case of retaliation under Civil Service Rules, a classified employee need only establish that he or she "reasonably believed" that conduct prohibited by law or regulation occurred. In this respect, the Commission's Rule is similar to the Louisiana Environmental Whistleblower Statute that prohibits an employer from retaliating against an employee who, in "good faith,":

> Discloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, ***that the employee reasonably believes is in violation of an environmental law, rule, or regulation***.

La. Rev. Stat. Ann. § 30:2027A(1)(emphasis added).

### B. Appeal Based on a Challenge to Sufficiency of Cause

An appointing authority may discipline an employee with permanent status in the classified service for sufficient cause. La. Con. Art. X, § 8(A). If an employee believes that an appointing authority issued discipline without sufficient cause, he/she may bring an appeal before this Commission. *Id.* It is well-settled that, in an appeal before the Commission pursuant to Article X, § 8(A) of the Louisiana Constitution, an Appointing Authority has the burden of proving, by a preponderance of the evidence; 1) the occurrence of the complained of activity, and 2) that the conduct complained of impaired the efficiency of the public service in which the appointing

Z. Edmonds
Nos. 8467 & 8485

authority is engaged. *Gast v. Dep't of Police*, 2013-0781 (La. App. 4 Cir. 3/13/14), 137 So. 3d 731,

733 (La. Ct. App. 2014)(quoting *Cure v. Dep't of Police*, 2007-0166 (La. App. 4 Cir. 8/1/07), 964

So. 2d 1093, 1094 (La. Ct. App. 2007)).  If the Commission finds that an appointing authority has

met its initial burden and had sufficient cause to issue discipline, it must then determine if that

discipline "was commensurate with the infraction." *Abbott v. New Orleans Police Dep't*, 2014-

0993 (La. App. 4 Cir. 2/11/15, 7); 165 So.3d 191, 197 (citing *Walters v. Dep't of Police of City of*

*New Orleans*, 454 So.2d 106, 113 (La. 1984)).  Thus, the analysis has three distinct steps with the

appointing authority bearing the burden of proof at each step.

## IV. ANALYSIS

### A. Appellant's Retaliation Claim

In an order issued in January 2016, the Commission ruled that Appellant could ***pursue*** a

claim of retaliation against the DPW.  However, in order to ***prevail*** in her claim of retaliation,

Appellant must first establish that; 1) she engaged in a protected activity as articulated in Rule II,

§10.1, 2) she experienced discipline or discriminatory treatment, and 3) there was a causal

connection between Appellant's protected activity and the alleged discipline and discriminatory

treatment she suffered at the hands of the DPW.

Appellant alleges that her pre-disciplinary hearing, emergency suspension and termination

constitute "discipline and/or discriminatory treatment" undertaken by the DPW in retaliation for

her 2012 whistleblowing activates. We agree.  And, for the purposes of our decision we will

assume, without deciding, that Appellant reasonably believed that the bidding process in

connection with the 2012 Curb Management RFP violated MJL 10-05.  There was a great deal of

testimony and evidence on this matter, but the Commission need not reach a decision on the

Z. Edmonds
Nos. 8467 & 8485

reasonableness of Appellant's belief since Appellant has failed to establish a causal connection between the DPW's alleged retaliatory actions and her "protected activity."

First and foremost, the lack of any temporal proximity between Appellant's whistleblowing activities and the alleged retaliatory conduct deals a substantial blow to Appellant's claim. *See Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 742 (5th Cir.2017), *as revised* (Mar. 13, 2017)(three year gap between the plaintiff's alleged protected activity and alleged retaliation by her employer was "far too long" a period to establish causation without other evidence); *see also Admire v. Strain*, 566 F.Supp.2d 492, 515 (E.D. La. 2008)(the elapse of twenty-three months between the plaintiff's protected activity and her employer's retaliatory action militated against a finding of a causal connection).  In order to find merit in Appellant's retaliation claim, the Commission must first find that the DPW waited more than two-and-a-half years – and issued Appellant overwhelmingly positive performance evaluations – before exacting any manner of revenge upon Appellant.  The Commission does not find that the DPW perpetrated such a Machiavellian scheme.

The second obstacle to Appellant's retaliation claim is the demonstrated personal animosity between Appellant and Ms. Copeland.  Appellant testified that her relationship with Col. Jernigan was "excellent" before Col. Jernigan made the decision to bring Ms. Copeland on board as HR Manager.  (Tr. v. 8 at 38:17-24).  According to Appellant, "up until about March 2014, we [Appellant and Col. Jernigan] had a great relationship." *Id.* at 230:11-17.  Appellant went on to testify that it was only upon Ms. Copeland's hiring and assumption of a larger role in the day-to-day operations of the DPW that "the harassment and retaliation escalated." (Tr. v. 6 at 116:19-21).  Appellant herself acknowledged that Ms. Copeland was engaging in "personal harassment and retaliation." *Id.* at 116:21-25.  However, since Ms. Copeland was not employed by the DPW when

32

Z. Edmonds
Nos. 8467 & 8485

Ms. Edmonds engaged in her alleged whistleblowing activities, any alleged harassment or retaliation Appellant suffered at the hands of Ms. Copeland did not trigger Rule II, § 10.1.[9]  The Commission finds that much of the tension and hostility within the DPW was due to the toxic personal relationship between Ms. Copeland and Appellant as opposed to any whistleblowing activity undertaken by Appellant in 2012.

`       Based upon the foregoing, the Commission finds that Appellant has failed to establish that the discipline and discriminatory treatment allegedly perpetrated by the DPW were the product of impermissible retaliation and DENY her retaliation appeal.

### B. Occurrence of the Complained of Activities

Since the Commission finds that the DPW's actions did not violate Rule II, § 10.1, we now move to the question of whether or not the DPW established sufficient cause for Appellant's termination.

#### 1.    *Failure to Cooperate with OIG Investigation*

The prior close working relationship between Appellant and OIG investigators bred a certain degree of informality that ultimately created confusion regarding what information Investigator Hernandez initially requested Appellant produce in August of 2014.  The rule known as "The Zepporiah Rule" likely should have been standard practice at the outset of Mr. Hernandez's investigation.  Given the Commission's familiarity with the detailed investigative work performed by the OIG and his staff, we are surprised that Mr. Hernandez did not make his

---

[9] The Commission also dismisses any suggestion that a "cat's paw" theory of retaliation was at play here.  Under "cat's paw" theory of liability, "a plaintiff can establish an employer's liability where another employee with retaliatory animus influenced an actual decision-maker to take retaliatory or discriminatory action against the plaintiff." *Bounds v. Capital Area Family Violence Intervention Ctr., Inc.*, CA 14-802-JJB-RLB, 2016 WL 1089266, at *4 (M.D. La. Mar. 18, 2016)(citing *Zamora v. City Of Houston*, 798 F.3d 326, 332 (5th Cir. 2015)).  The only actionable retaliatory animus cited by Appellant resulted from her complaint that the curb management bidding process violated MJL 10-05.  This occurred two years before Ms. Copeland joined the DPW.  Therefore, we do not find that Appellant's complaint about the 2012 bidding process could serve as retaliatory animus for Ms. Copeland.

Z. Edmonds
Nos. 8467 & 8485

original request for information in writing.  Apparently Mr. Hernandez himself was not sure of what information he had originally requested of Appellant since, in December 2014, he asked Appellant to send him the list of items he had originally requested earlier in the year.  (App. Exh. 9).  When pressed about the lack of any written request, Mr. Hernandez testified that "when I said I was going to be meeting with [Appellant], I said, do I need to type something up? [My supervisor] said, no.  She has been cooperative in the past.  Go over there and talk to her.  She'll, most likely, give us everything that we need."  (Tr. v. 3 at 235:15-21).  Because Appellant was the only witness with a clear recollection of the initial request, we accept her testimony on the matter.

In her written response to the OIG's report, Appellant claimed that Mr. Hernandez's initial request was for "copies of parking tickets that were issued during a certain time frame near the Federal Complex."  (DPW Exh. 12).  But, during the presentation of her case, Appellant offered contradictory accounts of what information was available to her and her staff as of August 2014.  Appellant first claimed that filling Mr. Hernandez's initial request would consume a great deal of her staff's resources – which was why Appellant had asked for more time to produce a response.  *Id.*

However, in a February 13, 2015 email, Appellant claimed that there was no way for her staff to search Xerox-era data for tickets based on street address.  (App. Exh. 59).  Instead, her staff – and Mr. Hernandez – would have to rely upon reports generated by Xerox's project manager.  *Id.*  This is at odds with Appellant's testimony and written response wherein Appellant claimed that her staff could have produced the requested information, but it would have involved an extensive physical search through paper records.  (DPW Exh. 12; Tr. v. 7 at 26:3-9; Tr. v. 8 at 213:7-16).

34

Z. Edmonds
Nos. 8467 & 8485

The Commission finds that Appellant could have filled Mr. Hernandez's initial request for citation data in one of two ways. First, she could have assigned her staff the task of conducting a manual search through the Parking Division's paper records. Second, she could have submitted a request to the Xerox project manager for a report based upon a search of historic data stored in Xerox's databases.

In either case, it may have been unreasonable for the OIG to expect production of such information immediately, but Mr. Hernandez demonstrated empathy and patience in his communications with Appellant over the course of September, October and November 2014. Unfortunately, his polite inquiries did not prompt Appellant to focus on production.

Mr. Hernandez's patience began to wan by December 2014. His email of January 12, 2015 is far more indicative of the types of inquiries the Commission has reviewed as part of an OIG investigation. (*See* App. Exh. 10). In this email, Mr. Hernandez recapped portions of his interview with Appellant and asked numerous, detailed questions regarding a wide range of subjects. Mr. Hernandez also noted that the questions were the same or similar to those that went unanswered by Ms. Emery. Unlike the January 12th email, Mr. Hernandez's earlier texts and emails did not refer to specific pieces of information that remained outstanding.

Appellant claimed that part of the reason she did not produce the records requested by Mr. Hernandez was her work load. There is some support for this in the record. For example, in an email to Col. Jernigan on July 16, 2014, Appellant wrote that she would be late to a meeting because she had "just finished putting documents together for the OIG." (App. Exh. 2). Appellant also wrote that she was "OVERWHMED!!!" *Id.* (emphasis in original). Appellant testified that her work load and illness contributed to the delay in responding to the OIG's request for information. However, the Commission agrees with Mr. Centola and Mr. Hernandez that

Z. Edmonds
Nos. 8467 & 8485

Appellant's sick leave did not relieve the DPW or the Parking Division of the responsibility to respond to the various requests for information. Appellant was obligated to delegate her various duties to others while she was on sick leave or notify Col. Jernigan that she would not be able to respond to Mr. Hernandez's request in a timely manner. Apparently, she did attempt to assign Ms. Emery the task of working with Mr. Hernandez regarding the OIG's investigation into PCOs. However, Appellant did a poor job of following through on this delegation and did not closely monitor Ms. Emery's response.

The Commission finds that Appellant should have either assigned her staff to incrementally begin the work of searching through paper records or requested that Xerox's project manager prepare a report on the tickets issued within the geographic area described by Mr. Hernandez in August 2014. She did not. Appellant's failure to make such a request was not intentional or purposefully designed to thwart the OIG's investigation. Rather, a combination of her workload, illness and transition to a new ticket processing vendor likely caused her to lose track of the OIG's request.[10] Nevertheless, her failure to take appropriate action in response to Mr. Hernandez's requests in August of 2014 hindered the OIG's investigation into PCO misconduct.

Based upon the foregoing, the Commission finds that Appellant did fail to fully and expediently cooperate with Mr. Hernandez regarding the OIG's investigation into PCO misconduct. However, we also find that Appellant's lack of cooperation was unintentional, out of character based upon her prior interactions with OIG investigators, and due in part to her heavy work load and illness. These facts serve as mitigating factors to the underlying misconduct.

---

[10] The Commission is not convinced that Mr. Hernandez text of August 6, 2014 pertained to GPS data related to the OIG's investigation into PCOs. First, Appellant claims that she met with Mr. Hernandez on August 11, 2014, five days after Mr. Hernandez's initial text. Second, the OIG had at least two other active investigations that could have involved a request for GPS data.

36

Z. Edmonds
Nos. 8467 & 8485

> **2.      Interference in Departmental Investigations into Allegations of Sexual Harassment against Alton Jones**

In Appellant's termination notice, the DPW alleged that Appellant spoke with Mr. Jones regarding the sexual harassment allegations and in doing so interfered with Col. Jernigan's investigation.  However, Appellant denied speaking with Mr. Jones regarding the substance of the allegations against him, and Mr. Jones testified that the first time he learned of the nature of the allegations against him was during a conversation with a City attorney.  In fact, it was Col. Jernigan who contacted Appellant, while she was on sick leave, and asked her to arrange a meeting between Mr. Jones and himself.  Thus, the Commission finds that Appellant's contact with Mr. Jones during the course of the investigation was appropriate and prompted by Col. Jernigan.  We do not find that Appellant's communications with Mr. Jones interfered with the DPW's investigation.

The DPW also made the following allegations against Appellant regarding the investigation into Mr. Jones's conduct:

> [Appellant] also spoke with the three current DPW employees named as potential witnesses; Ashley Terry, India Toney, Rachel Cook and Mr. Thomas Terry, an employee in the Department of Property Management, who was related to the complainant, a former DPW employee.  [Appellant's] actions interfered with [Col. Jernigan's] investigation, without [his] permission or knowledge, and while [Appellant] was out on sick leave.  After speaking with [Appellant], one of the potential witnesses changed her original statement and another one refused to provide any substantive comments.

(H.E. Exh. 2).  The Commission breaks down each allegation below:

As a preliminary matter, there was no evidence or testimony establishing that Appellant had any conversations with Ashley Terry regarding her allegations against Mr. Jones.  In her statement, Ms. Terry states that; 1) she had spoken with her father about the alleged sexual harassment, and 2) no one attempted to have her withdraw or otherwise change her initial statement.  (App. Exh. 44).  The DPW further alleged that Appellant reached out to Mr. Terry, the

37

Z. Edmonds
Nos. 8467 & 8485

father of Ms. Terry and Ms. Scott, in an attempt to interfere with the DPW's investigation. Ms. Terry's statement to the OIG directly contradicts this allegation. If Appellant had contacted Mr. Terry in an attempt to influence the actions of his daughters, the Commission would have expected Ms. Terry to mention that to the OIG. Instead, she specifically stated that no one had asked her to withdraw or otherwise alter her statement, even after having a conversation with her father.

Col. Jernigan's belief that Appellant spoke with Ms. Toney, Ms. Cook and Mr. Terry in order to interfere with the DPW's investigation into the allegations against Mr. Jones is based upon circumstantial evidence and speculation. Ms. Toney explicitly wrote that she withdrew her statement because she did not want it used against her fellow employees. She further wrote that she felt pressured by Ms. Copeland and Ms. Terry to provide the first statement. (App. Exh. 44). Appellant testified that she reached out to Ms. Toney only because a relative of Ms. Toney's had informed Appellant that Ms. Toney was distraught over an incident at work and was in tears. Appellant denied pressuring Ms. Toney to withdraw her statement. Ms. Toney did not testify.

Col. Jernigan's speculation that Appellant's communication with Ms. Cook prompted Ms. Cook to refrain from providing any evidence or testimony against Mr. Jones is directly contradicted by Ms. Cook's statement in which she claims that she did not feel comfortable providing Ms. Copeland a statement and that she and Appellant did not discuss the allegations against Mr. Jones. (DPW Exh. 23). Ms. Cook did not testify.

Finally, Appellant acknowledged that she spoke with Mr. Terry, the father of the complainant (Ms. Scott) and one of the witnesses (Ms. Terry). Appellant reached out to Mr. Terry because she had a good working relationship with him and was worried about the apparent conflict in the Towing Unit. Appellant denied asking Mr. Terry to talk his daughters into withdrawing their statements and, when interviewed by the OIG, Ms. Terry stated that no one had asked her to

38

Z. Edmonds
Nos. 8467 & 8485

withdraw or change her statement and asserted that she had discussed the matter with her father. (App. Exh. 44).

Finally, the DPW failed to provide the Commission with any evidence that Appellant had a motive in getting Ms. Toney and Ms. Cook to change their stories. Appellant testified that she had disciplined Mr. Jones in the past and had no incentive to quash the investigation into his alleged sexual harassment. (Tr. v. 7 at 51:13-16). There was no testimony that Appellant and Mr. Jones were friends or saw each other outside of a work setting, and Appellant herself stated that she "had nothing to gain" by getting Ms. Toney or Ms. Cook to change their statements. Without a motive, the DPW asks the Commission to make assumptions about conversations between Ms. Toney and Ms. Cook that Appellant disputes. The Commission will not accept circumstantial evidence and speculation over live testimony and written statements.

The DPW did not produce a scintilla of evidence to support its speculation that Appellant attempted to tamper with the witnesses against Mr. Jones. Ms. Toney's June 23rd statement, Ms. Cook's statement, Ms. Terry's statement, and Appellant's testimony severely undercut the DPW's broad assumptions and speculations. Based upon the foregoing, we find that Appellant did not interfere with the DPW's investigation into the allegations against Mr. Jones. We accept Appellant's testimony that she reached out to Ms. Toney, Ms. Cook and Mr. Terry after learning that there was conflict within the towing division. Due to the close working relationship Appellant had with many of her subordinates, her desire to address distraught employees is understandable.

Finally, we note that Col. Jernigan ultimately found that there was insufficient evidence to substantiate the allegations against Mr. Jones, in part because Ms. Toney withdrew her original statement. The Commission would be remiss if it did not point out that, regardless of whether or not Mr. Jones's conduct rose to the level of discipline, his sexually explicit conversations with

Z. Edmonds
Nos. 8467 & 8485

staff members (several of whom reported to him) certainly warranted some form of verbal or written counselling ***at a minimum***.

### 3.      *Retaliation Against Supervisor Valerie Petty*

Typically, the Commission's analysis of retaliation involves a claim by an employee that an appointing authority has engaged in retaliatory behavior in violation of Rule II, § 10.1. In such cases, the Commission applies a burden shifting framework in which the employee must first establish a prima facie case of retaliation. Then, the burden shifts to the appointing authority to establish a non-retaliatory, business-based reason for the alleged retaliatory action. If the appointing authority can articulate such a reason, the burden shifts back to the employee to establish that the reason provided was pretext for the appointing authority's retaliatory motive. Here, the Commission believes that the burden shifting framework is still appropriate, but that the DPW bears the initial burden. Thus, DPW must establish; 1) Ms. Petty engaged in "protected activity" when she wrote an email to Ms. Copeland on May 8, 2015 complaining of Appellant's management of the Parking Division, 2) Appellant subjected Ms. Petty to discriminatory treatment, 3) the discriminatory treatment was a result of Ms. Petty's "protected activity."

The DPW alleged that Ms. Petty's May 8, 2015 email to Ms. Copeland constituted protected activity for the purposes of the alleged retaliation. The May 8th email does not contain any allegations that Appellant broke the law or violated a regulation, Civil Service Rule or City ordinance. Rather, Ms. Petty alleged that Appellant did not respect any supervisor except for Ms. Emery and did not provide any support to other supervisors. (App. Exh. 25). Ms. Petty also observed that "we have a good staff of people but all it takes is one apple to spoil the bunch and unfortunately we have two." *Id.* Based upon the email's context and content, it is a reasonable assumption that Ms. Petty was referring to Ms. Emery and Appellant as "bad apples." The question

40

Z. Edmonds
Nos. 8467 & 8485

for the Commission is whether or not an employee's common gripe about his or her supervisor rises to the level of protected activity in the context of a claim of retaliation. We find that it does not.

In arguing that Ms. Petty's email constitutes "protected activity," the DPW asks the Commission to establish precedent that could have dramatic implications across municipal government. By way of example, the Commission refers to its analysis of Appellant's retaliation claims. If all Appellant had to do to establish that she engaged in protected activity was to show she complained about the actions of Col. Jernigan and/or Ms. Copeland, her path to a prima facie case of retaliation would have been much easier. The Commission finds that, for the purposes of a claim of retaliation, an employee must do more than simply produce evidence that he or she complained about his or her boss.

Yet, even if the Commission were to find that Ms. Petty's complaints about Appellant constituted protected activity, the DPW did not establish that Appellant's reassignment of training duties constituted a discriminatory act. The DPW alleged that Appellant manipulated Ms. Petty's work assignments after learning of an email in which Ms. Petty complained to Ms. Copeland about Appellant's management style. (H.E. Exh. 2). Col. Jernigan acknowledged that Ms. Petty's reassignment did not constitute discipline or a demotion, but that Ms. Petty perceived the reassignment as a "radical change in supervisory responsibility or trust." (Tr. v. 5 at 139:21-140:7).

The Commission has held that retaliation does not necessarily have to involve discipline to be actionable under our rules and the Louisiana Supreme Court has observed that a drastic change in assignment – even one that does not involve a loss of pay – may constitute retaliation in specific circumstances. *Bannister v. Dep't of Streets*, 95-0404 (La. 1/16/96, 10), 666 So.2d 641, 648 (a mandate from an appointing authority that an employee work out of class may constitute

41

Z. Edmonds
Nos. 8467 & 8485

retaliation).  Yet, there was no testimony as to how much time, on average, Ms. Petty dedicated to training activities and thus how substantial the reassignment was.  Similarly, there is nothing in the record regarding how Ms. Petty's reassignment altered the hierarchy within the Parking Division. Therefore, the Commission finds that there is insufficient evidence in the record to establish that Ms. Petty's reassignment constituted a dramatic change in working conditions.

Finally, Appellant's April 5, 2015 memorandum, in evidence as "Appellant Exhibit 6," suggests that Appellant was contemplating a shift in the training functions for newly hired PCOs as well as in-service training for existing Parking Division employees before Ms. Petty wrote her emails to Col. Jernigan and Ms. Copeland.  The memorandum is directed to "Acting Section Managers" and purports to address a revision to the "chain of command."  Section managers were privy to Appellant's plans to reallocate supervisors among the various units in the Parking Division, but the message never got to the first-level supervisors.  This prompted Ms. Petty to reach out to Appellant and challenge her reassignment.  Appellant then articulated a legitimate, non-retaliatory reason for the reassignment.  Namely, the desire to rotate all supervisors through various tasks and assignments to determine if the supervisors are able to demonstrate a particular aptitude regarding such tasks and assignments.  Appellant likely should have communicated the change in assignments to the first-level supervisors well in advance of the implementation date, but her failure to do so does not constitute misconduct or retaliation.

As a result of the above findings, the Commission holds that the DPW has failed to establish that Appellant's reassignment of Ms. Petty's training duties constituted retaliation.

Z. Edmonds
Nos. 8467 & 8485

### 4.  *Settlement of Giara Mahogany Appeal Without Authorization or Approval from DPW Director*

Col. Jernigan testified that he became aware of the DPW's practice that authorized the Parking Administrator to settle disciplinary cases after Appellant settled Ms. Mahogany's case. And, it was only after this discovery that Col. Jernigan decided to change the practice.

If Appellant had settled a matter in violation of any newly-adopted procedure for settling cases, the DPW's allegations would be on solid footing. However, its current charge of misconduct is based upon Col. Jernigan's assumption that Appellant would not settle Ms. Mahogany's appeal without first checking with Col. Jernigan. Yet, in the past, neither Col. Jernigan nor his predecessors had asked the Parking Administrator to clear settlements with the DPW Director before finalizing such agreements. While Col. Jernigan was "pretty clear" that Ms. Mahogany's misconduct warranted a forty-five-day suspension and any reduction would need his approval, he did not specifically communicate that to Appellant. As a result, the Commission finds that Appellant did not have notice that the approach to settling appeals she had followed for the past six years was different in Ms. Mahogany's case. Appellant's settlement of Ms. Mahogany's appeal did not constitute misconduct.

### C. Impact on the Appointing Authority's Efficient Operations

The only allegation of misconduct the DPW established by a preponderance of the evidence was Appellant's failure to cooperate with the OIG's investigation into PCOs. As a result, the Commission will limit its analysis to whether or not Appellant's failure had an adverse impact on the DPW's efficient operations.

PCOs represent the very public face of the DPW and Parking Division. They are often the only Parking Division employees with whom the general public interact. The City relies upon PCOs to enforce parking ordinances and to do so in a professional, efficient and ethical manner.

Z. Edmonds
Nos. 8467 & 8485

As a result of concerns raised by OIG investigators and businesses in the CBD, the OIG initiated

an investigation into the possibility of PCOs loitering in CBD businesses and issuing improper

and/or retaliatory citations.  At the inception of the investigation, Appellant, as head of the Parking

Division, should have recognized that the alleged impropriety perpetrated by PCOs represented a

dramatic breach of trust and undermined the core mission of the Parking Division. Bearing that in

mind, Appellant and her staff should have done everything in their power to expedite production

of any requested records.

Ultimately, the OIG released a report confirming that PCOs were loitering in businesses

when they should have been performing enforcement duties, but left unanswered the question of

whether PCOs were issuing retaliatory citations.  The reason for the OIG's inability to make a

conclusion regarding the retaliatory nature of the citations was Appellant's failure to produce "all

citations issued to vehicles parked near the addresses of the complaints for the period of 2012 to

2014." While Appellant disputes Mr. Hernandez's claims as to the initial scope of the request, she

acknowledged that, at a minimum, Mr. Hernandez asked for copies of all citations issued near the

"Federal Complex" on Poydras St. for 2012 through 2014.  Appellant could have produced these

documents, albeit after a great deal of time and effort.  Instead, she continued to put off the request.

In the end, the OIG and DPW were unable to determine if PCOs had acted in an

unprofessional an unethical manner.  This represents a substantial negative impact on the efficient

operations of the DPW and Parking Division.  As Parking Administrator, Appellant bears the bulk

of the responsibility for the failure.  Mr. Hernandez repeatedly checked in with Appellant during

the months between his initial request and the release of the report and the Commission finds that

he never altered or withdrew his original request for citations issued around the "Federal

Z. Edmonds
Nos. 8467 & 8485

Complex." If Appellant believed that she would be unable to fill the request in a timely manner, she should have notified Mr. Hernandez and sought assistance from Col. Jernigan.[11]

### D. Was the Discipline Commensurate with Appellant's Offense

The Commission must independently decide, based upon the facts presented in each appeal, whether the punishment imposed by an appointing authority was commensurate with the offense. *Cornelius v. Dep't of Police*, 2007-1257 (La.App. 4 Cir. 3/19/08, 6), 981 So.2d 720, 724. In the matter now before the Commission, the question is whether or not Appellant's misconduct warranted termination otherwise, the discipline would be "arbitrary and capricious." *See Waguespack v. Dep't of Police*, 2012-1691 (La. App. 4 Cir. 6/26/13, 5); 119 So.3d 976, 978 (citing *Staehle v. Dept. of Police,* 98–0216 (La. App. 4 Cir. 11/18/98), 723 So.2d 1031, 1033).

The Commission's authority to "hear and decide" disciplinary cases "includes the authority to modify (reduce) as well as to reverse or affirm a penalty." *Whitaker v. New Orleans Police Dept.*, 863 So.2d 572, 576 (La.App. 4 Cir. 9/17/03)(citing La. Const. art. X, § 12; *Branighan v. Department of Police,* 362 So.2d 1221, 1223 (La.App. 4 Cir.1978)); *Bankston v. Dep't of Fire*, 2009-1016 (La.App. 4 Cir. 11/18/09, 10), 26 So.3d 815, 822 (an appointing authority's failure to properly consider mitigating circumstances rendered a ninety-day suspension arbitrary and capricious). However, the authority to reduce a penalty can only be exercised if there is insufficient cause for imposing the greater penalty. *Id.* As we have stated in the past, the Commission does not exercise this authority lightly. Yet, in the matter now before us, there is insufficient cause to support Appellant's termination.

---

[11] Appellant did indicate to Col. Jernigan that she felt "overwhelmed" but that was in an email sent before Mr. Hernandez made his initial request on August 11, 2014. Appellant notified Col. Jernigan of the request at the time, but never indicated that she was having difficulty assembling the data or that she was not planning on filling the request.

Z. Edmonds
Nos. 8467 & 8485

Col. Jernigan testified that Appellant's failure to cooperate with the OIG's investigation was the most serious incident of misconduct cited in the termination letter and would have justified termination as a stand-alone incident of misconduct. (Tr. v. 9 at 111:1-112:25). However, the Commission recognizes several factors that serve to mitigate the underlying misconduct.

First and foremost, prior to her termination, Appellant had served in the Parking Division for thirty-two years without any discipline and had received "Outstanding" performance ratings in 2012 and 2013. An employee's prior disciplinary history and performance should factor into an appointing authority's decision to issue discipline.

Secondly, Appellant had cooperated with OIG investigations into allegations against Parking Division personnel on numerous prior occasions. In fact, she had a reputation for openness and cooperation among the investigators within the OIG. During the OIG's investigation into the PCOs, there were several other active OIG investigations and Appellant facilitated those investigations by producing documents and arranging for interviews. Despite unsubstantiated claims to the contrary, the Commission finds that Appellant's failure to produce the records in question was not designed to thwart the OIG's investigation.

Finally, there is nothing in the record to suggest that Appellant understood that she faced discipline, up to and including termination, for her failure to provide Mr. Hernandez with the documents he requested in August 2014. In making this finding, the Commission does not suggest that Mr. Hernandez was under any obligation to continually reiterate his initial request. However, all Parties would have benefitted if Mr. Hernandez or Mr. Centola indicated that Appellant's continued failure to produce historic citation data would be featured prominently in the OIG's final report if progress was not made. As late as May 19, 2015 – one month prior to the OIG's release of the report – there was no indication that Appellant's failure to respond to the original request

46

Z. Edmonds
Nos. 8467 & 8485

would be part of the report. Had Mr. Hernandez or other OIG investigator made clear that Appellant's delay was going to occupy a substantial portion of the report, the outcome may have been different.

As a result of the foregoing, the Commission finds that, while Appellant did engage in misconduct when she failed to produce historic citation data, such misconduct did not warrant termination. There was nothing in the record to assist the Commission in determining what an appropriate level of discipline would be in the matter now before us.

## V. CONCLUSION

As a result of the above findings of fact and law, the Commission hereby DENIES-IN-PART and GRANTS-IN-PART the appeal. Termination was not commensurate with Appellant's misconduct and the Commission remands the matter back to the Hearing Examiner for the limited purpose of determining what level of discipline would be appropriate based upon the one substantiated allegation of misconduct. The Hearing Examiner shall limit each party's presentation to one hour. Should the Parties desire, they may submit the matter through written briefs limited to fifteen pages. Finally, the Commission Orders the DPW to immediately reinstate Appellant. However, the Commission will reserve awarding any back pay or emoluments of employment until after the Hearing Examiner provides a recommendation regarding the appropriate level of discipline.

The Commission DENIES Appellant's claim under Rule II, § 10.1.


THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK.

SIGNATURES APPEAR ON THE FOLLOWING PAGE.

Z. Edmonds
Nos. 8467 & 8485

Judgment rendered this 5th day of September, 2017.

CITY OF NEW ORLEANS CIVIL SERVICE COMMISSION

TANIA TETLOW, COMMISSIONER

8/21/17
DATE

RONALD P. McCLAIN, VICE-CHAIRMAN

8/18/17
DATE

STEPHEN CAPUTO, COMMISSIONER

8/21/17
DATE

48